# 24-1310(L)

## 24-1469(CON)

*To Be Argued By:*
DANIEL J. O'NEILL

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆–◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

JOHN COSTANZO, JR., AKA SEALED DEFENDANT 1,
MANUEL RECIO, AKA SEALED DEFENDANT 2,

*Defendants-Appellants,*

DAVID MACEY, LUIS GUERRA,

*Intervenors.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT JOHN COSTANZO, JR.

DANIEL J. O'NEILL
BRONWYN C. ROANTREE
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas,
  17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendant-Appellant
John Costanzo, Jr.*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................1

JURISDICTIONAL STATEMENT ....................................................3

ISSUES PRESENTED......................................................................3

STATEMENT OF THE CASE............................................................4

    A.   Costanzo's DEA Career ........................................................4

    B.   Costanzo's Friends ..............................................................6

    C.   The Indictment...................................................................7

    D.   Trial ................................................................................8

        1.  The "Bribes"...............................................................10

        2.  Recio's Subpoena Response............................................14

        3.  Rule 29 Motions And Conviction .....................................17

    E.   Sentence And Forfeiture Order .............................................17

STANDARDS OF REVIEW .............................................................18

SUMMARY OF ARGUMENT .........................................................18

ARGUMENT .................................................................................22

I.   EVIDENCE OF THE TESTIMONIAL ASPECTS OF THE GLC SUBPOENA RESPONSE VIOLATED COSTANZO'S CONSTITUTIONAL RIGHT OF CONFRONTATION................................22

    A.   Introducing And Using The Subpoena Response Against Costanzo Violated *Crawford* And *Bruton*................................22

1. The Subpoena Response Was Testimonial ..........................................24

2. The Subpoena Response Was A Codefendant's Admission..............29

B. The Error Was Not Harmless And Was Plain............................................30

II. THE GOVERNMENT FAILED TO PROVE QUID PRO QUO
BRIBERY ................................................................................................35

A. The Government Had To Prove A Quid Pro Quo Agreement
Beyond A Reasonable Doubt ................................................................36

B. The Complete Absence Of Evidence Alluding To Payment
Makes The Alleged Quid Pro Quo Implausible .......................................40

C. The Circumstantial Evidence Did Not Permit An Inference Of
Quid Pro Quo..........................................................................................42

D. Even If A Quid Pro Quo Could Be Inferred, The Government
Failed To Prove An Agreement For Specific Acts ..................................52

III. VENUE WAS IMPROPER ..........................................................................54

A. The Government's Two Asserted Bases For Venue ................................55

B. The Government Failed to Establish Venue ...........................................56

1. The Yankees Game Was Not "Essential Conduct" ...........................57

2. The July 2019 Phone Call Was Not "Essential Conduct,"
Nor Was A New York Nexus Foreseeable to Costanzo ....................59

3. Costanzo Lacked "Substantial Contacts" With The SDNY...............60

IV. THE FORFEITURE ORDER EXCEEDED STATUTORY
AUTHORITY...............................................................................................61

CONCLUSION ..................................................................................................63

## TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*Arizona v. Fulminante*,
499 U.S. 279 (1991) ...........................................................29

*Bruton v. United States*,
391 U.S. 123 (1968) ....................................... 18, 23, 29, 31

*Bullcoming v. New Mexico*,
564 U.S. 647 (2011) ...........................................................34

*Chiarella v. United States*,
445 U.S. 222 (1980) ...........................................................54

*Crawford v. Washington*,
541 U.S. 36 (2004) ...................................................... passim

*Davis v. Washington*,
547 U.S. 813 (2006) ...........................................................27

*Evans v. United States*,
504 U.S. 255 (1992) ...........................................................53

*Fisher v. United States*,
425 U.S. 391 (1976) ...........................................................24

*Galloway v. United States*,
319 U.S. 372 (1943) ...........................................................43

*Garlick v. Lee*,
1 F.4th 122 (2d Cir. 2021) ........................................ 23, 27, 31

*In re Grand Jury Subpoena Duces Tecum Dated Oct. 29, 1992*,
1 F.3d 87 (2d Cir. 1993) ....................................................25

*Honeycutt v. United States*,
581 U.S. 443 (2017) ...........................................................62

*Langston v. Smith*,
630 F.3d 310 (2d Cir. 2011) ...............................................43

*Lavender v. Kurn*,
327 U.S. 645 (1946) ......................................................................43

*Mason v. Scully*,
16 F.3d 38 (2d Cir. 1994) ..........................................................29

*McDonnell v. United States*,
579 U.S. 550 (2016) ............................................................ 37, 53

*Melendez-Diaz v. Massachusetts*,
557 U.S. 305 (2009) ....................................... 23, 24, 27, 28

*Michigan v. Bryant*,
562 U.S. 344 (2011) ....................................................................27

*Peck v. United States*,
106 F.3d 450 (2d Cir. 1997) ......................................................30

*Samia v. United States*,
599 U.S. 635 (2023) ............................................................ 29, 30

*Skilling v. United States*,
561 U.S. 358 (2010) ....................................................................37

*Smith v. Arizona*,
602 U.S. 779 (2024) ....................................................................23

*Snyder v. United States*,
603 U.S. 1 (2024) ........................................................................46

*United States v. Bahel*,
662 F.3d 610 (2d Cir. 2011) ......................................................38

*United States v. Bruno*,
383 F.3d 65 (2d Cir. 2004) ........................................................35

*United States v. Cassese*,
428 F.3d 92 (2d Cir. 2005) ................................... 18, 38, 50

*United States v. Coplan*,
703 F.3d 46 (2d Cir. 2012) ........................................................38

*United States v. Daugerdas*,
    837 F.3d 212 (2d Cir. 2016) ................................................................61

*United States v. Daugerdas*,
    892 F.3d 545 (2d Cir. 2018) ................................................ 18, 61

*United States v. Davis*,
    689 F.3d 179 (2d Cir. 2012) ................................................ 60, 61

*United States v. Delgado*,
    971 F.3d 144 (2d Cir. 2020) ................................................................29

*United States v. Doe*,
    465 U.S. 605 (1984) ................................................................25

*United States v. Farhane*,
    634 F.3d 127 (2d Cir. 2011) ................................................................26

*United States v. Friedman*,
    854 F.2d 535 (2d Cir. 1988) ................................................................43

*United States v. Gamez*,
    577 F.3d 394 (2d Cir. 2009) ................................................ 31, 32

*United States v. Garcia*,
    587 F.3d 509 (2d Cir. 2009) ................................................................31

*United States v. Glenn*,
    312 F.3d 58 (2d Cir. 2002) ................................................................48

*United States v. Gomez*,
    617 F.3d 88 (2d Cir. 2010) ................................................................32

*United States v. Hardwick*,
    523 F.3d 94 (2d Cir. 2008) ................................................ 34, 35

*United States v. Hubbell*,
    530 U.S. 27 (2000) ................................................ 19, 25

*United States v. Huezo*,
    546 F.3d 174 (2d Cir. 2008) ................................................................38

*United States v. Jones,*
    993 F.3d 519 (7th Cir. 2021) ...............................................37

*United States v. Kim,*
    246 F.3d 186 (2d Cir. 2001) ................................................57

*United States v. Kirk Tang Yuk,*
    885 F.3d 57 (2d Cir. 2018) ..................................................60

*United States v. Lorenzo,*
    534 F.3d 153 (2d Cir. 2008) ................................................38

*United States v. McClain,*
    377 F.3d 219 (2d Cir. 2004) ................................................23

*United States v. Newman,*
    773 F.3d 438 (2d Cir. 2014) ................................................38

*United States v. Nouri,*
    711 F.3d 129 (2d Cir. 2013) ................................................37

*United States v. Ogando,*
    547 F.3d 102 (2d Cir. 2008) ................................................50

*United States v. Pauling,*
    924 F.3d 649 (2d Cir. 2019) ......................................... passim

*United States v. Purcell,*
    967 F.3d 159 (2d Cir. 2020) ......................................... 18, 58

*United States v. Ramirez,*
    420 F.3d 134 (2d Cir. 2005) ......................................... 56, 57

*United States v. Reichberg,*
    5 F.4th 233 (2d Cir. 2021) ...................................................18

*United States v. Riggi,*
    541 F.3d 94 (2d Cir. 2008) ........................................... 34, 35

*United States v. Rodriguez-Moreno,*
    526 U.S. 275 (1999) ...........................................................56

*United States v. Rommy*,
  506 F.3d 108 (2d Cir. 2007) ...................................................60

*United States v. Rosen*,
  716 F.3d 691 (2d Cir. 2013) ........................................... 40, 46

*United States v. Santos*,
  449 F.3d 93 (2d Cir. 2006) .....................................................32

*United States v. Silver*,
  864 F.3d 102 (2d Cir. 2017) ........................................... 19, 37

*United States v. Silver*,
  948 F.3d 538 (2d Cir. 2020) ........................... 20, 39, 53, 54

*United States v. Stephenson*,
  895 F.2d 867 (2d Cir. 1990) ................................................57

*United States v. Sun-Diamond Growers of Cal.*,
  526 U.S. 398 (1999) ......................................................... 37, 45

*United States v. Svoboda*,
  347 F.3d 471 (2d Cir. 2003) ................................................57

*United States v. Tzolov*,
  642 F.3d 314 (2d Cir. 2011) ........................................... 56, 59

*United States v. Valle*,
  807 F.3d 508 (2d Cir. 2015) ...................................... 20, 38, 52

*United States v. Vayner*,
  769 F.3d 125 (2d Cir. 2014) ................................................33

**Statutes and Rules**

18 U.S.C. §201 ..................................................................... passim

18 U.S.C. §981 ............................................................... 21, 61

18 U.S.C. §1343 ......................................................................8

18 U.S.C. §1346 ................................................. 8, 37, 38, 46

18 U.S.C. §3231.................................................................................3

18 U.S.C. §3237...............................................................................57

21 U.S.C. §841................................................................................39

28 U.S.C. §1291................................................................................3

Fed. R. App. P. 28...........................................................................21

Fed. R. Crim. P. 18..........................................................................56

## **INTRODUCTION**

The Constitution guarantees every criminal defendant the right to confront each of the government's witnesses through cross-examination.  In Appellant John Costanzo's bribery trial, however, the government obtained a conviction by using the purported confession of his nontestifying codefendant—as its most conclusive evidence, on the most hotly disputed issue—in flagrant violation of Costanzo's constitutional rights.

The government lacked competent proof of quid pro quo, the defining element of bribery, so it resorted to tactics that crossed a clear constitutional line.  It labelled the codefendant's production of a particular document in response to a government subpoena an "admission" of quid pro quo bribery, despite clear indications it was produced for an entirely different reason.  The prosecutors then used this purported confession as the smoking gun against Costanzo, telling the jury it "essentially resolved" the case, was "direct evidence" of Costanzo's guilt, and was "all you need" to convict.  These unscrupulous tactics resulted in the very prejudice the Confrontation Clause guards against:  Unable to cross-examine his codefendant, Costanzo was powerless to elicit the *actual* reasoning behind the subpoena response or rebut the government's misleading arguments.  The introduction and use of this testimonial evidence violated the Sixth Amendment and deprived Costanzo of a fair trial.

The evidence of quid pro quo was legally insufficient in any event.  The government charged that Costanzo, a senior-level Special Agent in the Drug Enforcement Administration, received "bribes" in exchange for disclosing confidential DEA information to his friends.  That Costanzo occasionally shared such information was not in dispute.  Rather, the central issue was *why* he did so: Was it for bribes, or some other reason?  The government presented no evidence of a quid pro quo—not a single reference among hordes of the alleged conspirators' private communications to any arrangement, any bribe, or any payment.  Instead, the government sought to rely on an array of transactions involving Costanzo's friends or relatives.  But many lacked any connection to Costanzo and others lacked any connection to the alleged bribe payors.  As a whole, they reflected no pattern or logic, and no relation to any information Costanzo shared.  At bottom, the jury could convict only by entertaining layers of speculation—speculation that the payments originated with the supposed bribe payors and ended up with Costanzo, and further speculation that behind this random assortment of payments lay a quid pro quo agreement.  Under well-settled Circuit precedent, that whorl of speculation is insufficient to establish guilt beyond a reasonable doubt and requires that Costanzo's conviction be reversed.

The government also failed to establish venue in New York.  All relevant acts and all relevant individuals were in Florida or Washington, D.C.  The

government could identify only two isolated acts across a 14-month period that even touched New York: an outing to a Yankees-Red Sox game and a single phone call that, unbeknownst to Costanzo, the caller placed from New York. Neither had anything to do with the charged bribery scheme, and neither established venue.

Lastly, the district court's forfeiture order exceeded the court's statutory authority insofar as it required Costanzo to forfeit funds unrelated to the crimes of conviction.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. §3231. Judgment was entered on April 24, 2024, and an amended judgment entered on April 26, 2024. SPA-8. Costanzo timely filed a notice of appeal on May 8, 2024. A-904. This Court has jurisdiction under 28 U.S.C. §1291.

## ISSUES PRESENTED

1.      Whether Costanzo's constitutional Confrontation Clause right was violated when the government inculpated him with testimonial evidence of his nontestifying codefendant.

2.      Whether Costanzo is entitled to acquittal on all counts because the evidence was insufficient to prove a quid pro quo agreement to violate official duties in exchange for payment.

3

3.      Whether venue was improper, as the case had no valid nexus to the Southern District of New York and all relevant conduct occurred elsewhere.

4.      Whether the forfeiture order should be vacated because it required Costanzo to pay money in excess of offense "proceeds," as defined by statute.

## STATEMENT OF THE CASE

Costanzo appeals a judgment of conviction entered by the United States District Court for the Southern District of New York (Oetken, J.) following a jury trial.

Costanzo spent his entire life in law enforcement.  His father, John, Sr., had a distinguished career as a DEA special agent before starting his own private investigative firm, and Costanzo lived his childhood around the agency.  A-406-07; Dkt.234 at 15-16.  After college, Costanzo graduated the police academy and served as a Miami police officer.  A-476.  He joined the Secret Service as a member of former President Bill Clinton's personal security detail.  A-476; Dkt.234 at 19.  In 2004, Costanzo became a DEA special agent.  He was with the agency for nearly 18 years, rising through the ranks to supervisor and eventually DEA headquarters.  A-92, 94, 141.

### A.   Costanzo's DEA Career

Costanzo was highly regarded as a DEA special agent.  A-269, 284-290, 390-91, 393.  He was a member of Miami "Group 10," which conducts important

4

"international large-scale money laundering investigations," and was elevated to group supervisor in 2014. A-86-88, 92-93. The DEA selected Costanzo to lead highly sensitive, covert operations in foreign countries, particularly Venezuela and Colombia. A-86-88, 108-10, 250.

DEA agents use a variety of means to "identify, infiltrate, investigate, disrupt and dismantle" drug trafficking networks and their associated financial enterprises. A-124-25. Although agents participate in dangerous "on the ground" operations, much of their work is spent in the office, on the phone, and in interrogation rooms—eliciting, processing, and analyzing information about DEA targets. A-109-10.

Costanzo—who speaks Spanish—successfully cultivated many confidential sources who were critical to DEA operations. A-108, 186-88, 1087-88. Drug traffickers often "flip" on their organizations when charged or apprehended, seeking leniency from the authorities. A-112-14, 146, 235-36. Particularly in Miami, it is also "pretty standard" and "happens a lot" that attorneys for drug traffickers proactively approach the DEA about cooperating even before any formal criminal process. A-258, 288, 398-400. The government's witnesses praised Costanzo's skills in flipping informants, with one witness detailing his work with "a very useful asset for the DEA": Costanzo "orchestrated everything… start to finish. He had convinced her, he had flipped her, he had persuaded the

powers that be to…continue to cooperate her." A-260-61. Costanzo "was good at getting people to cooperate," "an important part of running a big case." A-288.

As a result, Costanzo regularly interacted with criminal defense attorneys—particularly those representing cooperators and sources in his investigations. Among these were Miami attorneys David Macey and Luis Guerra, who competed against each other for clients. A-119, 215-17, 234-35, 396-97.

In June 2019, the DEA transferred Costanzo from Miami to the financial investigations section at its Arlington, Virginia headquarters. A-94. There, Costanzo oversaw "the money side" of DEA investigations; held face-to-face meetings with DEA leadership; trained new agents at Quantico; and represented the DEA at international meetings. A-267, 270, 285-90. The DEA prized him as "an expert" on Colombian and Venezuelan drug cartels. A-269, 284-85.

### B. Costanzo's Friends

In addition to Costanzo, the case concerned four other individuals with whom Costanzo worked regularly while at the DEA, who were also his friends: co-Appellant Manuel Recio, attorneys Macey and Guerra, and Edwin Pagan, a Coral Gables police officer.

Recio ran the DEA's Miami office for much of Costanzo's 15 years there and was "well respected." A-91, 389-90. Recio and Costanzo collaborated on investigations and became close friends. A-93, 373, 379-80. Costanzo also became

6

friends with Macey and Guerra by working cases with each of them.  A-218-19, 373.  Pagan and Costanzo first met in the police academy and worked together when Pagan was assigned to a DEA task force.  A-373-74, 475-80.  They were best friends, hung out almost daily, and treated each other like family.  A-373, 477, 479-80.

Recio retired from the DEA in November 2018.  A-136-37.  He formed Global Legal Consulting LLC ("GLC"), a private investigative firm (A-294, 401-02, 788), and worked with both Macey and Guerra helping them represent cooperating witnesses in DEA cases (A-401-02).

### C.  The Indictment

The indictment charged Costanzo and Recio with bribery.  It alleged that from October 2018 through November 2019, Costanzo misused his DEA position to assist Recio, Macey, and Guerra.  A-39-40.  Specifically, the indictment alleged that Costanzo provided Recio "nonpublic DEA information" about investigations, sealed indictments, and forthcoming arrests, including information from the DEA's Narcotics and Dangerous Drugs Information System ("NADDIS").  *Id.*  Recio, Macey, and Guerra allegedly used this information to recruit DEA targets as clients.  A-40, 43-44.  There was no allegation they used the information to help anyone evade the authorities.

The indictment alleged that Costanzo provided DEA information in exchange for "various benefits" Recio "and others" provided. A-39. But of the four alleged "bribes," not one was paid *by* Macey, Guerra, or Recio *to* Costanzo. Three were assorted payments that Recio's company, GLC, made to various entities in which Costanzo had no role. A-44, 46. The fourth—by far the largest—was *Pagan's* investment in Costanzo's purchase of a new townhouse; the indictment alleged no connection to Macey, Guerra, or Recio. A-45-46.

Count Two charged Costanzo with accepting bribes as a public official "in violation of [an] official duty," 18 U.S.C. §201(b)(2)(C), and Count One charged Costanzo and Recio with conspiracy to commit that offense. A-53-56. Counts Four and Five charged both defendants with honest service fraud conspiracy and substantive honest services fraud, 18 U.S.C. §§1343, 1346, based on the same bribe theory. A-57-59.

### D. Trial

The government's investigation delved deep into the defendants' private communications. It obtained wiretaps to intercept their phone calls, subpoenaed their email service providers, and extracted the full contents of their cell phones, including call logs, notes, and texts sent and received over numerous services. *See* A-837-38, 842-44, 850-57. The government's cooperating witness, Jorge Hernández Villazón, also secretly recorded numerous conversations he had with

8

Recio and Guerra. A-199-201, 203-06. Accordingly, when trial began in October 2023, the government prominently featured these communications. The prosecutors spent much of their case playing intercepted calls and publishing text chains for the jury, highlighting each instance Recio requested or Costanzo shared DEA information.

But it was undeniable that Costanzo shared DEA information with Recio. The two often discussed NADDIS and did so in plain, unmasked terms. *E.g.*, A-760-61 (Recio: "Francisco Ameliach…Can you quickly run this name?"; Costanzo: "Kind of old 2015 stuff related to sandy G's case…Vz high end guy…Was connected to the Carvajal case"); A-762 (Recio: "Alirio trujillo…Can you look up…Potential new client for David"; Costanzo: "Trujillo is Colombian case…guillermo Fuentes was the former agent may want to talk to him first").

Rather, the central issue at trial was *why* Costanzo shared the information—that is, was there a quid pro quo? On this dispositive point the government's case was exceedingly thin. Even after combing through the supposed conspirators' communications, the government could not point to a single one reflecting—or even suggesting—that Costanzo shared information with Recio in exchange for any payment. Not a single call, message, or conversation referenced any such arrangement, tied DEA information to any payment, or referenced any payment at all.

9

1. *The "Bribes"*

With no evidence linking Costanzo's provision of information to any benefit to Costanzo, the government focused on seven payments involving Costanzo's friends—the four alleged in the indictment, plus three new ones—which it claimed were "bribes" to Costanzo. But these looked nothing like bribes. For all but two, the government lacked evidence either that the payment originated with one of the supposed bribers, or that Costanzo ever received any portion of it. And no two "bribes" looked the same: Their values ranged wildly, from a mere $284 (a Yankees ticket) to a whopping $50,000 (an investment in a townhouse). Some came from GLC, some from Pagan, some from Macey. Some went to Pagan's company while others went to Costanzo, Sr. The payments occurred sporadically and at random and—except for one—did not remotely coincide with any information Costanzo provided. And the payments all had clear alternative explanations, which the government sought to discredit at trial:

1. **$2,500 from GLC to EBCO:** On November 14, 2018—just after Recio's retirement—GLC wrote a $2,500 check to Costanzo's father's company, EBCO International. The check referenced a $2,500 EBCO invoice for "investigative services" and coincided with assistance that Costanzo's father—then a private investigator—gave Recio with Delvepoint, a subscription-based skip-tracing service. A-790, 774, 365; *see* A-816-18. The evidence showed EBCO

10

used the $2,500 to pay routine bills; the government's own agent conceded there was no record of any cash withdrawals and no indication any funds went to Costanzo. A-337-38, 355, 458-59, 470-71.

2. **$50,000 from Pagan to Costanzo, Sr.:** On January 17, 2019, Pagan delivered a $50,000 cashier's check to Costanzo, Sr. A-463. Pagan, who invested in real estate, testified he was investing in Costanzo's new townhouse after losing an earlier opportunity to buy in the same development. A-474, 483-86; *see* A-381. Pagan testified he gave the funds to Costanzo's father because Costanzo's mortgage prohibited gifts from non-family members. A-507-08; *see* A-449-51. Pagan paid the $50,000 with his own funds, which he amassed from salary and rental income. A-460-62, 484-87, 513. There was no evidence Pagan ever received *anything* from the alleged bribers. A-327-28, 462-64, 486-87.

3. **Approximately $5,000 from Macey to Juan Victorero:** On March 3, 2019, Macey gave approximately $5,000 to Juan Victorero, a contractor renovating Costanzo's house, as the second of two payments Costanzo owed him for the work. A-382-85. "It could have been cash, it could have been check"— Victorero wasn't sure. A-388. Victorero testified Costanzo told him he would leave the second payment with Macey because he was going out of town. A-387-88. Indeed, Costanzo's text messages that day confirm he was busy packing. A-753. There was no evidence what Victorero did with the money.

11

4. **$284 Yankees ticket Macey gave Costanzo:** In April 2019, Macey bought four tickets to a Yankees game and took Costanzo and two colleagues. A-770, 276-81. Costanzo's texts with Macey indicate that Macey had expected Costanzo to buy his own ticket, not that Macey intended this as a bribe. A-770. And there was no evidence they discussed anything but baseball at the game. *See* A-775 (Costanzo texting Recio pictures of the game).

5. **$10,000 from GLC to JEM Solutions:** In April 2019, Pagan's company, JEM Solutions, Inc., issued Recio a $10,000 invoice for "Investment of Risk Management Company." A-793.[1] The same day, GLC wrote a $10,000 check to JEM. A-791. Pagan testified GLC invested the money for JEM's office space. A-491, 512. No part of the $10,000 was ever transferred to Costanzo. A-346, 356-57, 832.

6. **$10,750 from GLC to JEM:** In June 2019, JEM invoiced Recio $10,750 for "services" on a case Recio worked on with another defense lawyer— neither Macey nor Guerra. A-794; *see* A-846-47. Pagan testified he helped Recio with document review. A-492-95, 504-06. The same day, GLC wrote JEM a $10,750 check. A-792. No part of the $10,750 was ever transferred to Costanzo. A-356-57, 832.

---

[1] Pagan founded JEM intending that Costanzo, Pagan, and Recio (John, Eddie, Manny) would eventually work together consulting athletes. A-487-90. In the meantime, Pagan used JEM for his business training police officers. A-489.

7. **$20,000 from Pagan to Susana Rueda:**  In January 2020—after the FBI interviewed Costanzo, who knew he was being investigated—Pagan gave a $20,000 cashier's check to Costanzo's then-girlfriend, Susana Rueda.  A-370-71, 403, 778.  The check was to repay Rueda for retaining an attorney to represent Costanzo *in this case*.  A-367-69, 374-75.  Rueda pressured Costanzo to pay her back.  A-375-76.  Their relationship was turbulent and, Pagan testified, the debt weighed on Costanzo, so Pagan repaid Rueda for him.  A-501-03.  Once again, Pagan paid from his own funds; there was no evidence he received *anything* from Recio, Macey, or Guerra.  A-462-64.

The supposed "bribes" thus had not only alternative explanations, but also serious factual issues about their sources and recipients, significantly undermining the government's "bribe" theory.  The government tried to poke holes, arguing, for example, that the lack of communications and formal paperwork around the transactions proved they were bogus.  A-560-65.  But it had no proof the payments were *for DEA information*, and no answer for the total lack of evidence connecting many of the payments to Recio, Macey, Guerra, or Costanzo.  It asserted Pagan and Costanzo, Sr. were sham "conduits" and "middlemen" (A-565-66, 569, 579), but there was zero evidence either received any benefit or had any reason to engage in criminal wrongdoing.  Nor could the government elaborate on its "conduit" theory:  Although Pagan's payments comprised 70% of the total, the government

never even alleged who originated his supposed "bribes" and appears to have finally conceded—only after trial—it was not Recio.  *See* A-897.

## 2.  *Recio's Subpoena Response*

Of the seven supposed "bribes," the government leaned most heavily on GLC's $2,500 check to EBCO.  That was the *only* payment with both a plausible connection to one of the attorneys (Macey paid GLC just before) and temporal proximity to a Recio-Costanzo NADDIS discussion.  A-295-96, A-830.  But EBCO had issued GLC an invoice for "investigative services" in that same amount days earlier (A-774), indicating the payment actually related to business between Recio's nascent private investigative firm and Costanzo, Sr.—then an experienced private investigator—and was not a bribe.

Just prior to trial, the government issued GLC a trial subpoena seeking, among other things, all documents "related to the November 12, 2018 invoice."  A-802-03.  Recio unsuccessfully moved to quash, in response to which the government explained it viewed the invoice as phony and expected GLC would produce nothing.  A-69-72.  After the district court denied the motion, however, GLC produced several documents.

Recio prepared the production as GLC's custodian of records and assembled the documents behind a cover sheet echoing the subpoena's language: "Documents Responsive to Request #1: All documents, communications, or other records

14

related to the November 12, 2018 invoice."  A-812-13.  The documents that
followed included a November 16, 2018 email from Delvepoint to Recio's GLC
email address with Recio's log-in credentials, as well as a two-page November 15
text chain between Recio and Costanzo in which Costanzo provided Recio his
father's address and a link to the Delvepoint website.  A-816-18, A-1130; *see* A-
354-55, 366.  The way GLC produced the text messages, however, included
portions of other text conversations before and after these messages, including
messages about NADDIS.

The government had a field day.  With its summary witness on the stand, the
government seized on GLC's production of snippets of the NADDIS exchanges
and turned that into an affirmative assertion that the NADDIS texts themselves
related to the $2,500 invoice.  It introduced GLC's subpoena response and led the
government analyst to testify that by including the NADDIS messages in its
production, GLC "is saying [they] relate to the $2500 payment."  A-306-09.  Both
defendants objected as soon as the government started down this path, arguing that
the government analyst had "no idea [about] the purpose for which the document
was provided" by Recio, but the court overruled their objections.  A-310-12.  And
because Recio did not testify, Costanzo was powerless to rebut the government's
mischaracterization.

The direct examination of the government investigator proceeded as follows:

> Q.   So what we are about to see is *what [GLC] says are all the documents, communications, or other records relating to this $2500 payment* from [GLC] to EBCO, is that correct?
>
> A.   Correct.
>
> …
>
> Q.   [L]et's read these text messages between Manuel Recio and John Costanzo, Jr. *that [GLC] is saying relate to the $2500 payment*…
>
> A.   "11/15/2018, 3:29:29 p.m.  John, can you run Moreno and USA D&D?"  John Costanzo responds, "Yeah."

A-307-09 (emphasis added).

Then, in their closing arguments, the prosecutors repeatedly told the jury that GLC's subpoena response was Recio confessing a quid pro quo:  "That [subpoena response] is Recio…*truthfully admitting* that the reason…EBCO got that payment …was because Costanzo was leaking DEA information and NADDIS information."  A-662-63 (emphasis added).  Ignoring the Delvepoint materials, the government focused instead on Recio's production of the NADDIS messages, characterizing that as "direct evidence" of Costanzo's guilt.  A-662.  It told the jury that Recio's subpoena response "essentially resolve[s] this [case] for you" and is "[a]ll you need to know":  "[T]his $2,500 was money for the information Costanzo was providing because [GLC] said it was.…That's enough to find…Costanzo… guilty."  A-573, 662-63.

16

3. *Rule 29 Motions And Conviction*

Defendants moved for judgments of acquittal, arguing the government failed to prove any count and specifically challenging the lack of evidence supporting venue in the SDNY. The court reserved decision. A-437-40, 534-36.

The jury convicted Costanzo and Recio on all counts. A-710-13. Defendants moved under Rules 29 and 33 for judgments of acquittal and a new trial. Dkts.208-11. As relevant here, Constanzo argued the government failed to prove quid pro quo bribery or establish venue, and the introduction of GLC's subpoena response violated the Confrontation Clause. Dkt.210 at 12-38. The district court denied Costanzo's motion at sentencing. A-866-73.

**E. Sentence And Forfeiture Order**

The court sentenced Costanzo principally to 48 months' imprisonment. The court also entered a forfeiture order, over Costanzo's objection, requiring him to forfeit $98,250, which the court said "represent[ed] the amount of proceeds traceable to the offenses…[Costanzo] personally obtained." SPA-4-7; A-874-81.

Costanzo paid the forfeiture in full (Dkt.268-1) and is serving his sentence.

## STANDARDS OF REVIEW

This Court reviews alleged Confrontation Clause violations and the sufficiency of the evidence—including as to venue—*de novo*. *United States v. Reichberg*, 5 F.4th 233, 244 (2d Cir. 2021); *United States v. Cassese*, 428 F.3d 92, 97 (2d Cir. 2005); *United States v. Purcell*, 967 F.3d 159, 185 (2d Cir. 2020). The Court reviews "legal conclusions regarding forfeiture *de novo* and…factual determinations for clear error." *United States v. Daugerdas*, 892 F.3d 545, 552 (2d Cir. 2018).[2]

## SUMMARY OF ARGUMENT

I.     The government violated Costanzo's constitutional confrontation right when it introduced the GLC subpoena response and elicited misleading testimony from a government agent that, by producing portions of one document, Recio was "saying" there was a quid pro quo. The Sixth Amendment's Confrontation Clause applies to all "testimonial statement[s]," in any form, introduced at trial to incriminate the defendant. *Crawford v. Washington*, 541 U.S. 36, 61 (2004). And the Confrontation Clause takes on special significance when the statement at issue is an out-of-court confession of the very codefendant with whom the defendant stands trial. *Bruton v. United States*, 391 U.S. 123, 135-36 (1968).

---

[2] Quotations omit internal citations, quotation marks, footnotes, and previous alterations.

The GLC subpoena response—which Recio gathered and prepared for use at trial—was clearly testimonial: Recio included a cover sheet representing that the enclosed documents "related to the November 12, 2018 invoice," and because identifying those documents required Recio to use "the contents of his own mind," his act of production in itself "communicate[d] statements of fact." *United States v. Hubbell*, 530 U.S. 27, 36, 43 (2000). The government emphasized the response's testimonial and supposed confessional nature, characterizing it as Recio "saying" and "admitting" the quid pro quo the government had to prove. Without cross-examining Recio, Costanzo could not expose the government's mischaracterization, which the government hammered home in summation, telling the jury the subpoena response was "all [it] need[ed]" to convict.

II.     For each count, the government had to prove beyond a reasonable doubt that Costanzo entered "a quid pro quo agreement"—that he agreed to violate his official DEA duties in exchange for a bribe. *United States v. Silver*, 864 F.3d 102, 111 (2d Cir. 2017). The evidence was legally insufficient as a matter of law. Not a single communication in the mountain of recordings and text messages the government obtained hinted at any link between any act and any payment, and no witness testimony filled that gap. Nor could a jury reasonably infer a quid pro quo from the supposed "bribes," which all had other, legitimate explanations. The government failed to even connect most of them to Costanzo or to the supposed

bribers, and, as a group, the "bribes" defied any pattern or relation to any information exchange. In the end, the jury's only path to convict was to engage in pure speculation about a quid pro quo, yet it is well-settled that "speculation…is an insufficient basis on which to rest a guilty verdict." *United States v. Pauling*, 924 F.3d 649, 660 (2d Cir. 2019). At a minimum, the evidence gave "equal or nearly equal circumstantial support" to the government's quid pro quo theory "and a theory of innocence," and thus cannot sustain Costanzo's conviction beyond a reasonable doubt. *United States v. Valle*, 807 F.3d 508, 522 (2d Cir. 2015).

But even if a quid pro quo could be inferred, the most the government proved was "an open-ended promise to perform…actions for the benefit of the payor," which is not sufficient. *United States v. Silver*, 948 F.3d 538, 559 (2d Cir. 2020). By its own admission, the government failed to prove "a link between each specific benefit and a single official act," *id.*, and on appeal, the government cannot now try to revive an alternative "as opportunities arise" theory of quid pro quo on which the district court refused to charge the jury.

III.     The evidence was legally insufficient to establish venue in the SDNY. The relevant conduct—the supposed exchange of DEA information for bribes— occurred entirely in Florida and Washington, D.C. Within the 14-month indictment period, the government could point to only two events that in any way touched New York: a Yankees game and a single phone call. But neither was

20

sufficient for venue. The Yankees game was a purely social outing; nothing about it permits the inference it was a "bribe" to Costanzo or otherwise furthered the alleged scheme. Likewise, a lone call the government intercepted when Recio happened to be in New York was not about DEA matters. In any event, only *foreseeable* conduct touching the SDNY can confer venue, and Costanzo could not reasonably foresee that he'd be subjecting himself to prosecution in Manhattan when he answered that call.

IV.    The district court erroneously ordered Costanzo to forfeit funds exempt from forfeiture under the applicable statute. Costanzo could forfeit only criminal "proceeds"—that is, funds he obtained "as the result of the commission of the offense" or "through illegal transactions." 18 U.S.C. §981(a)(2). Of the $98,250 the district court ordered him to pay, the government presented zero evidence—not even meeting a preponderance standard—connecting $70,000 to the supposed bribers or the alleged bribe scheme. As a result, the forfeiture order vastly exceeds any criminal "proceeds."

V.    Pursuant to Federal Rule of Appellate Procedure 28(i), Costanzo joins Argument, Point A of co-Appellant Recio's brief.

## ARGUMENT

### I. EVIDENCE OF THE TESTIMONIAL ASPECTS OF THE GLC SUBPOENA RESPONSE VIOLATED COSTANZO'S CONSTITUTIONAL RIGHT OF CONFRONTATION

Lacking sufficient evidence to establish a quid pro quo, the government twisted GLC's trial subpoena response into a purported "confession" about that hotly disputed element. The government elicited testimony and made arguments mischaracterizing GLC's (*i.e.*, Recio's) production of a text message thread as an "admission" that DEA information related to one of the "bribes," and thus "direct evidence" of a quid pro quo. This was an egregious misrepresentation of the subpoena response: Recio produced the text thread *not* for the NADDIS-related messages at the margins, but the messages in the middle—those about Costanzo's father, Delvepoint, and Recio's newly-launched career as a private investigator. Yet because Recio did not testify, Costanzo could not cross-examine him to expose the government's mischaracterization. The government's introduction and use of the subpoena response violated Costanzo's Confrontation Clause right and requires a new trial.

#### A. Introducing And Using The Subpoena Response Against Costanzo Violated *Crawford* And *Bruton*

The Sixth Amendment guarantees every criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. This bedrock constitutional guarantee attaches to any "testimonial statement" the government

introduces, regardless of its particular form. *Crawford*, 541 U.S. at 51 ("witnesses" means anyone "who bears testimony"). The confrontation right is essential to a fair trial because only through "the crucible of cross-examination" can "[t]he reliability of a testimonial statement…be determined." *Garlick v. Lee*, 1 F.4th 122, 129 (2d Cir. 2021) (quoting *Crawford*, 541 U.S. at 61); *see Smith v. Arizona*, 602 U.S. 779, 785 (2024) ("need to test an absent witness" strongest when statement's truth at issue). Thus, "*Crawford*…establish[es] a per se bar on the admission of out-of-court testimonial statements made by unavailable declarants where there was no prior opportunity for cross-examination." *United States v. McClain*, 377 F.3d 219, 221 (2d Cir. 2004). Stated differently, "[a] witness's testimony against a defendant is…inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309 (2009).

Confrontation Clause concerns are particularly acute when a codefendant's confession inculpates the defendant. Such statements are not only "powerfully incriminating" and "inevitably suspect," but—without cross-examination—the "unreliability of such evidence is intolerably compounded." *Bruton*, 391 U.S. at 135-36.

23

1. *The Subpoena Response Was Testimonial*

Costanzo could not cross-examine Recio, his codefendant, at trial.  Thus, the only issue is whether the GLC subpoena response was testimonial.  Plainly it was.

a.      With an investigative analyst from the U.S. Attorney's Office on the stand, the government entered its trial subpoena into evidence and highlighted that the subpoena called for GLC to produce all documents "related to the…November 12, 2018 invoice."  A-302, 802-03.  The government then elicited that, in response, GLC produced the documents collected in GX530, together with a typed cover sheet on which Recio described the documents as "related to the November 12, 2018 invoice."  A-306-09.  The government now concedes this cover sheet was testimonial.  *See* Bail Motion Oral Arg. (June 25, 2024) at 8:44-8:58, https://ww3. ca2.uscourts.gov/decisions/isysquery/9defe9ec-291d-48ca-8c87-0cff834b3c47/265 /doc/24-1310%20mtn.mp3.  And indisputably it was:  The cover sheet made a representation about the production's "substance or effect" and "interpret[ed]… what the [production] contains or shows"—*i.e.*, that the documents related to the invoice.  *Melendez-Diaz*, 557 U.S. at 322.

Moreover, GLC's very act of producing the documents in response to the subpoena was testimonial in its own right.  It is well-established that the act of production may be testimonial, as it "has communicative aspects of its own, wholly aside from the contents of the papers produced."  *Fisher v. United States*,

425 U.S. 391, 410 (1976); *see United States v. Doe*, 465 U.S. 605, 612 (1984) ("A government subpoena compels the holder of the document to perform an act that may have testimonial aspects and an incriminating effect.").[3]  Producing documents in response to a subpoena "may implicitly communicate statements of fact…and information about the existence, custody, and authenticity of the documents [produced]," particularly where the respondent must "make extensive use of the contents of his own mind" to identify responsive documents.  *Hubbell*, 530 U.S. at 36-37, 43.

In *Hubbell*, the Supreme Court affirmed the dismissal of an indictment, holding the defendant's document production in response to a subpoena amounted to compelled testimony.  *Id.* at 43-44.  The subpoena called for broad, open-ended categories of documents (*e.g.*, "any and all documents…relating to any direct or indirect sources of money…provided"), so that "the collection and production of the materials demanded was…the functional equivalent of the preparation of an answer to either a detailed written interrogatory or a series of oral questions at a discovery deposition."  *Id.* at 41-42; *see also In re Grand Jury Subpoena Duces Tecum Dated Oct. 29, 1992*, 1 F.3d 87, 93 (2d Cir. 1993) ("response to a subpoena

---

[3] The defense did *not* object to admitting the texts themselves.  It stipulated to the entire Costanzo-Recio text history.  A-850-57.

25

may require incriminating testimony…if the existence and location of the subpoenaed papers are unknown to the government").

Here, Recio's production of documents in response to the trial subpoena required judgments about which documents "related to the November 12, 2018 invoice."  That is, by providing the documents, Recio was conveying that they related to the invoice—a testimonial act inadmissible against Costanzo absent confrontation.

b.  The subpoena response was also testimonial in that the circumstances in which it was provided "would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."  *Crawford*, 541 U.S. at 52.  Recio and GLC must have been "aware[] or expect[ed] that [their] statements may later be used at trial."  *United States v. Farhane*, 634 F.3d 127, 163 (2d Cir. 2011).  The production was made in response to a *trial subpoena* issued by the U.S. Attorney's Office just two months before trial.  A-802.  The subpoena identified this case by name and number and was signed by one of the AUSAs prosecuting Recio and Costanzo.  *Id.*  It required GLC's custodian of records to produce the requested documents to the FBI agent assisting the prosecutors and "*testify and give evidence*" on the same date and in the same courtroom as Recio and Costanzo's trial.  *Id.* (emphasis added).  No reasonable recipient could miscomprehend that delivering the production to the FBI meant it "would be used

26

in a later prosecution." *Garlick*, 1 F.4th at 134 (statements in an autopsy report testimonial because "made in aid of a police investigation" and "delivered to the Bronx District Attorney's Office"). In fact, the production's trial-related "purpose was reprinted on the [subpoena itself]." *Melendez-Diaz*, 557 U.S. at 311, 321 (laboratory certifications about presence of cocaine were "calculated for use…in the court" and thus testimonial). And the government made it explicit in opposing GLC's motion to quash—*i.e.*, before Recio produced anything—that it intended to use at trial not only any documents GLC might produce, but also the testimonial implications of GLC's production (or non-production), to make substantive points about the invoice and $2,500 check. A-69-72. As the government explained, "[t]he purpose of the GLC Trial Subpoena is to show that GLC has no documentation supporting its payments" so "a jury can rationally infer that the payments were not for legitimate services but rather were bribes." A-71-72.

Further, the GLC subpoena response had all the hallmarks of a formal, testimonial statement. *See, e.g.*, *Crawford*, 541 U.S. at 51 ("formal statement to government officers" testimonial but "casual remark to an acquaintance" not); *Michigan v. Bryant*, 562 U.S. 344, 377 (2011) (statement more likely to be testimonial if "formality…would have alerted [declarant] to…possible future prosecutorial use"). Unlike, for example, spontaneous remarks made over the phone or at a crime scene, Recio had ample time to deliberate about GLC's

response "calmly" and "safe[ly]" before committing to any representation to the government. *Davis v. Washington*, 547 U.S. 813, 827 (2006). Reinforcing that formality, Recio signed a declaration as GLC's custodian under penalty of perjury. A-812.

In effect, Recio's subpoena response was "functionally identical to live, in-court testimony, doing precisely what a witness does on direct examination." *Melendez-Diaz*, 557 U.S. at 310-11. It was no different than Recio taking the stand and a prosecutor asking him, "what, if any, documents does GLC have related to the November 12, 2018 invoice?" or "what did the November 12, 2018 invoice relate to?", and Recio testifying that the invoice related to the documents GLC produced.

c.     Indeed, the government presented the GLC subpoena response to the jury as testimonial. It elicited testimony from its analyst that the response was GLC "saying" the $2,500 check "relate[d] to" Costanzo's NADDIS searches (A-306-09), and it argued to the jury that the response was Recio "truthfully admitting" a quid pro quo: "[T]his $2,500 was money for the information Costanzo was providing because [GLC] said it was" (A-573, 662-63).

The GLC subpoena response thus falls squarely within *Crawford*'s class of testimonial statements that are inadmissible unless the defendant can confront the declarant.

2. *The Subpoena Response Was A Codefendant's Admission*

The subpoena response also raised significant problems under *Bruton*, exacerbated by the government's arguments that the response was Recio "admitting" a quid pro quo.

In *Bruton*, the Supreme Court recognized that a nontestifying codefendant's confession raises particularly acute Confrontation Clause issues. 391 U.S. at 135-36; *see also Mason v. Scully*, 16 F.3d 38, 42 (2d Cir. 1994) ("A defendant's right to confront the witnesses against him includes the right not to have the incriminating hearsay statement of a nontestifying codefendant admitted in evidence against him."). "A confession is like no other evidence." *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991). As such, when "the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial…the incriminations [are] devastating to the defendant." *Bruton*, 391 U.S. at 135-36. And a codefendant confession is "inevitably suspect" even when, as in *Bruton*, the confession does not shift blame but rather inculpates both the codefendant and the defendant. *Id.* at 136. Confrontation Clause concerns are at their peak whenever a confession directly implicates the defendant. *Samia v. United States*, 599 U.S. 635, 652-53 (2023); *see United States v. Delgado*, 971 F.3d 144, 155 (2d Cir. 2020) (statements that "inculpate [the defendant]" violate *Bruton*).

29

Here, the GLC subpoena response directly implicated Costanzo because it amounted to Recio's testimony that *Costanzo's* texts about NADDIS searches were related to GLC's check to his father's company—*i.e.*, that Costanzo had participated in a quid pro quo. And that is precisely how the prosecutors characterized the evidence, telling the jury the subpoena response was Recio "*admitting* that the reason *Costanzo* got that that payment—the reason EBCO got that payment was because *Costanzo* was leaking DEA information and NADDIS information." A-662-63 (emphasis added); *see* A-573. Moreover, the jury received no instruction prohibiting it from using the GLC subpoena response against Costanzo. *Cf. Samia*, 599 U.S. at 655 (codefendant's confession did not violate Confrontation Clause because it "did not directly inculpate the defendant and was subject to a proper limiting instruction").

Thus, not only did the subpoena response violate Costanzo's Confrontation Clause right, it also triggered *Bruton*'s special concerns about the substantial prejudice that ensues from admitting a codefendant's confession.

## B.    The Error Was Not Harmless And Was Plain

The government cannot carry its burden to prove beyond a reasonable doubt that "a rational jury, absent the error, would have arrived at the same verdict." *Peck v. United States*, 106 F.3d 450, 455 (2d Cir. 1997). In its post-trial ruling, however, the district court held that plain error review—not harmless error

review—applied, stating that "defense counsel did not object" to the GLC subpoena response "or to the related testimony or argument by the government." A-870.  That misstates the record, as the defense *did* object to the government analyst's testimony as soon as it became apparent the prosecutors were using her to establish a communicative aspect to Recio/GLC's production, not simply to introduce the documents produced.  A-309-12.  Regardless, allowing the government to use Recio/GLC's cover sheet and act of production—and Recio's purported confession—against Costanzo easily qualifies as plain error.

Under plain error review, relief is warranted when there was an error that is (1) plain and (2) affects substantial rights, and (3) the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *United States v. Garcia*, 587 F.3d 509, 515 (2d Cir. 2009).  An error is "plain" when the operative legal question is settled.  *United States v. Gamez*, 577 F.3d 394, 400 (2d Cir. 2009).  Here, the applicable legal rules are well-settled:  Supreme Court and Circuit precedent have long established that the Confrontation Clause does not allow testimonial statements and codefendant confessions to be used against the defendant absent an opportunity for cross-examination.  *See, e.g.*, *Crawford*, 541 U.S. at 50-53; *Bruton*, 391 U.S. at 135-36; *Garlick*, 1 F.4th at 129.

Nor can there be any doubt that the error affected Costanzo's substantial rights.  An error affects substantial rights when it is prejudicial—that is, when it

31

affects the outcome of the trial court proceedings. *Gamez*, 577 F.3d at 400-01.
The admission of Recio's purported confession was highly prejudicial: The
government presented the GLC subpoena response as its most damning, conclusive
evidence on the trial's central disputed issue: whether there was a quid pro quo.
*See, e.g.*, *United States v. Gomez*, 617 F.3d 88, 97 (2d Cir. 2010) (erroneously
admitted evidence "had substantial weight precisely because it went to the core of
the government's case" and thus not harmless). The government's proof on this
essential element was weak, requiring the jury to engage in pure speculation. Point
II, *infra*; *see United States v. Santos*, 449 F.3d 93, 102 (2d Cir. 2006)
(Confrontation Clause error not harmless given weakness of government's other
evidence). The only alleged "bribe" with any proximity to an exchange of DEA
information was GLC's $2,500 check to EBCO, making it a key part of the
government's case. But even that evidence was plagued with problems—namely,
contrary evidence indicating a legitimate purpose related to assistance Costanzo,
Sr., an experienced private investigator, gave Recio as he began his new career in
that field. *See* A-814, 816-18. The November 12 invoice issued before Recio ever
asked Costanzo to run a search in NADDIS (A-830), and thus undermined the
government's "bribe" theory.

To shore up its proof, the government seized on the GLC subpoena
response. Its introduction of Recio's purported admission was a pivotal moment in

the trial because it was the only time the jury heard anything approaching direct evidence that there was a quid pro quo. In its summation, the government directed the jurors to rely on the GLC subpoena response, telling them it was "all you need to know" to convict Costanzo:

> [Y]ou know this $2,500 was money for the information Costanzo was providing because Global Legal Consulting said it was. The 2500 was related to these text messages, it was in exchange for…confidential information Costanzo was sharing….That's it. Honestly, *that's all you need to know. That's enough to find both Costanzo and Recio guilty*.

A-573 (emphasis added). Then, after defense counsel argued the government had presented "nothing direct" to prove a quid pro quo but only "speculation, leaps, and guesswork" (A-608, 645), the government doubled-down on the subpoena response. In rebuttal, it told the jury the response "essentially resolve[s] this [case] for you" because it was "Recio…truthfully admitting that the reason Costanzo got that payment…was because Costanzo was leaking DEA information and NADDIS information." A-662-63. It told the jury the response was "direct evidence" of a quid pro quo and, in turn, Costanzo's guilt. A-662. Having repeatedly directed the jury to the GLC subpoena response in its jury arguments—telling the jury the response "resolve[s]" the case and was "all" the jury needed—the government cannot now seriously claim "with fair assurance that the evidence did not substantially influence the jury." *United States v. Vayner*, 769 F.3d 125, 133 (2d Cir. 2014).

The error also seriously affected the fairness and integrity of the trial. The very "purpose of the rights set forth in the Sixth Amendment is to ensure a fair trial….If a particular guarantee of the Sixth Amendment is violated, no substitute procedure can cure the violation, and no additional showing of prejudice is required to make the violation complete." *Bullcoming v. New Mexico*, 564 U.S. 647, 663 (2011).

This Court has repeatedly found plain error in very similar circumstances. In *United States v. Hardwick*, for example, this Court reversed a conviction for plain error on Confrontation Clause grounds where the government, in closing, pointed to a nontestifying codefendant's confession and argued it left "no dispute" as to defendant's guilt. 523 F.3d 94, 99 (2d Cir. 2008). The Court reasoned that the evidence "almost certainly contributed to the jury's verdict" because it was "a direct admission" of the "quid pro quo," which the government told the jury left "no dispute" about the defendant's guilt. *Id.* Concluding that "the fairness and integrity of the proceedings…were seriously affected," this Court vacated Hardwick's conviction and remanded for a new trial. *Id.* Similarly, in *United States v. Riggi*, this Court vacated a conviction for plain error where plea allocutions of nontestifying codefendants "were woven throughout the summation, and went beyond isolated, causal or merely cumulative mention." 541 F.3d 94, 108 (2d Cir. 2008). The Court emphasized that the government's repeated

summation references to them "reinforced" the "prejudicial impact," "attribute[d] to them undue probative value and significance," and thus "undoubtedly prejudiced the jury and influenced their verdicts," "seriously affect[ing] the fairness and integrity of the proceedings" and the defendant's "substantial rights." *Id.* at 102-08. *See also United States v. Bruno*, 383 F.3d 65, 80-81 (2d Cir. 2004) (vacating convictions for plain error Confrontation Clause violation; "[a]llowing [them] to stand…would seriously call into question the fairness and integrity of these proceedings").

So too here, allowing the government to introduce and use Recio's purported confession in blatant violation of Costanzo's Confrontation Clause was plain error. The government exacerbated and compounded the error by inviting the jury to rest a conviction on the subpoena response alone. The purported confession evidence thus "almost certainly contributed to the jury's verdict" and degraded "the fairness and integrity of the[se] proceedings." *Hardwick*, 523 F.3d at 99.

As it did in *Hardwick*, *Riggi*, and *Bruno*, this Court should vacate Costanzo's conviction.

## II.   THE GOVERNMENT FAILED TO PROVE QUID PRO QUO BRIBERY

That Costanzo occasionally shared DEA information with Recio might have violated DEA policy, but it is not enough to establish §201 bribery or honest services fraud. Instead, the government had to prove a quid pro quo. It failed to

do so.  There was not a single call, text message, or witness that remotely suggested any connection between Costanzo's acts and any payment.  And the seven supposed "bribes" were nothing of the sort.  Occurring at haphazard times and involving widely disparate amounts, formats, and participants, the payments defied association with any information exchange or scheme.  The government failed to prove many of the "bribes" ever went to Costanzo and presented no evidence that the largest ones came from Recio, Macey, or Guerra.  Instead, the government invited the jury to speculate about other hypothetical transactions for which it lacked actual proof, and thus to speculate about the ultimate question of quid pro quo.  That is not evidence beyond a reasonable doubt.

In any event, even if the evidence was legally sufficient, the most the government proved was an open-ended, ill-defined quid pro quo arrangement, not an agreement to exchange specific benefits for specific acts, as this Court's precedents require.

## A.   The Government Had To Prove A Quid Pro Quo Agreement Beyond A Reasonable Doubt

The federal-official bribery statute, in relevant part, makes it a crime for a public official to "corruptly demand[], seek[], receive[], accept[], or agree[] to receive or accept anything of value personally or for any other person or entity, in return for…being induced to do or omit to do any act in violation of [his] official duty."  18 U.S.C. §201(b)(2)(C).  For purposes of this case, the honest services

statute is the same. "To preserve" 18 U.S.C. §1346 in the face of its obvious "vagueness problem," the Supreme Court cabined the offense to bribe and kickback schemes only. *Skilling v. United States*, 561 U.S. 358, 404, 408-09 (2010). The government relied exclusively on a bribery theory here. *E.g.*, A-57-59, A-587.

For each count, the government was required to prove "a quid pro quo agreement—that [Costanzo] received, or intended to receive, something of value in exchange for" violating an official duty. *Silver*, 864 F.3d at 111; *see McDonnell v. United States*, 579 U.S. 550, 563 (2016) (official must have "committed or agreed to commit an official act in exchange for" a benefit); *United States v. Jones*, 993 F.3d 519, 533 (7th Cir. 2021) (construing §201(b)(2)(C)). *See also Skilling*, 561 U.S. at 412 (§1346 "draws content" from §201). Essential to quid pro quo bribery is the official's "specific intent" to be induced or influenced to act for the supposed bribe. *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404-05 (1999) (§201(b)); *United States v. Nouri*, 711 F.3d 129, 139 (2d Cir. 2013) (§1346). Unless the official specifically intends to be induced or influenced, a payment is at most a gratuity—*i.e.*, "a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken"—and thus outside the scope of §201(b)(2)(C) or §1346. *Sun-Diamond*, 526 U.S. at 404-05 (§201(b) reaches bribery, not gratuities); *see*

*United States v. Bahel*, 662 F.3d 610, 633 (2d Cir. 2011) (government concedes "Section 1346 does not encompass illegal gratuities").

Conspiracy requires proof that "the defendant had the specific intent to violate the substantive statute[s]." *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008). Accordingly, if evidence of specific intent was insufficient, the conspiracy convictions also fall. *E.g.*, *United States v. Newman*, 773 F.3d 438, 455 (2d Cir. 2014).

A finding of quid pro quo—like any other offense element—must be based on more than mere speculation. *Pauling*, 924 F.3d at 660-61; *see United States v. Coplan*, 703 F.3d 46, 76 (2d Cir. 2012) (reversing conviction based upon "speculation and surmise"). On sufficiency review, the Court may credit only "reasonable inferences" that "are sufficiently supported" by the factual record to permit a finding beyond a reasonable doubt. *Pauling*, 924 F.3d at 656-57. "It would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty." *Id.* at 657. Thus, "it is not enough that the inferences in the government's favor are permissible....If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *Valle*, 807 F.3d at 522; *accord Coplan*, 703 F.3d at

38

69; *United States v. Huezo*, 546 F.3d 174, 193 (2d Cir. 2008); *Cassese*, 428 F.3d at 103.

In *Pauling*, for example, the defendant was convicted of conspiring to distribute or possess "100 grams or more" of heroin. *See* 21 U.S.C. §841(b)(1)(B). There was no dispute the government proved 89 grams, but the question on appeal was whether a customer's order for the "same thing as last time" coupled with code for 14 grams was sufficient for a jury to infer—beyond a reasonable doubt— that Pauling and his coconspirator previously sold at least 11 more grams. 924 F.3d at 652-53. This Court concluded it was not. The Court reasoned: "The jury did not hear evidence as to who provided the heroin in this prior transaction, when the transaction occurred, or what the circumstances were. To conclude so much on the basis of so little amounts to impermissible speculation." *Id.* at 659.

That same principle governs here. If no rational trier of fact could find a quid pro quo agreement beyond a reasonable doubt, the Court must reverse Costanzo's conviction. *Silver*, 948 F.3d at 575.

## B.    The Complete Absence Of Evidence Alluding To Payment Makes The Alleged Quid Pro Quo Implausible

The government effectively conceded there was zero evidence referencing or reflecting any agreement to trade DEA information for money.[4]  Despite accessing the alleged conspirators' most private communications, the government could not point to *anything* that tied Costanzo's provision of DEA information to any financial arrangement.  *Cf. United States v. Rosen*, 716 F.3d 691, 702 (2d Cir. 2013) (sufficient evidence of quid pro quo because "communications…repeatedly tied the consulting payments to Seminario's use of his official influence").  There was not a single wiretapped call, text message, email, or secretly recorded conversation in which Costanzo ever requested anything in return, or in which Recio, Macey, or Guerra ever promised any payment.  Not once when Recio asked Costanzo to run a name through NADDIS did Costanzo respond, "for how much?"  Not once did Recio even obliquely reference a payment when asking Costanzo to search the DEA's databases.  As the district court observed, "there's no direct evidence of an offer or Mr. Recio actually giving [Costanzo] anything."  A-533.

Indeed, the government's principal trial witness—whom it called for an insider's account of the supposed scheme—knew nothing of any quid pro quo.

---

[4] As discussed *supra* at 33, the defendants' summations focused on the lack of evidence of a quid pro quo.  The government's only response on rebuttal was to mischaracterize GLC's subpoena response.

Jorge Hernáandez Villazón helped Recio, Guerra, and Macey recruit new clients and testified Costanzo was the source of confidential information they used.  A-188-93, 196-98, 202, 206.  Yet even Hernáandez had never seen or heard about any payment to Costanzo.  A-219-20, 230.

The absence of quid pro quo evidence is particularly striking given how candid and unguarded the defendants were in their communications.  As the government told the jury, it captured "Recio and Costanzo speaking their true selves," "plotting the bribery scheme" "in unambiguous, clear terms," when "they didn't know anyone else was listening."  A-82, 538, 646.  The government even argued they sometimes communicated over a "secret" phone specifically so they could speak freely.[5]  A-80, 552, 576.  And, in fact, Costanzo and Recio made no effort to disguise their conversations, including when discussing NADDIS information and potential clients—the very heart of the alleged quid pro quo.  *See, e.g.*, A-760-61 ("Kind of old 2015 stuff related to sandy G's case…[Venezuelan] high end guy…Was connected to the Carvajal case"), A-762-63 ("Potential new client for David"; "Colombian case…Fuentes was the former agent"), A-739 ("Can you look at Gilberto Hernández"), A-742 ("Can u look into case file and tell me about this guy"), A-758-59 ("Call me and give me a summary on his NADDIS");

---

[5] The phone was not a "secret."  Costanzo maintained several cell phones, per standard DEA practice, and used his regular personal phone just as often—if not more often—when speaking with Recio.  A-115-17, 150-51, 165-66, 404-05.

*see also, e.g.*, A-740, 764-69, 771-72. Yet not once did they allude to any benefit Costanzo might receive for providing this information.

To surmount this stark absence of proof, the government repeatedly cited two conversations in which Recio and Guerra talked about money *they—not* Costanzo—would generate from their clients. A-723 (Guerra saying he and Recio were together "scheming about how we're going to make money, money, money"), A-736 (Recio saying a court filing was "30 grand right here"); *see* A-83, 537, 554, 574, 583. But neither conversation suggested *Costanzo* would share in those proceeds. Nor did these conversations correspond to any payment: There was no proof Guerra made *any* payment, and there was no "30 grand."

That *not one* of the alleged conspirators' calls, texts, emails, or other communications even hinted at Costanzo receiving anything in return makes a quid pro quo implausible.

## C.   The Circumstantial Evidence Did Not Permit An Inference Of Quid Pro Quo

Nor may a quid pro quo be inferred from the circumstantial evidence, which consisted of a grab bag of payments and other evidence bearing none of the hallmarks of bribery.

"An inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." *Pauling*, 924 F.3d at 656. Speculation, on the other hand, is a conclusion

made either despite "a 'complete absence of probative facts to support the conclusion reached,'" or based on another fact but "not logically" so.  *Id.* at 656 (quoting *Lavender v. Kurn*, 327 U.S. 645, 653 (1946); citing *Langston v. Smith*, 630 F.3d 310, 314, 319 (2d Cir. 2011)).  That the conclusion might be "likely" or even "probable" is immaterial.  *Id.* at 662; *see id.* at 656 (not enough that fact "is within the realm of possibility").  "[S]peculation…is an insufficient basis on which to rest a guilty verdict" and cannot "'be…allowed to do duty for probative facts.'"  *Id.* at 656, 660 (quoting *Galloway v. United States*, 319 U.S. 372, 395 (1943)).  As a result, on sufficiency review, this Court "give[s] no deference to impermissible speculation."  *Id.* at 656-57.

The evidence here did not permit an inference of quid pro quo.  The jury could convict only after engaging in multi-layered speculation—speculation not only that the alleged bribers and Costanzo were somehow connected to payments, but also that these random transactions were actually bribes, exchanged for Costanzo's DEA information.

1.     In appropriate circumstances, a quid pro quo may be inferred when a public official receives payments or other benefits from someone who then benefits from acts the official later takes.  *See, e.g.*, *United States v. Friedman*, 854 F.2d 535, 554 (2d Cir. 1988) ("[A] jury can…infer guilt from evidence of benefits received and subsequent favorable treatment…").  But here the government failed

to prove the essential predicate: that Costanzo received benefits from Recio, Macey, or Guerra. The government had no proof whatsoever that the two largest "bribes"—Pagan's $50,000 townhouse investment and $20,000 attorney retainer—had anything to do with the alleged bribers. Instead, bank records conclusively proved Pagan made both payments with his own funds and never received *anything* from the others. A-327-28, 462-64, 484-87, 513. Nor would it make any sense for Pagan himself to bribe Costanzo for DEA information; as a DEA task force officer Pagan had direct access to NADDIS and could run searches himself. *See* A-830.

Moreover, the government failed to prove Costanzo ever received any money or benefit from three of the supposed "bribes." There was no evidence that EBCO transferred any of the $2,500 it received from GLC to Costanzo. A-337-39, 355, 457-59, 470-71. Although the government tried to insinuate a $1,500 cash deposit Costanzo made six days later might have been related (A-321), its own investigator admitted she had no evidence about the source of those funds (A-340). The government also pointed to a November 13 text about car repairs in which Costanzo wrote Macey, "Just made 2500 fuck it" (A-737), but there was no evidence of Costanzo receiving $2,500 from anyone around that time. Similarly, it was undisputed JEM never transferred any of the $20,750 it received from GLC to Costanzo. A-346, 356-57. The government asserted Costanzo used JEM's bank

account as his "secret slush fund" (A-560), citing three airplane ticket purchases through that account totaling roughly $3,400 (A-323-25). But other evidence indicated Pagan let Costanzo use JEM's debit card to repay $3,500 in expenses Costanzo previously covered. A-495-99. And why would Costanzo leave $17,350 sitting in JEM's account while struggling to pay other bills? *See, e.g.*, A-375-76 (Rueda pressured Costanzo to repay $20,000 in early 2020).

In denying Costanzo's Rule 29 motion, the district court held the evidence sufficient because, among other things, payments "went through a suspicious chain of entities" and took "circuitous routes" before "end[ing] up in some way connected to Costanzo." A-867, 869. But each payment had only a single "chain" link and travelled in a straight line, such as from GLC to JEM or from Pagan to Rueda. The payments only look "suspicious" and "circuitous" if one assumes the very thing the government failed to prove: that these were bribes *from* Recio, Macey, and Guerra *to* Costanzo.

The supposed "bribes" also lacked any consistency or coherence. They had wildly divergent values, took many different forms, and involved varying participants. They ranged from Macey's $284 Yankees ticket for Costanzo, to Pagan's $50,000 cashier's check to Costanzo, Sr., and everywhere in between. Some came in back-to-back months, others were separated by as many as seven months, and still others happened in the same month. And their values fluctuated

45

widely: $2,500 in November 2018, $50,000 in January 2019, around $5,000 in March 2019, the $284 Yankees ticket in April 2019, $10,000 the same month, $10,750 in June 2019, and $20,000 in January 2020. The haphazard nature of the payments makes it impossible to infer this was bribery. *Cf. Rosen*, 716 F.3d at 700, 703 (bribery can be inferred from payments "at regular intervals" "structured as monthly consulting payments").

In any event, to qualify as a bribe, a payment must have been "made or agreed to *before* an official act in order to influence the official with respect to that future official act." *Snyder v. United States*, 603 U.S. 1, 5 (2024). "[P]ayments made to an official after an official act as a token of appreciation" are "gratuities" not "bribes," *id.*, and thus not covered by §201(b)(2)(C) or §1346. Nothing here suggests that any payment was made for Costanzo to take a *future* act. Pagan's January 2020 repayment to Rueda, for example, occurred *two months after* Recio's last request and Costanzo's last search—when Costanzo already knew he was being investigated. There was no future act to which it could possibly have been connected. In fact, other than the $2,500 to EBCO, no payment had any plausible temporal connection to any Recio request or Costanzo search. *See* A-830 (government summary chart of requests and NADDIS searches).[6] Sixteen of 23

---

[6] As discussed above and below, the $2,500 cannot sustain the conviction because the government contaminated its proof with the Confrontation Clause violation and all relevant events occurred in Florda, making venue in the SDNY improper.

requests/searches occurred in months without any corresponding payment, and four of the seven payments occurred in months without any corresponding request/search. The government brandished summary charts before the jury illustrating the close proximity of Recio's requests for information to Costanzo's searches, and between those searches and subsequent phone calls. A-830-31. No doubt if the supposed "bribes" bore any plausible relation to Recio's requests or Costanzo's searches the government would have flaunted yet another chart. But it didn't, because it couldn't. The supposed "bribes" had no pattern whatsoever.

2.     Contrary to the government's "bribe" theory, the only explanation for any payment apparent on the face of the evidence was an innocent one—*e.g.*, Recio compensated Costanzo, Sr. for assisting him with Delvepoint, Recio invested in JEM, Pagan invested in Costanzo's townhouse. *See supra* at 10-13. The government tried to discredit these explanations by, for example, claiming that responsible businesspeople would not engage in such large transactions without formal agreements (A-561), yet there was ample evidence Costanzo and his friends—career law enforcement officers, not sophisticated businessmen—did exactly that. They often covered each other's expenses, transacted business together, and consummated sizable financial dealings with a simple handshake. A-465-69, 491-92, 495-98.

Regardless, even if an explanation given for a payment was false, it does not necessarily follow that the payment was a *bribe* to Costanzo; there might well have been other reasons for one friend paying another. Without some *fact* from which to infer a bribe—*e.g.*, a payment *from* Recio, Macey, or Guerra *to* Costanzo coinciding with a NADDIS search—this Court cannot bank on such "a sizable inferential leap" to affirm a conviction. *United States v. Glenn*, 312 F.3d 58, 67 (2d Cir. 2002).

Indeed, the evidence strongly supports that Costanzo shared DEA information not for money, but to help his close friends succeed in recruiting clients and even to benefit the *DEA*. *E.g.*, A-373-74, 379-80. Having access to reliable informants inside the drug trade was critical to the success of DEA investigations (*e.g.*, A-108-14, 288), and the DEA could more easily flip targets into cooperators if "cooperator attorneys" like Macey or Guerra represented them (*see* A-215-17). The information Costanzo shared with Recio was usually relatively benign—such as the name and phone number of the DEA agent supervising the investigation so Macey, Guerra, or Recio could initiate cooperation discussions. A-126-28, 152-53, 161-62, 164, 740, 758-59, 762-63, 771, 833. And Costanzo and Recio celebrated when potential clients were inclined to cooperate and commiserated when such discussions fell through. *E.g.*, A-741 ("Omg we landed the client…He is going to cooperate"; "Sounds great"), A-764-65 ("He

wants to cooperate…I have a chance to get him"), A-773 ("The Tumaco guy is afraid to cooperate and decided against moving forward…."; "Wow"). In fact, Costanzo had been sharing DEA information and discussing cooperating witnesses with Macey and Guerra *for years*—long before any supposed "bribe." A-754.

3.      The government gave undue weight to Costanzo's and Recio's supposed "concealment" (A-575-82), as did the district court in denying Costanzo's Rule 29 motion (A-868-69). For example, the government made much of the fact that certain calls and messages were found on Recio's phone but not on Costanzo's, arguing Costanzo deleted incriminating communications. A-154-56, 579-81. But the evidence indicated Costanzo simply purged data to free up space, not nefariously excised damaging material. The deletions included indisputably innocent communications with Costanzo's urologist and others—often entire days' worth of items—and left undisturbed many communications the government found incriminating. A-159-60, 162-63, 167-82. As another example of "concealment," the government highlighted a brief conversation in which a DEA supervisor asked Costanzo what Recio was doing in retirement and Costanzo responded, "Manny is doing his thing." A-96-97. The government argued Costanzo deliberately concealed he was sharing NADDIS information with Recio (A-650-51), but Costanzo's supervisor admitted this was just fleeting, "very casual," "water cooler conversation"; he asked a general question ("What's the deal with Manny? What's

49

he doing?") and "just left it at that." A-97, 120-21. *See also supra* at 41 n.5 (addressing supposed "secret" phone).

In any event, "concealment" evidence only goes so far and does not, and cannot, lead to the inference Costanzo was sharing information *for bribes*. *See United States v. Ogando*, 547 F.3d 102, 109 (2d Cir. 2008) ("false exculpatory statements…are insufficient proof on which to convict where other evidence of guilt is weak"); *Cassese*, 428 F.3d at 101 (same). If, as the government maintained, Costanzo violated his official duties by disclosing DEA information, he had every reason to conceal he was doing so, even if he received no money in return—the essential element for bribery.

\* \* \*

At bottom, the jury could find a quid pro quo only through rank, impermissible speculation.

This case is no different from *Pauling*, where this Court held the evidence insufficient to support a nonspeculative finding that the drug conspiracy involved an additional 11 grams of heroin. Take, for starters, the "bribes." The government invited the jury to conclude that each payment originated with Recio, Macey, or Guerra and ultimately ended up with Costanzo, even though five of seven lacked *any* evidence about the supposed beginning or final leg. Just as in *Pauling*, "[t]he jury did not hear evidence" about that critical supposed transaction, nor "when the

transaction occurred, or what the circumstances were."  924 F.3d at 659.  To

nonetheless conclude "on the basis of so little" that Recio, Macey, or Guerra

initiated each payment, and Costanzo received it, reflects the exact same type of

"impermissible speculation" this Court rejected in *Pauling*.  *Id.*

The same is true of the ultimate question: whether there was a quid pro quo.

The government pointed to a hodgepodge of payments and tried to show that each

payment's innocent explanation was incredible.  From that—together with

supposed "concealment," the GLC subpoena response, and a jumble of stray

comments—the government argued the payments were a quid pro quo for DEA

information.  A-571-83.  Yet "[t]he jury did not hear evidence" connecting any

payment to an exchange of DEA information, either explicitly or circumstantially.

"To conclude so much on the basis of so little amounts to impermissible

speculation."  *Pauling*, 924 F.3d at 659.

The government's efforts to "dirty up" Costanzo, Recio, and the assorted

payments cannot bridge the gap.  Indeed, in *Pauling*, in addition to the customer's

"same thing as last time" order, the government cited Pauling's substantial drug-

related interactions with coconspirator Low, including discussions about a "stash

house," others in the distribution chain, and that Low had "a nice amount" left to

distribute.  924 F.3d at 660.  But this Court held that *even that* was not enough to

reasonably infer a conspiracy to distribute an additional 11 grams, because it was

51

"not specific evidence of drug quantity." *Id.* at 661. "While one could argue, based on reasonable speculation, that it was 'likely' or 'probable' that Low and Pauling agreed to distribute an additional 11 grams of heroin, the government had to prove more than likelihood or probability—it had to prove an agreement to distribute…an additional 11 or more grams of heroin beyond a reasonable doubt," and it "failed to do so." *Id.* at 662.

The same is true here. While one could speculate it was "probable" or even "likely" Costanzo and Recio had a quid pro quo agreement to trade DEA information for money, the government had to *prove beyond a reasonable doubt* that such an agreement existed. It offered no "specific evidence," of any kind, of any connection between DEA information and money, and thus failed to prove a quid pro quo.

At a minimum, the evidence at trial gave "equal or nearly equal circumstantial support" to the government's "theory of guilt and a theory of innocence," and was thus legally insufficient to sustain a conviction beyond a reasonable doubt. *Valle*, 807 F.3d at 522.

### D. Even If A Quid Pro Quo Could Be Inferred, The Government Failed To Prove An Agreement For Specific Acts

Even assuming a jury could reasonably infer *some* quid pro quo agreement related to DEA information, that is not enough. The government must prove "more than…an open-ended promise to perform official actions for the benefit of

the payor." *Silver*, 948 F.3d at 559.  Instead, the government must prove that "*at the time of the alleged quid pro quo*," Costanzo and Recio agreed with specificity on acts Costanzo would take.  *McDonnell*, 579 U.S. at 572-73; *Evans v. United States*, 504 U.S. 255, 268 (1992).

There are two ways the government can satisfy that showing.  It can prove there was "a 'link between each specific benefit and a single official act.'" *Silver*, 948 F.3d at 554.  "[A]lternatively," it can prove the official agreed to accept benefits in return for taking "official acts as the opportunities to commit those acts arise." *Id.*  The government conceded these are the only two "alternative[s]."  A-421.

Throughout trial, the government insisted it was relying exclusively on an as-opportunities-arise theory.  It conceded none of the "bribes" "relate[d] to any specific thing" and that "nothing about our presentation at trial…has suggested that we are tying specific payments to specific acts."  A-422, 663.  It argued the jury need not find any payment correlated to any act, because "this isn't about, well, can we tie a payment to this particular text or can we tie a payment to this particular phone call."  A-663-64.  And it sought to circumvent that lack of connection by repeatedly arguing for an as-opportunities-arise jury instruction—including in a recess amid closing arguments.  Dkt.124 at 10; A-418-22, 435-36, 518-28, 621-22.  But the district court refused to give one, noting that the

applicable caselaw is more "nuanced" than the government's proposed instruction. A-623.

On appeal, the government has reversed course and abandoned reliance on as-opportunities-arise. C.A.Dkt.18 at 11-12. And for good reason: This Court "cannot affirm a criminal conviction on the basis of a theory not presented to the jury." *Chiarella v. United States*, 445 U.S. 222, 236 (1980). The government's abrupt strategic shift, however, dooms any attempt to defend the sufficiency of the evidence: As discussed above and as previously conceded, none of the "bribes" "relate[d] to any specific thing." A-663. In other words, the government—by its own admission—failed to prove "a link between each specific benefit and a [specific] act." *Silver*, 948 F.3d at 554.

Costanzo's conviction must be reversed.

## III.    VENUE WAS IMPROPER

Venue was improper: The alleged offense conduct occurred entirely in Florida or Washington, D.C. There was no nexus to New York. No alleged "bribe" and no relevant act occurred in SDNY. The government could identify only two isolated acts in the 14-month indictment period that remotely touched the district—the Yankees game to which Macey invited Costanzo, and a three-minute phone call when Recio happened to be in Manhattan. Neither establishes venue.

### A. The Government's Two Asserted Bases For Venue

1.      As discussed, *see supra* at 12, Macey purchased four tickets to a Yankees home game on April 16, 2019 and took his friend Costanzo and two other DEA agents.  A-276-80.  One of those agents, Nic Palmeri, headed the DEA's New York division.  A-277.  The government offered two contradictory theories for the game.  It asserted both that Macey bought Costanzo's ticket as a bribe to Costanzo in exchange for DEA information, and that the game was an effort to influence *Palmeri*—that Macey and Costanzo were trying to "curry favor" with a powerful DEA higher-up to persuade *him* to share DEA information.  A-439; Dkt.220 at 25-26.  But there was no evidence the event was anything but social— no evidence the group discussed the DEA, let alone discussed sharing confidential DEA information.  Indeed, Costanzo's and Recio's texts during the game were strictly about baseball.  A-280-81, 775.  The best the government could do to link the outing to the charged scheme was a text exchange between Costanzo and Recio *six months later* in which the two celebrated Palmeri's promotion to regional director of Mexico.  A-282-83, 776.  That brief, nine-word exchange made no mention of the Yankees game, bribes, or the exchange of DEA information.

2.      On July 16, 2019, Recio called Costanzo, and they spoke for three-and-a-half minutes.  A-725-28.  Recio happened to be in New York at the time (A-835)—a fact unknown to Costanzo until well into their conversation.  During the

call, the two discussed, among other things, a Homeland Security Investigations ("HSI") operation. A-726-28. The government argued that made the call "part and parcel of the bribery scheme and Costanzo's violations of his official duties." Dkt.220 at 24-25. But there was no evidence the DEA was involved in that investigation. To the contrary, Costanzo remarked he might "jump on it" after HSI did its work, and only "if there's anything that benefits the DEA." A-727. The conversation then turned to other topics—including the weather. Halfway through the call, Recio informed Costanzo he "just got to New York," and Costanzo reacted with surprise, asking "What are you doing up there?" A-727-28.

## B. The Government Failed to Establish Venue

The Constitution twice guarantees a defendant's right to be tried in the district where the crime was "committed." U.S. Const. art. III, §2, cl.3; U.S. Const. amend. VI; *see* Fed. R. Crim. P. 18. Where, as here, the criminal statute does not define the location of the crime's commission, "the locus delicti must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011).

Thus, this Court "must initially identify the conduct constituting the offense," mindful that "[v]enue is proper only where the acts constituting the offense—the crime's 'essential conduct elements'—took place." *United States v. Ramirez*, 420 F.3d 134, 138 (2d Cir. 2005) (quoting *United States v. Rodriguez-*

*Moreno*, 526 U.S. 275, 279 (1999)); *see* 18 U.S.C. §3237(a) (venue proper where offense was "begun, continued, or completed"). The "essential conduct elements" of §201 are seeking, receiving, accepting (or agreeing to receive or accept) a bribe. *See United States v. Stephenson*, 895 F.2d 867, 874-75 (2d Cir. 1990); 18 U.S.C. §201(b)(2)(C). Honest services fraud is a species of wire fraud, whose essential conduct elements are "causing a wire to be transmitted in furtherance of a fraud." *United States v. Kim*, 246 F.3d 186, 191 (2d Cir. 2001). For venue to lie, it must have been reasonably foreseeable to the defendant that an act in furtherance of the offense would occur in the district. *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003). Additionally, if "venue may properly lie in more than one district," this Court generally requires that the case be venued only where the defendant had "substantial contacts." *Ramirez*, 420 F.3d at 139.

1. *The Yankees Game Was Not "Essential Conduct"*

The Yankees game had nothing to do with the charged scheme. Rather, the evidence indicated the game was purely a social outing. The government presented no evidence that any DEA business was discussed at all, let alone that any "essential conduct" took place. Certainly there was no evidence that the outing involved the transmission of any wires, as required for honest services fraud. Nor was there any evidence that Costanzo sought, received, accepted, or

agreed to receive or accept, anything of value in exchange for DEA information while at the game, as required for §201.

The district court nonetheless held that a jury could "reasonably infer[]" that the game "was a bribe payment and/or part of an effort to develop sources to obtain further confidential DEA information." A-869. But venue cannot be premised on bald speculation about facts unsupported by the evidence. *Purcell*, 967 F.3d at 188-89 (reversing conviction for lack of venue where government's theory of "conduct essential to the crime" was "entirely speculative"). And here there was no basis to conclude Macey's $284 ticket was anything but a gift between friends, which the DEA's policy manual expressly permitted (A-144, 716). There were no communications linking the ticket to any information sharing, nor did Costanzo run any NADDIS searches in the surrounding days (*see* A-830). Similarly, nothing permits an inference that taking Palmeri to the game was an effort to draw him into the supposed scheme. Although Macey told Costanzo he did not want to "disappoint[]" Palmeri with their seats (A-770), impressing a senior DEA official is a far cry from inducting him into a criminal conspiracy. Nor does the text exchange between Costanzo and Recio many months later alter the mix. Nothing about those texts concerned the alleged bribery scheme, and the mere mention of Palmeri cannot justify the inference that the game was a ploy to convert Palmeri into an inside DEA source. Regardless, under the Palmeri theory, the game was

58

just a "preparatory act[]"—not an "act[] constituting the violation"—and thus legally insufficient for venue on the substantive counts. *Tzolov*, 642 F.3d at 319.

### 2. *The July 2019 Phone Call Was Not "Essential Conduct," Nor Was A New York Nexus Foreseeable to Costanzo*

The July 2019 phone call likewise had nothing to do with the charged scheme and cannot support venue. It is indisputable that Costanzo and Recio discussed no DEA information on the call, and that the call had nothing to do with Costanzo seeking, receiving, accepting a bribe for DEA information. Indeed, the conversation was limited to speculation about HSI, a separate agency, and it was *Recio* who disclosed information *to Costanzo*. A-726.

The government argued that because HSI is sometimes involved in narcotics investigations, the call related to the alleged scheme. A-551-52. But Costanzo was charged with disclosing DEA information, not HSI information, so the call could not further the charged scheme. A-39-40. And for the same reason, the district court's reason for holding the call sufficient for venue—that Costanzo "mentioned the potential DEA angle for getting involved" (A-869)—was inapposite. As charged, the scheme was not about finding opportunities for the DEA to expand its reach; it was about Costanzo sharing DEA information in return for bribes. As a result, the call was not "essential conduct" for any of the charged offenses.

Venue based on the phone call was also improper because it was not reasonably foreseeable to Costanzo that Recio was in New York. "[T]here must be some sense of venue having been freely chosen by the defendant," which the "reasonably foreseeability" requirement ensures. *United States v. Davis*, 689 F.3d 179, 186 (2d Cir. 2012). Recio did not even tell Costanzo he was in New York until well into their call, and Costanzo reacted with surprise:

> MR: …I just got to New York. It is H-O-T here.

> JC: Yeah it's hot here man. There's a huge heatwave it's gonna go hotter. What are you doing up there?

A-727. That is, Costanzo was not aware that Recio was in New York until *after* the relevant conversation occurred. *Cf. United States v. Kirk Tang Yuk*, 885 F.3d 57, 73-74 (2d Cir. 2018) (foreseeability requirement satisfied where conspirators "discussed several issues related to their…conspiracy" *after* one told the other he was "up in New York"); *United States v. Rommy*, 506 F.3d 108, 124 (2d Cir. 2007) (venue proper where defendant knew conspirators "were already in New York" before phone calls occurred). Because it was not reasonably foreseeable to Costanzo that their discussion could implicate New York, the call cannot support venue in the SDNY.

### 3. *Costanzo Lacked "Substantial Contacts" With The SDNY*

Regardless, the Yankees game and isolated phone call represent at most *de minimis* contact with New York, falling well short of the required "substantial

60

contacts." None of the four factors the Court considers in that analysis—the "site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of the district for accurate fact finding"—support venue. *See Davis*, 689 F.3d at 186. The first three factors all point to either (1) Florida, where Recio, Macey, and Guerra were based and where Costanzo was for most of the relevant period, or (2) Washington D.C., where Costanzo was for the remainder. Nor was the SDNY particularly suitable: None of the fact witnesses were in New York, and there was nothing about New York that favored prosecution in the district.

## IV.   THE FORFEITURE ORDER EXCEEDED STATUTORY AUTHORITY

Forfeiture is intended to "recover" a defendant's "ill-gotten gains but not to seize legitimately acquired property." *Daugerdas*, 892 F.3d at 548. The governing statute permits forfeiture only of "property, real or personal, which constitutes or is derived from proceeds traceable to" certain criminal offenses. 18 U.S.C. §981(a)(1)(C). Section 981(a)(2), in turn, defines forfeitable "proceeds" as property the defendant obtained "as the result of the commission of the offense" or "through illegal transactions." The government must establish the "nexus between the property and the offense…by a preponderance of the evidence." *United States v. Daugerdas*, 837 F.3d 212, 231 (2d Cir. 2016). A defendant generally cannot be made to forfeit funds that "have no connection whatsoever to [his] participation in

the crime and would have [to be] paid from [his] untainted assets." *Honeycutt v. United States*, 581 U.S. 443, 449 (2017).

The $98,250 forfeiture order improperly required Costanzo to forfeit funds that do not qualify as "proceeds." SPA-5. Specifically, the government failed to prove—even by a preponderance of the evidence—that Pagan's $50,000 investment in Costanzo's townhouse and $20,000 payment for Costanzo's attorney had anything to do with the supposed bribers, and anything to do with the charged scheme. The government repeatedly asserted that Pagan was a "conduit" or a "middleman" for payments from someone else (A-565-66, A-569, A-579), but, as discussed above, offered zero evidence of Pagan receiving funds from anyone and could not even allege who that "someone else" was. And a forensic accountant testified—and the government was unable to rebut—that there was no record of Pagan receiving *any* funds from Macey, Guerra, Recio, GLC, or anyone remotely connected to the alleged scheme. A-462-64. Indeed, after Costanzo's sentencing, the government conceded it couldn't tie these payments to Recio; instead, it sought forfeiture against him in the amount of only $23,250 only, corresponding to three other supposed "bribes." A-897.

As a result, the forfeiture order overstated Costanzo's criminal proceeds by at least $70,000.

62

## **CONCLUSION**

For the foregoing reasons, the Court should vacate Costanzo's conviction and enter a judgment of acquittal, or else grant a new trial, on all counts and vacate the forfeiture order.

Dated:    New York, New York
            December 2, 2024

                   /s/ Daniel J. O'Neill
                   Daniel J. O'Neill
                   Bronwyn C. Roantree
                   SHAPIRO ARATO BACH LLP
                   1140 Avenue of the Americas, 17th Floor
                   New York, New York 10036
                   (212) 257-4880

                   *Attorneys for Defendant-Appellant*
                     *John Costanzo, Jr.*

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENT, AND <u>TYPE STYLE REQUIREMENT</u>

1.      The undersigned counsel of record for Defendant-Appellant John Costanzo, Jr. certifies pursuant to Federal Rule of Appellate Procedure 32(g) and Local Rule 32.1 that the foregoing brief contains 13,853 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), according to the Word Count feature of Microsoft Word for 365.

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for 365 in 14-point font of Times New Roman.

Dated:    December 2, 2024

/s/ Daniel J. O'Neill
Daniel J. O'Neill