# 24-1310(L)

## 24-1469(CON)

*To Be Argued By*:
EMILY DEININGER

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

### Docket No. 24-1310(L), 24-1469(CON)

————◆◆◆————

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

JOHN COSTANZO, JR., also known as Sealed Defendant 1,
MANUEL RECIO, also known as Sealed Defendant 2,

*Defendants-Appellants,*

*(Caption continued on inside cover)*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

MATTHEW PODOLSKY,
*Acting United States Attorney for
the Southern District of New York,
Attorney for Defendant-Appellee.*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

MATHEW ANDREWS,
EMILY DEININGER,
MICHAEL D. MAIMIN,
*Assistant United States Attorneys,
Of Counsel.*

DAVID MACEY, LUIS GUERRA,

*Intervenors.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement Of Facts . . . . . . . . . . . . . . . . . . . . . . . . .  2

    A.  The Government's Case . . . . . . . . . . . . . . .  2

        1.  Background to the Conspiracy . . . . . . .  3

        2.  After Recio Retired, Costanzo Began
            Leaking Him Information . . . . . . . . . . .  6

    B.  The Defense Case . . . . . . . . . . . . . . . . . . . .  12

    C.  The Verdict, Post-Trial Motions, and
       Sentencing . . . . . . . . . . . . . . . . . . . . . . . . .  13

ARGUMENT:

POINT I—There Was Sufficient Evidence of a
*Quid Pro Quo* . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

    A.  Relevant Law . . . . . . . . . . . . . . . . . . . . . . .  15

        1.  Sufficiency of the Evidence . . . . . . . . .  15

        2.  Bribery, Honest Services Wire Fraud,
            and the *Quid Pro Quo* Requirement . .  18

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  19

POINT II—Recio and Costanzo Are Not Entitled to
a New Trial Because the Government Used
Evidence Obtained from a Subpoena to
Recio's Company . . . . . . . . . . . . . . . . . . . . . . . . .  31

ii

PAGE

A. Relevant Facts . . . . . . . . . . . . . . . . . . . . . . 32

B. Applicable Law . . . . . . . . . . . . . . . . . . . . . 36

    1. Purpose of Grand Jury Subpoenas . . . . 36

    2. The Fifth Amendment and Corporate Records . . . . . . . . . . . . . . . . . . . . . . . . . 37

    3. The Confrontation Clause . . . . . . . . . . 38

    4. Standards of Review . . . . . . . . . . . . . . 40

C. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . 43

    1. Judge Oetken Did Not Abuse His Discretion in Denying Recio's Motion to Quash the Grand Jury Subpoena to GLC . . . . . . . . . . . . . . . . . . . . . . . . 43

    2. Judge Oetken Did Not Abuse His Discretion in Denying Recio's Motion to Quash the Trial Subpoena to GLC . 47

    3. Judge Oetken Did Not Plainly Err in Failing to Limit Argument Based on *Braswell* . . . . . . . . . . . . . . . . . . . . . . . 50

    4. Judge Oetken Did Not Plainly Err by Admitting GLC's Trial Subpoena Returns in Violation of Costanzo's Confrontation Rights . . . . . . . . . . . . . . 55

iii

PAGE

POINT III—The District Court Did Not Abuse its
Discretion in Admitting an Email that Recio
Sent from His Official DEA Email Account to
His Personal Email Account Containing
Confidential Details of Operations Run by
Costanzo............................................... 64

    A.  Applicable Law ....................... 64

    B.  Discussion ........................... 65

POINT IV—There Was Sufficient Evidence
Establishing Venue in the Southern District
of New York ......................................... 68

    A.  Relevant Facts ....................... 68

        1.  Applicable Law.................... 70

        2.  Discussion....................... 73

POINT V—Judge Oetken Did Not Err in Imposing
Forfeiture............................................. 78

    A.  Relevant Facts ....................... 78

    B.  Applicable Law ....................... 79

    C.  Discussion ........................... 81

        1.  Judge Oetken Did Not Err in
Ordering $98,250 in Forfeiture
Against Costanzo................. 81

iv

PAGE

2. Judge Oetken Did Not Err in
   Ordering $23,250 in Forfeiture
   Against Recio . . . . . . . . . . . . . . . . . . . .  82

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  84

# TABLE OF AUTHORITIES

*Cases*:

*Armstrong v. Guccione*,
   40 F.3d 89 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . .  50

*Bellis v. United States*,
   417 U.S. 85 (1974) . . . . . . . . . . . . . . . . . . . . . . . . .  37

*Branzburg v. Hayes*,
   408 U.S. 665 (1972) . . . . . . . . . . . . . . . . . . . . . . .  36

*Braswell v. United States*,
   487 U.S. 99 (1988) . . . . . . . . . . . . . . . . . . . . .  *passim*

*Bruton v. United States*,
   391 U.S. 123 (1968) . . . . . . . . . . . . . . . . . . . . .  34, 39

*Bullcoming v. New Mexico*,
   564 U.S. 647 (2011) . . . . . . . . . . . . . . . . . . . . . . .  56

*Chiarella v. United States*,
   445 U.S. 222 (1980) . . . . . . . . . . . . . . . . . . . . . . .  29

*Crawford v. Washington*,
   541 U.S. 36 (2004) . . . . . . . . . . . . . . . . . . . . .  38, 39

*Davis v. Washington*,
   547 U.S. 813 (2006) . . . . . . . . . . . . . . . . . . . . . . .  38

v

PAGE

*Fisher v. United States,*
    425 U.S. 391 (1976). . . . . . . . . . . . . . . . . . . . . . . . 60

*Garlick v. Lee,*
    1 F.4th 122 (2d Cir. 2021) . . . . . . . . . . . . . . . . . 56

*Greer v United States,*
    593 U.S. 503 (2021). . . . . . . . . . . . . . . . . . . . . . . 56

*Hair Indus., Ltd. v. United States,*
    340 F.2d 510 (2d Cir. 1965) . . . . . . . . . . . . . . . . 38

*In re Grand Jury Proceeding,*
    971 F.3d 40 (2d Cir. 2020) . . . . . . . . . . . . . . . . . 45

*In re Grand Jury Subpoena Duces Tecum Dated
    Oct. 29, 1992,*
    1 F.3d 87 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . 48

*In re Grand Jury Subpoena Issued June 18, 2009*,
    593 F.3d 155 (2d Cir. 2010) . . . . . . . . 37, 38, 45, 48

*In re Nortel Networks Corp. Sec. Litig.,*
    539 F.3d 129 (2d Cir. 2008) . . . . . . . . . . . . . 77, 82

*Libretti v. United States,*
    516 U.S. 29 (1995). . . . . . . . . . . . . . . . . . . . . . . . 79

*Mathieu,*
    853 F. App'x. . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Matter of Grand Jury Subpoenas Dated Oct. 22,
    1991 and Nov. 1,*
    959 F.2d 1158 (2d Cir. 1992) . . . . . . . . . . . . 38, 51

*Melendez-Diaz v.Massachusetts,*
    557 U.S. 305 (2009). . . . . . . . . . . . . . . . . . . . 48, 56

vi

PAGE

*Michigan v. Bryant,*
    562 U.S. 344 (2011). . . . . . . . . . . . . . . . . . . . . . . . 38

*Musacchio v. United States,*
    577 U.S. 237 (2016). . . . . . . . . . . . . . . . . . . . . . . . 17

*Puckett v. United States,*
    556 U.S. 129 (2009). . . . . . . . . . . . . . . . . . . . . . . . 41

*Samia v. United States,*
    599 U.S. 635 (2023). . . . . . . . . . . . . . . . . . . . . . 39, 60

*Skilling v. United States,*
    561 U.S. 358 (2010). . . . . . . . . . . . . . . . . . . . . . . . 18

*Snyder v. United States,*
    603 U.S. 1 (2024). . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Anderson,*
    747 F.3d 51 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . 16

*United States v. Anekwu,*
    695 F.3d 967 (9th Cir. 2012) . . . . . . . . . . . . . . . 58

*United States v. Atilla,*
    966 F.3d 118 (2d Cir. 2020) . . . . . . . . . . . . . 15, 16

*United States v. Barlow,*
    479 F. App'x 372 (2d Cir. 2012) . . . . . . . . . . . . . 42

*United States v. Benjamin,*
    95 F.4th 60 (2d Cir. 2024) . . . . . . . . . . . . . . . 19, 23

*United States v. Bruno,*
    383 F.3d 65 (2d Cir. 2004) . . . . . . . . . . . . . . . . . 61

*United States v. Bruno,*
    661 F.3d 733 (2d Cir. 2011) . . . . . . . . . . . . . . . . 24

vii

PAGE

*United States v. Capers,*
    20 F.4th 105 (2d Cir. 2021) . . . . . . . . . . . . . . . . . 41

*United States v. Capoccia,*
    503 F.3d 103 (2d Cir. 2007) . . . . . . . . . . . . . . . . . 80

*United States v. Chow,*
    993 F.3d 125 (2d Cir. 2021) . . . . . . . . . . . . . . . . . 16

*United States v. Contorinis,*
    692 F.3d 136 (2d Cir. 2012) . . . . . . . . . . . . . 80, 82

*United States v. Coplan,*
    703 F.3d 46 (2d Cir. 2012) . . . . . . . . . . . . . . . . . 77

*United States v. Coppola,*
    671 F.3d 220 (2d Cir. 2012) . . . . . . . . . . . . . . . . . 65

*United States v. Davis,*
    689 F.3d 179 (2d Cir. 2012) . . . . . . . . . . . . . . . . . 72

*United States v. Denton,*
    944 F.3d 170 (4th Cir. 2019) . . . . . . . . . . . . . . . . 58

*United States v. Dhinsa,*
    243 F.3d 635 (2d Cir. 2001) . . . . . . . . . . . . . . . . . 47

*United States v. Diaz,*
    176 F.3d 52 (2d Cir. 1999) . . . . . . . . . . . . . . . . . 66

*United States v. Doe,*
    465 U.S. 605 (1984). . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Dominguez Benitez,*
    542 U.S. 74 (2004). . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Eisen,*
    974 F.2d 246 (2d Cir. 1992) . . . . . . . . . . . . . . . . . 17

viii

PAGE

*United States v. Eldridge*,
   2 F.4th 27. . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 44

*United States v. Facen*,
   812 F.3d 280 (2d Cir. 2016) . . . . . . . . . . . . . . . . 15

*United States v. Guerrier*,
   No. 20-3469,
   2022 WL 610338 (2d Cir. 2022) . . . . . . . . . . . . . 83

*United States v. Hardwick*,
   523 F.3d 94 (2d Cir. 2008) . . . . . . . . . . . . . . . . . 61

*United States v. Hassan*,
   578 F.3d 108 (2d Cir. 2008) . . . . . . . . . . . . . . . . 15

*United States v. Hendricks*,
   921 F.3d 320 (2d Cir. 2019) . . . . . . . . . . . . . . . . 40

*United States v. Ho*,
   984 F.3d 191 (2d Cir. 2020) . . . . . . . . . . . . . 15, 16

*United States v. Honeycutt*,
   581 U.S. 443 (2017). . . . . . . . . . . . . . . . . . . . . . . 83

*United States v. Hubbell*,
   530 U.S. 27 (2000). . . . . . . . . . . . . . . 47, 48, 59, 60

*United States v. Jabar*,
   19 F.4th 66 (2d Cir. 2021) . . . . . . . . . . . . . . . . . 15

*United States v. Jackson*,
   346 F.3d 22 (2d Cir. 2003) . . . . . . . . . . . . . . 41, 42

*United States v. Jass*,
   569 F.3d 47 (2d Cir. 2009) . . . . . . . . . . . . . . . . . 39

ix

PAGE

*United States v. Jergensen*,
797 F. App'x 4 (2d Cir. 2019) . . . . . . . . . . . . . . . 83

*United States v. Jones*,
129 F.3d 718 (2d Cir. 1997) . . . . . . . . . . . . . 36, 45

*United States v. Joyner*,
313 F.3d 40 (2d Cir. 2002) . . . . . . . . . . . . . . . . . 62

*United States v. Kaufman*,
No. 21-2589,
2023 WL 1871669 (2d Cir. Feb. 10, 2023) . . . . . . 82

*United States v. Kelley*,
551 F.3d 171 (2d Cir. 2009) . . . . . . . . . . . . . . . . 40

*United States v. Kelly*,
— 4th —,
Nos. 22-1481(L), 22-1982(CON),
2025 WL 466673 (2d Cir. Feb. 12, 2025) . . . . 29, 30

*United States v. Khan*,
821 F.2d 90 (2d Cir. 1987) . . . . . . . . . . . . . . . . . 73

*United States v. Kim*,
246 F.3d 186 (2d Cir. 2001) . . . . . . . . . . . . . 71, 76

*United States v. Kozeny*,
667 F.3d 122 (2d Cir. 2011) . . . . . . . . . . . . . 15, 29

*United States v. Landesman*,
17 F.4th 298 (2d Cir. 2021) . . . . . . . . . . 16, 17, 23

*United States v. Lange*,
834 F.3d 58 (2d Cir. 2016) . . . . . . . . . . . . . . . . . 71

*United States v. LaSanta*,
978 F.2d 1300 (2d Cir. 1992) . . . . . . . . . . . . . . . 65

x

PAGE

*United States v. Leung*,
40 F.3d 577 (2d Cir. 1994) . . . . . . . . . . . . . . . 36, 46

*United States v. Levasseur*,
816 F.2d 37 (2d Cir. 1987) . . . . . . . . . . . . . . . . . 73

*United States v. Lombardozzi*,
491 F.3d 61 (2d Cir. 2007) . . . . . . . . . . . . . . . . . 40

*United States v. Lumpkin*,
192 F.3d 280 (2d Cir. 1999) . . . . . . . . . . . . . . . . 64

*United States v. MacPherson*,
424 F.3d 183 (2d Cir. 2005) . . . . . . . . . . . . . . . . 23

*United States v. Mangano*,
— 4th —,
Nos. 22-861(L), 22-937(CON),
2025 WL 479623 (2d Cir. Feb. 13, 2025) . . . . 28, 40

*United States v. Marcus*,
560 U.S. 258 (2010) . . . . . . . . . . . . . . . . . . . . 40, 41

*United States v. Martinez*,
862 F.3d 2234 (2d Cir. 2017 . . . . . . . . . 42, 50, 56

*United States v. Miller*,
808 F.3d 607 (2d Cir. 2015) . . . . . . . . . . . . . . . . 71

*United States v. Morgan*,
505 F.3d 332 (5th Cir. 2007) . . . . . . . . . . . . . . . 58

*United States v. Moses*,
109 F.4th 107 (2d Cir. 2024) . . . . . . . . . . . . . . . 30

*United States v. Moss*,
756 F.2d 329 (4th Cir. 1985) . . . . . . . . . . . . . . . 44

xi

PAGE

*United States v. Mussaleen,*
    35 F.3d 692 (2d Cir. 1994) . . . . . . . . . . . . . . . . . 46

*United States v. Napout,*
    963 F.3d 163 (2d Cir. 2020) . . . . . . . . . . . . . 61, 62

*United States v. Naranjo,*
    14 F.3d 145 (2d Cir. 1994) . . . . . . . . . . . . . . . . 71

*United States v. Novak,*
    443 F.3d 150 (2d Cir. 2006) . . . . . . . . . . . . . 73, 74

*United States v. O'Garro,*
    700 F. App'x 52 (2d Cir. 2017) . . . . . . . . . . . . . 42

*United States v. Ohle,*
    441 Fed. Appx. 798 (2d Cir. 2011) . . . . . . . . . . . 80

*United States v. Olano,*
    507 U.S. 725 (1993). . . . . . . . . . . . . . . . . . . . . 42

*United States v. Pastore,*
    Nos. 18-2482(L), 18-2610(CON),
    2022 WL 2068434 (2d Cir. 2022) . . . . . . . . . . . . 83

*United States v. Persico,*
    645 F.3d 85 (2d Cir. 2011) . . . . . . . . . . . . . 15, 16

*United States v. Price,*
    447 F.2d 23 (2d Cir. 1971) . . . . . . . . . . . . . . . . 73

*United States v. Punn,*
    737 F.3d 1 (2d Cir. 2013) . . . . . . . . . . . . . . . . . 36

*United States v. Qualls,*
    613 F. App'x 25 (2d Cir. 2015) . . . . . . . . . . . . . 57

xii

PAGE

*United States v. Quinones,*
    511 F.3d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*United States v. Raniere,*
    55 F.4th 354 (2d Cir. 2022) . . . . . . . . . . . . . . . . . 18

*United States v. Riggi,*
    541 F.3d 94 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . 61

*United States v. Rijo,*
    502 F. App'x 1036 (2d Cir. 2012) . . . . . . 43, 50, 56

*United States v. Roldan-Zapata,*
    916 F.2d 795 (2d Cir. 1990) . . . . . . . . . . . . . 65, 67

*United States v. Rommy,*
    506 F.3d 108 (2d Cir. 2007) . . . . . . . . . . . . . 71, 72

*United States v. Royer,*
    549 F.3d 886 (2d Cir. 2008) . . . . . . . . . . . . . . . . . 72

*United States v. Ruppel,*
    666 F.2d 261 (5th Cir. 1982) . . . . . . . . . . . . . . . . 44

*United States v. Rutigliano,*
    790 F.3d 389 (2d Cir. 2015) . . . . . . . . . . . . . *passim*

*United States v. Salameh,*
    152 F.3d 88 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . 36

*United States v. Sasso,*
    59 F.3d 341 (2d Cir. 1995) . . . . . . . . . . . . . . . 36, 44

*United States v. Silver,*
    864 F.3d 102 (2d Cir. 2018) . . . . . . . . . . 27, 31, 71

*United States v. Silver,*
    948 F.3d 538 (2d Cir. 2020) . . . . . . . . . . 18, 23, 31

xiii

PAGE

*United States v. Skelos,*
 988 F.3d 645 (2d Cir. 2021) . . . . . . . . . . . . . . . . 40

*United States v. Smith,*
 198 F.3d 377 (2d Cir. 1999) . . . . . . . . . . . . . . . . 72

*United States v. Stephenson,*
 895 F.2d 867 (2d Cir. 1990) . . . . . . . . . . . . . 71, 76

*United States v. Stitsky,*
 536 F. App'x 98 (2d Cir. 2013) . . . . . . . . . . . . . . 42

*United States v. Svoboda,*
 347 F.3d 471 (2d Cir. 2003) . . . . . . . . . . . . . 72, 77

*United States v. Tang Yuk,*
 885 F.3d 57 (2d Cir. 2018) . . . . . . . . . . . . . . . . . 73

*United States v. Tanner,*
 942 F.3d 60 (2d Cir. 2019) . . . . . . . . . . . 80, 83, 84

*United States v. Terry,*
 760 F.2d 939 (9th Cir. 1989) . . . . . . . . . . . . . . . 17

*United States v. Treacy,*
 639 F.3d 32 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 79

*United States v. Tzolov,*
 642 F.3d 314 (2d Cir. 2011) . . . . . . . . . . . . . . . . 71

*United States v. Uddin,*
 551 F.3d 176 (2d Cir. 2009) . . . . . . . . . . . . . . . . 81

*United States v. Velasquez,*
 271 F.3d 364 (2d Cir. 2001) . . . . . . . . . . . . . . . . 17

*United States v. Veliz,*
 800 F.3d 63 (2d Cir. 2015) . . . . . . . . . . . . . . 17, 29

xiv

PAGE

*United States v. Vonn*,
  535 U.S. 55 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Williams*,
  642 F. App'x 12 (2d Cir. 2016) . . . . . . . . . . . . . . 40

*United States v. Yeley-Davis*,
  632 F.3d 673 (10th Cir. 2011) . . . . . . . . . . . . . . 58

*Washington v. Griffin*,
  876 F.3d 395 (2d Cir. 2017) . . . . . . . . . . . . . . . . 38

*Statutes, Rules & Other Authorities*:

18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

18 U.S.C. § 201 . . . . . . . . . . . . . . . . . . . . . . . . . 2, 18, 70

18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 981 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

18 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 18

18 U.S.C. § 1349 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1512 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

18 U.S.C. § 1956 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

18 U.S.C. § 3237 . . . . . . . . . . . . . . . . . . . . . . . . . 71, 72

Fed. R. Crim. P. 12 . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Fed. R. Crim. P. 18 . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Fed. R. Crim. P. 29 . . . . . . . . . . . . . . . . . . . . . . . . . . 13

xv

PAGE

FED. R. CRIM. P. 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

FED. R. CRIM. P. 32.2 . . . . . . . . . . . . . . . . . . . . . . . 80

FED. R. EVID. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . 65

FED. R. EVID. 404(b) . . . . . . . . . . . . . . . . . . . . . . . . 65

FED. R. EVID. 803 . . . . . . . . . . . . . . . . . . . . . . . 55, 56

FED. R. EVID. 902(11) . . . . . . . . . . . . . . . . . . . . . . 57

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
## Docket Nos. 24-1310(L), 24-1469(CON)

———————

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

JOHN COSTANZO, JR., also known as Sealed Defendant 1, MANUEL RECIO, also known as Sealed Defendant 2,

*Defendant-Appellants,*

DAVID MACEY, LUIS GUERRA,

*Intervenors.*

———————

## BRIEF FOR THE UNITED STATES OF AMERICA

———————

## Preliminary Statement

John Costanzo and Manuel Recio appeal from an amended judgment of conviction entered on April 26, 2024, and a judgment of conviction entered on May 14, 2024, respectively, in the United States District Court for the Southern District of New York, following a trial before the Honorable J. Paul Oetken, United States District Judge, and a jury.

2

Indictment 22 Cr. 281 (JPO) was filed on May 18, 2022, in five counts. Count One charged Costanzo and Recio with participating in a conspiracy to commit bribery, in violation of 18 U.S.C. § 371. Count Two charged Costanzo with substantive bribery, in violation of 18 U.S.C. §§ 201 and 2. Count Three charged Recio with substantive bribery, in violation of 18 U.S.C. §§ 201 and 2. Count Four charged Costanzo and Recio with participating in a conspiracy to commit honest services fraud, in violation of 18 U.S.C. § 1349. Count Five charged Costanzo and Recio with honest services fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 2.

Trial commenced on October 23, 2023, and ended on November 8, 2023, when the jury convicted Costanzo and Recio on all counts.

On April 24, 2024, Judge Oetken sentenced Costanzo to a term of 48 months' imprisonment, to be followed by three years' supervised release, and imposed a $400 mandatory special assessment and $98,250 in forfeiture. On May 14, 2024, Judge Oetken sentenced Recio to a term of 36 months' imprisonment, to be followed by three years' supervised release, and imposed a $400 mandatory special assessment and $23,250 in forfeiture.

Costanzo and Recio are serving their sentences.

## Statement Of Facts

### A. The Government's Case

The evidence at trial established overwhelmingly that, for over a year, Recio—a former DEA agent-

3

turned-private investigator—and other co-conspirators paid Costanzo—a senior DEA agent—nearly $100,000 for confidential, sensitive information about DEA cases. Recio, working with criminal defense attorneys David Macey and Louis Guerra, used Costanzo's information to attempt to recruit DEA targets as clients. Costanzo and Recio took numerous steps to hide their criminal activity, including making payments through trusted third parties, such as Costanzo's father and a DEA task force officer named Edwin Pagan, using a secret phone, deleting messages, and lying on DEA forms and on tax returns. The Government called 16 witnesses, including a cooperating witness, and introduced hundreds of exhibits, including recorded phone calls and text and chat messages, evidence that Recio and Costanzo had deleted inculpatory messages from their cellphones, bank records, phone records, false invoices, and corporate records from companies operated and controlled by Recio, Pagan, and Costanzo's father.

## 1. Background to the Conspiracy

Recio was a DEA agent for over 20 years, rising to various supervisory positions. (Tr. 129, 958; A. 481; GX 101).[1] After he retired in 2018, Recio formed Global

---

[1]    "Tr." refers to the transcript of the trial in this case; "GX" refers to a government exhibit admitted at trial; "DX" refers to a defense exhibit admitted at trial; "[Name] Br." refers to the named appellant's brief on appeal; and "A." refers to the appendix filed with those briefs. Unless otherwise noted, case text

4

Legal Consulting LLC ("GLC"), a private investigative firm, where he worked with defense attorneys, including David Macey and Luis Guerra. (Tr. 325, 1639; A. 722–24).

Costanzo was a DEA agent from 2004 through 2022 —when he was indicted—rising to supervisory positions, including as the group supervisor for Group 10 of the Miami Field Division. (A. 269–70; GX 106A). Costanzo and Recio both worked together and were friends; after Costanzo took over Group 10, he developed close relationships with Macey and Guerra as well. (A. 92–93, 96–97, 189, 192–93). While Costanzo's relationships with these attorneys were partly personal, Costanzo also worked with them, in violation of the DEA Standards of Conduct's prohibition of "Misuse of Official Position,"[2] providing them information

——————

quotations omit all internal quotation marks, citations, and previous alterations.

[2] The DEA Standards of Conduct list certain conduct that constitutes "Misuse of Official Position," including:

> a. "Us[ing] his/her official position for private gain;"

> b. "Glean[ing] or garner[ing] information not available to the general public and us[ing] that information for nonofficial purposes. This includes conducting a search in a database that an employee has access to due to his/her employment with DEA;" and

5

and helping them generate business. (Tr. 615–18, 620–35; A. 188–91, 193–98, 481–82, 754–57; GX 325). Among other things, in 2018, Costanzo and Guerra met an informal DEA source named Jorge Luis Hernandez Villazon and asked him to recruit a DEA target as a client for Guerra. (A. 188–91; Tr. 615–18).

In October 2018, when Recio was about to retire from the DEA and begin a second career as a defense investigator, Costanzo introduced Recio to Guerra. (A. 197–98; GX 255). At that time, as Costanzo knew, Hernandez was helping Macey recruit Group 10 targets as clients; in a meeting at Macey's office—while Recio was still an agent—Recio encouraged Hernandez to recruit those same clients for Recio's new business. (A. 198; GX 325).

At the end of October 2018—while Recio was still an agent—Recio forwarded confidential DEA operations plans, known as a "SARC memo,"[3] which detailed a highly sensitive covert overseas operation targeting high-level drug traffickers, to his personal e-mail account. (A. 1110–25). Costanzo was one of the authors of the SARC plan and had "direct and immediate

——————

   c. "Distribut[ing] or disclos[ing] information not available to the general public for nonofficial purposes."

(A. 714–19). Both Recio and Costanzo certified that they understood the Standards of Conduct. (GX 105, 110).

[3]   "SARC" stands for Sensitive Activity Review Committee. (A. 1116).

6

management responsibilities for this proposed operation." (A. 1124).

Two weeks later, on November 10, 2018, Recio retired from the DEA. (GX 101).

### 2. After Recio Retired, Costanzo Began Leaking Him Information

On November 12, 2018—just two days after Recio retired—Macey paid Recio $5,000 through GLC; GLC deposited the check the next day. (A. 825, GX 440B). On the day he deposited the $5,000 check, Recio texted a name to Costanzo, and Costanzo responded immediately, explaining who that person was. (GX 1001). That day, Costanzo texted Macey "Just made 2500"; sure enough, the next day, GLC wrote a $2,500 check for "Investigative services" to EBCO of Miami, a dormant company owned by Costanzo's father. (A. 737, 790, 805, 826; Tr. 168–83; GX 421). On November 14, 2018—the day he first paid Costanzo—Recio asked Costanzo about more names, including whether he could "run" them; minutes later, Costanzo ran two names through the DEA's Narcotics and Dangers Drugs Indexing System ("NADDIS"), an internal database containing vast quantities of confidential information, including about DEA targets, investigations, and operations, which database cautioned users that the information was "DEA/Law Enforcement Sensitive" and "for Official Use Only." (Tr. 160–61; A. 831; GX 118, 1001). This was just the start; over the course of a year, Costanzo ran 21 names through Naddis at Recio's request (and another name at Macey's request). (A. 831). They were often open about what they

7

were doing: for example, one time, Recio texted Costanzo "You looked before and you said the names were to[o] vague but David [Macey] is placing a lot of pressure on me"; another time, Recio asked Costanzo to "give me a summary of [a name's] NADDIS"; and Costanzo would explain, for example, that one person "ran loads to Costa Rica." (A. 758, 766–67). Nevertheless, Recio later lied to law enforcement, denying ever asking Costanzo to run names in NADDIS. (Tr. 1345).

Costanzo did not just run NADDIS searches for Recio; rather, Costanzo provided Recio a variety of confidential information so that Recio could help Macey and Guerro recruit new clients. Among other things:

- In April 2019, Recio told Hernandez details about an "operation ... invol[ving] many Venezuelans" who they had to be ready to "pick ... up" as clients, who they would then dole out to Macey and Guerra. (Tr. 651–52; GX 253A-T, 253B-T). Costanzo had given Recio that information. (A. 202).

- On April 23, 2019, Costanzo discussed a Group 10 target with Recio, and spoke with Recio on the call; Costanzo also texted that target's name to Guerra, and spoke to Hernandez about "a situation which could work for us in a very interesting way." (GX 252B-T, 397A, 397B; A. 847). Guerra told Hernandez that the person had been arrested by "someone ... we know very well" in Group 10—Hernandez understood Guerra to mean

8

Costanzo—but that Hernandez should not "tell anybody where that information comes from." (Tr. 663; GX 252A-T, 252B-T).

- On July 4, 2019, Costanzo gave Recio confidential information about an upcoming indictment and arrest of a suspected Venezuelan money launderer (Tr. 834, 840–44, 846–47, 874; A. 720, 847), even counseling Recio that he would "give you what you can say. If you get a meeting, let me know and I'll tell you what to say" (A. 720). Costanzo later lied to the FBI, denying ever sharing information or discussing sealed investigations. (GX 255-T).

- Costanzo knew that Recio and Macey had travelled to the Dominican Republic to recruit a drug trafficker who was under investigation in cases with both the FBI and the DEA. (Tr. 373; GX 201-T, 703). Recio asked Costanzo—who was not even assigned to this drug trafficker's case—to gather information for him; Recio, in turn, told Macey how to leverage the fact that they were "connected [and] informed" to recruit the trafficker. (GX 380, 388, JC-1009-A). Macey and Recio understood that the trafficker wanted to know the "specifics" of his case and would only flee and "pay the rest of the money when [he saw] the proof." (GX 205-T, DX MR

9

143T). On July 31, 2019, Costanzo warned Recio that "the guy in the DR" would be "gone [arrested] in two weeks." (GX 210-T). On August 20, 2019, law enforcement attempted to arrest the trafficker but he had fled; Costanzo and Recio discussed the failed arrest later that day. (Tr. 411; GX 212A-T).

- In September 2019, Recio and Guerra prepared a document on behalf of a client as part of a pitch for a motion for a reduced sentence in consideration for cooperation; Costanzo added information that he knew would be valuable. (Tr. 853–54; GX 215-T, 330, 330A; DX JC-2001). Recio told Costanzo: "Make it look good, it's 30 grand right here.") (A. 736).

- On October 16, 2019, Costanzo "received an email from a concerned citizen"—which contained significant information about murders and other crimes, as well as names and details about various criminals—and forwarded it to Recio for "[y]our eyes only" because he "just want[ed Recio] to know the people around other people . . . u know what I mean." (GX 311-TR, 332).

Costanzo was paid well for his assistance. In addition to the $2,500 that Recio and Macey—using GLC—paid Costanzo through his father's dormant company on November 14, 2018 (A. 737, 790, 805, 825–26; Tr. 168–83; GX 421), Recio and the lawyers paid

10

Costanzo at least nearly $100,000 through various means. As one example, Costanzo, Pagan, and Recio formed a company named JEM in January 2019—it was named after the first initials of founders John Costanzo, Edwin Pagan, and Manuel Recio—which Costanzo referred to as "our company; Pagan opened JEM's bank account and immediately sent the bank login information to Costanzo (Tr. 1786; GX 357, 477, 507), who used that account for first-class personal travel (A. 832). JEM was just one vehicle through which Recio and the lawyers paid Costanzo:

- On January 17, 2019, Pagan wrote a $50,000 cashier's check to Costanzo's father, which Costanzo's father "gifted" two weeks later to Costanzo as part of a down payment on a house. (A. 507–09; GX 401B, 434A, 700). Pagan's entire net income for 2019 was less than $62,000. (GX 604, 709).

- In February 2019, Macey introduced Costanzo to a contractor to do work on his house; on March 3, 2019, Macey paid the contractor $5,000 for approximately half of that work. (Tr. 1252–53; A. 753; GX 333).

- On April 16, 2019, Macey bought Costanzo and two other DEA agents tickets to a Yankees game in New York City, paying approximately $1,136 for the tickets. (Tr. 977–81; A. 770, 775; GX 525).

11

- On April 17, 2019, GLC wrote a $10,000 check to JEM, purportedly for "[i]nvestment of risk management company," even though neither company had any records regarding this purported investment. (Tr. 1065–66, 1071–80; A. 807; GX 471A).

- On June 3, 2019, GLC wrote a $10,750 check to JEM, purportedly for "services for Johnny Grobman case," even though neither company had any records regarding services provided by JEM in connection with that case. (Tr. 1081–89; GX 471B, 628).

- On December 3, 2019, Costanzo's girlfriend paid an attorney $20,000 on behalf of Costanzo; on January 3, 2020, Pagan—who, again, had an annual net income of under $62,000 (GX 604, 709)—wrote a $20,000 cashier's check to Costanzo's girlfriend (A. 777–78, 828; GX 453A, 533, 534).

Costanzo, Recio, and their co-conspirators understood the true value of their bribes; indeed, on July 4, 2019, Costanzo complained that, unlike Macey, Guerra had not "[brought] anything to the table," and Recio had to reassure him that Guerra had brought approximately $130,000 to the scheme. (GX 202B-T). The next day, Costanzo spoke with Guerra and told him that he needed to "love" Costanzo because Costanzo would be "running this fucking thing [the DEA] pretty soon," to which Guerra replied: "Okay, listen, so

12

we're here scheming about how we're going to make money, money, money, so we're all on the same page." (A. 722–23).

Costanzo and Recio worked hard to hide their scheme; among other things, they used a secret phone —purchased by Recio but used by Costanzo—for many of their communications, including calls on which Costanzo provided Recio with sensitive information. (Tr. 464–68; A. 721–28; GX 208-T, 209-T, 210-T, 255-T, 708). Costanzo and Recio deleted hundreds of messages from their phones, including messages in which they discussed the bribery scheme, and Recio deleted call log entries reflecting his calls with Costanzo using the secret phone. (Tr. 532–33; GX 361A, 361C, 363A, 708). Needless to say, Costanzo did not report his communications or activities to his supervisors at the DEA or on a security form requiring disclosure of "all employment activities," and Costanzo, Pagan, and Costanzo's father did not report the money flowing between them on their IRS forms. (A. 97; Tr. 970–71, 1165, 1169–70; GX 104). And when Recio told Costanzo that two people were saying that Macey "bought [Costanzo] a Mercedes . . ., and that's why he has you in his back pocket," Costanzo reacted poorly: "Cause if they want a problem, I'll make a problem. I'll find people to put problems on them. . . . And they should be lucky that they're breathing the air." (A. 730–33).

## B.  The Defense Case

Recio and Costanzo defended themselves. In addition to vigorous cross-examination, Recio submitted

13

five exhibits, and Costanzo submitted 18 exhibits. Costanzo also called three witnesses in his defense: his mortgage broker, an accountant, and Pagan.

## C.   The Verdict, Post-Trial Motions, and Sentencing

On November 8, 2023, after deliberating for roughly four hours, and sending no notes, the jury convicted Costanzo and Recio on all charges. (Tr. 2091–94).

Costanzo and Recio moved for judgments of acquittal or new trials under Federal Rules of Criminal Procedure 29 and 33, arguing that: (1) there was insufficient evidence to prove that Costanzo received money or things of value in exchange for being induced in the performance of his official duty (Dkt. 210 at 16–21); (2) there was insufficient evidence to establish venue in the Southern District of New York (Dkt. 210 at 21–28); (3) the Government improperly used a compulsory production of documents by GLC as an admission of Recio, in violation of Recio's Fifth Amendment rights (Dkt. 213 at 2–5), and against Costanzo in violation of Costanzo's Confrontation Clause rights (Dkt. 210 at 29–38); and (4) certain counts were multiplicitous (Dkt. 210 at 38–41). Judge Oetken denied these motions, explaining his reasoning in detail. (A. 866–73, 882–88).

On April 24, 2024, Judge Oetken sentenced Costanzo to 48 months' imprisonment, to be followed by three years' supervised release, and imposed forfeiture of $98,250 and a mandatory $400 special assessment. (Dkt. 242, 253 at 56–58, 65).

14

On May 14, 2024, Judge Oetken sentenced Recio to 36 months' imprisonment, to be followed by three years' supervised release, and imposed forfeiture of $23,250 and a mandatory $400 special assessment. (Dkt. 255, 256).

# ARGUMENT

## POINT I
## There Was Sufficient Evidence of a *Quid Pro Quo*

Recio and Costanzo argue that, though "Costanzo occasionally shared DEA information with Recio [in] violat[ion of] DEA policy, . . . it is not enough to establish § 201 bribery or honest services fraud" because the Government failed "to prove a quid pro quo." (Costanzo Br. 35; *see also* Recio Br. 43 (joining Costanzo's argument)). They are wrong. As Judge Oetken explained (A. 866–69, 883–85), there was ample evidence that Costanzo was not providing confidential information to Recio for free; rather, Recio and his co-conspirators repeatedly paid Costanzo for his services, using various means to cover their tracks. In order to get around this evidence, Costanzo and Recio insist on drawing inferences in their favor, analyzing evidence in isolation, disregarding circumstantial evidence, and applying the sufficiency test to each incident, rather than to the totality of the case; in other words, they do exactly what they must not under the law.

15

## A. Relevant Law

### 1. Sufficiency of the Evidence

"A defendant challenging the sufficiency of the evidence bears a heavy burden," *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011), because the standard of review is "exceedingly deferential" to the jury's verdict, *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008). A jury verdict must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Persico*, 645 F.3d 85, 105 (2d Cir. 2011). Accordingly, "[a] court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Atilla*, 966 F.3d 118, 128 (2d Cir. 2020).

When assessing the sufficiency of the evidence, this Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence," *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021), because "the task of choosing among competing, permissible inferences is for the jury, not for the reviewing court," *United States v. Ho*, 984 F.3d 191, 199 (2d Cir. 2020). For that reason, "the government's case need not exclude every possible hypothesis of innocence." *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016).

16

This Court "must analyze the evidence in conjunction, not in isolation, and apply the sufficiency test to the totality of the government's case and not to each element, as each fact may gain color from others." *Atilla*, 966 F.3d at 128. These principles apply regardless of "whether the evidence being reviewed is direct or circumstantial," *United States v. Chow*, 993 F.3d 125, 135 (2d Cir. 2021), as "the jury is entitled to base its decision on reasonable inferences from circumstantial evidence," *Ho*, 984 F.3d at 199; *see also United States v. Anderson*, 747 F.3d 51, 70 (2d Cir. 2014) ("Jurors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences."). Indeed, a "jury's verdict may be based entirely on circumstantial evidence." *United States v. Rutigliano*, 790 F.3d 389, 402 (2d Cir. 2015). "Where there are conflicts in the testimony, [the Court] must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses." *Persico*, 645 F.3d at 104.

With respect to a conspiracy conviction, the "high degree of deference" afforded a jury's verdict is "especially important" because "a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Landesman*, 17 F.4th 298, 320 (2d Cir. 2021). Indeed, "a single act may be sufficient for an inference of [a defendant's] involvement in a criminal enterprise of substantial scope at least if the act is of a nature justifying an inference of knowledge of the broader conspiracy." *Anderson*, 747 F.3d at 61. "The agreement to participate in the conspiracy may be inferred from

17

the facts and circumstances of the case, and both the existence of the conspiracy and the defendant's participation in it with the requisite criminal intent may be established through circumstantial evidence." *Landesman*, 17 F.4th at 320. Importantly, "the conspiratorial agreement may be established by proof of a tacit understanding among the participants, rather than by proof of an explicit agreement." *Rutigliano*, 790 F.3d at 402.

In evaluating the sufficiency of the evidence, this Court is not limited to the Government's case, but may consider the defense case. *United States v. Velasquez*, 271 F.3d 364, 371 (2d Cir. 2001); *see also United States v. Eisen*, 974 F.2d 246, 259 (2d Cir. 1992) ("[T]he jury is free to draw negative inferences from an untruthful witness's testimony as long as there is affirmative testimony to supplement or corroborate those negative inferences."); *United States v. Terry*, 760 F.2d 939, 941 (9th Cir. 1989) (analyzing sufficiency of the evidence and noting that "credibility of the defense witnesses was somewhat suspect given some discrepancies in their testimony").

This Court's "determination on sufficiency review . . . does not rest on how the jury was instructed," but rather on the actual elements of the offense. *Musacchio v. United States*, 577 U.S. 237, 243 (2016). A conviction "may [be] affirm[ed] on any grounds for which there is a record sufficient to permit conclusions of law" and is not limited to the District Court's reasons for upholding the verdict. *United States v. Veliz*, 800 F.3d 63, 73 (2d Cir. 2015).

18

This Court reviews preserved claims of insufficient evidence *de novo*. *United States v. Raniere*, 55 F.4th 354, 364 (2d Cir. 2022).

### 2. Bribery, Honest Services Wire Fraud, and the *Quid Pro Quo* Requirement

It is a crime to "directly or indirectly, corruptly give[ ], offer[ ], or promise[ ] anything of value to any public official . . ., with intent . . . to induce such public official . . . to do . . . . any act in violation of the lawful duty of such official," and, correspondingly, it is a crime for a "public official . . ., directly or indirectly, [to] corruptly demand[ ], seek[ ], receipt[ ], [or] accept . . . anything of value . . . in return for . . . being induced to do or omit to do any act in violation of the official duty of such official." 18 U.S.C. § 201(b)(1)(C) & (b)(2)(C). Acts of bribery also fall within the scope of 18 U.S.C. §§ 1343 and 1346, which prohibit honest services wire fraud. *See Skilling v. United States*, 561 U.S. 358, 408–09 (2010).

Where the prosecution relies on a bribery theory, the Government must prove a *quid pro quo* exchange. *United States v. Silver*, 948 F.3d 538, 551 (2d Cir. 2020) ("*Silver II*"). Or, as Judge Oetken explained it, Costanzo had to "underst[an]d that the thing of value was being provided in exchange for the promise or performance of an act or nonperformance of an act in violation of his official duty." (Tr. 2040). While "the *quid pro quo* must be clear and unambiguous, there is no reason why it cannot be implied from the official's and the payor's words and actions"; indeed, "[t]he official and the payor need not state the *quid pro quo* in

19

express terms, for otherwise the law's effect could be frustrated by knowing winks and nods." *United States v. Benjamin*, 95 F.4th 60, 68 (2d Cir. 2024), In other words, "the showing of a *quid pro quo*, assuming it is required, may be based on inference and need not involve an express statement." *Id.* at 71.

## B. Discussion

The very first time that Recio paid Costanzo for information, Costanzo effectively explained that there was a *quid pro quo*. On November 13, 2018—three days after Recio retired from the DEA—Recio texted Costanzo a name: Marco Antonio Flores Moreno (GX 1001). Costanzo immediately ran a NADDIS search for the name and responded: "Flores is a general was just appointed to some minister of some shit." (A. 831; GX 1001). Costanzo understood what he was getting for giving Recio information: after running a NADDIS search and telling Recio who Flores was, Costanzo told Macey that he would be able to pay for repairs to his Porsche because "Just made 2500 fuck it." (A. 737). After Costanzo told Macey that he was getting paid, Recio continued, asking Costanzo if "anyone ha[d] a case on Flo[r]es," to which Costanzo responded: "Oh no not that I saw initially . . . Call u in a few." (GX 1001). Recio added a request for information about a second person—Edgar Marval—and Costanzo told Recio to call him in an hour. (GX 1001). Recio then asked Costanzo to "run Moreno [Flores] and" the company with which Flores was a director, and Costanzo agreed to do so. (GX 1001). Sure enough, the day after Costanzo told Macey that he "[j]ust made 2500," Costanzo ran a NADDIS search for Marval, and GLC

20

wrote a $2,500 check for "Investigative services" to EBCO. (A. 737, 790, 805, 815, 825–26, 831; Tr. 168–83; GX 421). In other words, the jury watched a *quid pro quo* play out—from Recio seeking information, Costanzo providing it, Recio paying Costanzo through a third party, Costanzo bragging about how he could repair his Porsche because of that *quid pro quo*, and searching for more information for Recio.

While this, alone, demonstrated the *quid pro quo* money-for-information agreement, there was more. Over the course of the following year, Costanzo ran 21 names through NADDIS at Recio's request (and another name at Macey's request) (A. 831), and provided Recio with information about: an "operation . . . involving many Venezuelans" in April 2019 (Tr. 651–52, 659; GX 253A-T, 235B-T); a Group 10 target "which," Guerra explained, "could work for us in a very interesting way" on April 23, 2019 (Tr. 663, GX 252A-T, 252B-T, 397A, 397B; A. 847); the upcoming indictment and arrest of a suspected Venezuelan money launderer on July 4, 2019 (Tr. 834, 840–44, 846–47, 874; A. 720, 847); the upcoming arrest of a Dominican drug trafficker who Recio and Macey were already trying to recruit on July 31, 2019 (Tr. 373, 411; GX 201-T, 205-T, 210-T, 212A-T, 380, 388, 703, JC-1009-A; DX MR 143T); and "an email from a concerned citizen" containing names and details regarding various criminals and murders on October 16, 2019 (GX 311-TR, 332). Additionally, when Recio was helping a client who was pitching cooperation in September 2019, he asked Costanzo to help, telling him to "[m]ake it look good, it's 30 grand right there," and Costanzo added information

21

to the pitch document to do so. (Tr. 853–54; A. 735–36; GX 215-T, 330, 330A; DX JC-2001).

Recio and his co-conspirators paid Costanzo for his efforts, although they were always careful not to pay Costanzo directly. In addition to the first $2,500 payment: on January 17, 2019, Pagan paid $20,000 to Costanzo's father, which Costanzo's father, in turn, "gifted" to Costanzo for a down payment on a house (A. 507–09; GX 401B, 434A, 700); on March 3, 2019, Macey paid a contractor doing work on Costanzo's house $5,000 for that work (Tr. 1252–53; GX 333; A. 753); on April 16, 2019, Macey bought Costanzo and others tickets to a Yankees game for $1,136 (Tr. 977–81; A. 770, 775; GX 525); on April 17, 2019, GLC—Recio's company—paid $10,000 to JEM, a company opened by Costanzo, Recio, and Pagan and used by Costanzo (Tr. 1065–66, 1071–80; GX 471A; A. 807); on July 3, 2019, GLC paid $10,750 to JEM (Tr. 1081–89; GX 471B, 628); and, on January 3, 2020, Pagan paid $20,000 to Costanzo's girlfriend, reimbursing her for $20,000 she had paid to an attorney on behalf of Costanzo just a month earlier (A. 777–78, 828–29; GX 453A, 533, 534).

Costanzo made clear that his relationship with Recio, Pagan, Macey, and Guerra was financial: on July 4, 2019, Costanzo told Recio about a new case he had started that was "gonna touch some stuff that you're doing trust me," and Recio and Costanzo then discussed whether they would get more money for these services from Macey or Guerra, with Costanzo complaining that "Luis [Guerra] doesn't bring anything to the table," and Recio explaining that Guerra brought

in a good deal of money. (GX 202B-T). The next day, Costanzo spoke with Guerra and Recio and told Guerra that he needed to "love" Costanzo because Costanzo would be "running this fucking thing [the DEA] pretty soon," to which Guerra replied: "Okay, listen, so we're here scheming about how we're going to make money, money, money, so we're all on the same page." (A. 723). Indeed, Costanzo deleted messages from his phone—in an apparent attempt to cover his tracks[4]—in which he referred to the money that he and Recio would receive together: "here is JMs [*John Costanzo and *M*anuel Recio's] cut on a Mexican case." (GX 362C; *see also* GX 361A (another deleted text chain in which Recio sends Costanzo a link to a new GLC website stating that "It's vague enough but gives *us* credibility" (emphasis added))). It is thus not surprising that Costanzo referred to Recio as "my partner" and passed information regarding DEA investigations to Recio and Guerra in a WhatsApp group labeled "Work" (GX 1034, 1037).

---

[4]  Costanzo's deletion of text threads from his phone was not his and Recio's only attempt to hide their activities. Among other things, Recio bought a secret phone for Costanzo for many of their communications (Tr. 464–68; A. 721–27; GX 208-T, 209-T, 210-T, 255-T, 708), Recio deleted evidence of his calls with Costanzo using that secret telephone from his own call log (Tr. 523–33), and both Costanzo and Recio lied about their use of that secret cellphone when interviewed by law enforcement (GX 3548-0002a, 255-T).

23

In spite of this overwhelming evidence, Costanzio and Recio argue that the Government failed to prove the requisite *quid pro quo* because (1) there was no direct evidence of an explicit agreement to trade information for money (Costanzo Br. 40–42); (2) the evidence of a *quid pro quo* was circumstantial (Costanzo Br. 42–52); and (3) Recio's and Costanzo's agreement was insufficiently specific (Costanzo Br. 52–54). Each argument is unavailing.

First, the jury was entitled to rely upon circumstantial evidence. The "explicit *quid pro quo* requirement may be met by implication from the official's and the payor's words and actions and need not entail an express statement." *Benjamin*, 95 F.4th at 68; *see also*, *e.g.*, *Silver II*, 948 F.3d at 564 ("circumstantial evidence of the timing" of various events established a *quid pro quo*). This is because "the law . . . recognizes that the *mens rea* elements of knowledge and intent can often be proved through circumstantial evidence and the reasonable inferences drawn therefrom." *United States v. MacPherson*, 424 F.3d 183, 189 (2d Cir. 2005). Indeed, "the law draws no distinction between direct and circumstantial evidence" and "[a] verdict of guilty may be based entirely on circumstantial evidence as long as the inferences of culpability drawn from the circumstances are reasonable." *Id.* at 190; *see also Landesman*, 17 F.4th at 320.

Second, there was, in any event, direct evidence of an express *quid pro quo*. Among other things, GLC was subpoenaed for communications "related to the November 12, 2018" invoice from EBCO to GLC for $2,500 for "investigative services"; GLC responded by

24

providing text messages in which Recio asked Costanzo to run certain names through NADDIS. (A. 803–05, 813–16). And, indeed, Costanzo, who told Macey that he "[j]ust made 2500" (A. 737), did run those names—and, over the following year, many others—at Recio's request (A. 831). In fact, payments were often grouped around the timing of particular disclosures. For example, on April 11, 2015, Recio discussed information that he had received from Costanzo about "many Venezuelans" who were about to be arrested. (Tr. 659, GX 253B-TR). Five days later, Macey bought Costanzo and others tickets to a Yankees game for $1,136 (Tr. 977–81; A. 770, 775; GX 525), and the next day GLC paid $10,000 to JEM (GX 471A). Less than a week later, Costanzo continued to do his job, telling Recio and Guerra about a Group 10 target on April 23, 2019 (Tr. 663, GX 252A-T, 252B-T, 397A, 397B; A. 847). This is more than enough evidence of a *quid pro quo*. *See*, *e.g.*, *United States v. Bruno*, 661 F.3d 733, 745 (2d Cir. 2011) (finding "sufficient evidence of a quid pro quo" where the timing of payments and actions was such that a "jury could also conclude that the arrangement was structured to pay for Bruno's continued assistance to Abbruzzese and Evident").

Moreover, Costanzo and Recio explicitly discussed the fact that Recio and his co-conspirators were paying Costanzo for information. During a July 4, 2019, phone call, Costanzo complained that Guerra, in contrast to Macey, had not "[brought] anything to the table," and Recio explained that Guerra was expected to bring approximately $130,000 to the scheme. (GX 202B-T). The next day, on a call with Costanzo and Recio, after Costanzo told Guerra that "you better love me," Guerra

25

responded that "we're here scheming about how we're going to make money, money, money, so we're all on the same page." (A. 723).[5] And, on April 4, 2019—in a text message that Costanzo deleted—Costanzo wrote Recio: "here is JMs [*J*ohn Costanzo and *M*anuel Recio's] cut on a Mexican case," which Costanzo characterized as "significant." (GX 362C). Later that month, Recio suggested to Costanzo that they "talk to Lui [Guerra] to go 50/50" on a client matter, and Costanzo responded that he was "[m]eeting with him manana." (GX 384). In short, Costanzo and Recio repeatedly discussed the fact that Costanzo was being paid for his information.

Third, in spite of Costanzo and Recio's argument otherwise (Costanzo Br. 42–52), there was more than sufficient evidence for a jury reasonably to infer that Costanzo was being paid in exchange for his improper disclosures of confidential DEA information. Costanzo and Recio argue that "the government failed to prove the essential predicate: that Costanzo received benefits from Recio, Macey, or Guerra" (Costanzo Br. 43–44). But Macey paid $5,000 directly to Costanzo's contractor (Tr. 1252–53; GX 333; A. 753), and purchased

---

[5]    Costanzo argues that Guerra and Recio were only discussing money they would make, and not money that would go to Costanzo. (Costanzo Br. 42). However, this ignores the context: Guerra was speaking with Costanzo and responding to his admonition that "you better love me" (A. 723), and, indeed, was doing so the day after Costanzo asked Recio what Guerra would "bring . . . to the table" (GX 202B-T).

26

tickets to a Yankees game for Costanzo (Tr. 977–81; A. 770, 775; GX 525). Moreover, on November 12, 2018, EBCO invoiced GLC $2,500 for "Investigative services" (A. 805, 814); the next day, Costanzo told Macey that he "[j]ust made 2500," and ran a NADDIS search (A. 737, 831). This demonstrated that Costanzo was accepting bribe money through his father, a pattern that would repeat itself on January 17, 2019, when Pagan gave Costanzo's father $50,000, which Costanzo's father promptly gifted to his son. (Tr. 1777–79; GX 401B, 434A, 700).[6] GLC also wrote two checks, totaling $20,750, to Costanzo through JEM, a company named after Costanzo, Pagan, and Recio, the bank account of which Costanzo had access

---

[6]  Costanzo argues that there was no evidence of the source of the $50,000 that Pagan put toward Costanzo's down payment in January 2019, or, for that matter, the $20,000 that Pagan laundered through Costanzo's girlfriend to pay Costanzo's lawyers in January 2020. (Costanzo Br. 44). However, given that Pagan was otherwise involved in transferring bribe money to Costanzo through JEM—which he set up with Costanzo and Recio—and that Pagan's net income for all of 2019 was under $62,000 (GX 709), a jury could reasonably have rejected Pagan's self-serving (and hard-to-understand) explanations that he was somehow paying $50,000 to invest in Costanzo's house (Tr. 1737–38), and paying another $20,000 "because [he] didn't want [Costanzo" to be stressed out" about owing his girlfriend money (Tr. 1760), and instead concluded that these payments were part of the bribery scheme.

27

to, and Costanzo, in fact, used for first-class personal travel. (Tr. 1065–66, 1071–89, 1786; GX 357, 471B, 477, 507, 628; A. 807, 809, 832).[7] A reasonable jury could reasonably have inferred, therefore, that these payments were intended for Costanzo, particularly in light of the fact that Recio and Costanzo had substantial expertise and experience in money laundering techniques. (Tr. 958, 988–99).

Fourth, there was sufficient evidence that the various payments were not mere gratuities. Costanzo and Recio's argument otherwise (Costanzo Br. 46–47) focus on the last bribe: the $20,000 Pagan paid Costanzo's girlfriend in January 2020. However, there was frequently a close temporal nexus between payments and provision of information. (*See* pages 7–11, above). Indeed, Costanzo, using his father's company, EBCO, billed Recio's company, GLC, $2,500 immediately before he began running NADDIS searches for Recio in November 2018, and Costanzo even bragged that he "[j]ust made 2500." (A. 737–38, 805, 814, 831). "Once the quid pro quo has been established"—as it was, here, with the initial $2,500 payment—"the specific transactions comprising the illegal scheme need not match up this for that." *United States v. Silver*, 864

---

[7]  Costanzo asks why he would have left more than $17,000 in the JEM bank account. (Costanzo Br. 45). A jury could reasonably infer that he stopped using that account after he was interviewed by law enforcement agents in November 2019 (Tr. 1376) because he did not want to confirm that those funds were his.

28

F.3d 102, 122 n. 110 (2d Cir. 2018) ("*Silver I*")). More-over, Pagan paid Costanzo $50,000 on January 17, 2019 (GX 401B), before Costanzo ran the vast majority of the NADDIS searches for Recio (A. 831). Similarly, Recio paid Costanzo $10,000 through JEM on April 17, 2019 (GX 471A), less than a week after Costanzo told Recio about an "operation involving many Venezue-lans" that Recio and Hernandez would need to be ready to "pick up" (Tr. 651–52, 659; GX 253A-T, 253B-T), and preceded only by days, several additional NADDIS searches that Costanzo ran for Recio (A. 831). And Recio paid Costanzo another $10,750, again through JEM, on June 3, 2019 (GX 471B), less than a month before Costanzo leaked valuable, confi-dential information regarding the anticipated date of an indictment (A. 719–20), and then an anticipated ar-rest date. (GX 210-T).

Nor does it matter that some payments came after information was provided: in determining whether something is a bribe or a gratuity, "the timing of the agreement is the key, not the timing of the payment," and bribery can occur "where the agreement was made before the act but the payment was made after the act." *Snyder v. United States*, 603 U.S. 1, 18–19 (2024). Given the timing of the disclosure of information and the payments, the jury could reasonably have inferred that, when Costanzo provided information to Recio and his co-conspirators, he did so in exchange for money. Alternatively, the repeated nature of pay-ments to Costanzo demonstrate as well that he was willing to provide information as opportunities arose. *See United States v. Mangano*, — F.4th —, Nos. 22-861(L), 22-937(CON), 2025 WL 479623, at 21 (2d

29

Cir. Feb. 13, 2025) (confirming that the "as opportunities arise" theory of bribery remains a valid basis for conviction).[8]

Costanzo and Recio offer innocent—if strained—explanations for the various payments. (Costanzo Br. 47–49). But that runs directly contrary to the longstanding requirement that this Court "view[ ] the evidence in the light most favorable to the prosecution" and "credit[ ] any inferences that the jury might have drawn in [the Government's] favor." *United States v. Kelly*, —F.4th—, Nos. 22-1481(L), 22-1982(CON), 2025 WL 466673, at *1 n1, *8 (2d Cir. Feb. 12, 2025). Moreover, Costanzo and Recio's reliance on Pagan's testimony (Costanzo Br. 47) is misplaced. Pagan was unable to answer basic questions regarding, among other

--------

[8]    Costanzo argues that "[t]his Court 'cannot affirm a criminal conviction on the basis of a theory not presented to the jury,'" and, therefore, because Judge Oetken did not instruct the jury on as-opportunities-arise bribery, the Government is precluded from seeking affirmance on that basis. (Costanzo Br. 54 (quoting *Chiarella v. United States*, 445 U.S. 222, 236 (1980))). However, the Supreme Court has recently clarified that "determination on sufficiency review . . . does not rest on how the jury was instructed," but rather on the actual elements of the offense. *Musacchio*, 677 U.S. at 243; *see also Veliz*, 800 F.3d at 73 (explaining that a conviction "may [be] affirm[ed] on any grounds for which there is a record sufficient to permit conclusions of law" and is not limited to the District Court's reasons for upholding the verdict.).

30

things: the purported investment and work that he claimed explained the $20,750 paid by GLC to JEM (Tr. 1801–05); why there were no business records regarding those matters (Tr. 1794–1800); or his purported investment in Costanzo's townhouse (Tr. 1772–73). Indeed, Pagan claimed he gave $20,000 to Costanzo's girlfriend because he did not want Costanzo to be "stressed out." (Tr. 1760). The jury was well within its rights to reject this testimony. *See Kelly*, 2025 WL 466673, at *8 (this Court "defer[s] to the jury's assessment of witness credibility and its assessment of the weight of the evidence."). Similarly, the jury was permitted to reject Costanzo and Recio's argument that Costanzo shared confidential DEA information not for money, but simply to help his friends and the DEA (Tr. 1948–49, 1960, 1969), which Costanzo and Recio assert again on appeal (Costanzo Br. 48–49), or the argument that Costanzo deleted incriminating messages simply to "free up space," and was otherwise concerned about being caught violating DEA rules, but not accepting bribes (Costanzo Br. 49–50). *See United States v. Moses*, 109 F.4th 107, 116 (2d Cir. 2024) ("the task of choosing among competing, permissible inferences is for the jury, not for the reviewing court.").

Fifth, even though Costanzo and Recio argue that the evidence failed to establish "a link between each specific benefit and a single official act" (Costanzo Br. 53), they ignore the $2,500 payment in November 2018 for the NADDIS searches the next day, as well as the other temporally related payments for information. More importantly, though, their premise is wrong. "[B]ribery *quid pro quo does not* require a link between each specific benefit and a *single* official act."

31

*Silver II*, 948 F.3d at 554 (first emphasis added, second emphasis in original); *see also Silver I*, 864 F.3d at 122 n.110 ("[o]nce the quid pro quo has been established" "the specific transactions comprising the illegal scheme need not match up this for that."). Rather, bribery *quid pro quo* may "be proven through evidence of a scheme involving payments at regular intervals in exchange for specific official[ ] acts as the opportunities to commit those acts arise—*i.e.*, this for these or these for these, not just this for that." *Id.* Or, as Judge Oetken explained to the jury, the requisite *quid pro quo* existed if "Costanzo received or accepted something of value"—the various bribery payments—at least in part "with intent to commit an act in violation of his official duty"—leaking confidential DEA information to third parties. (Tr. 1029–30). Here, over the course of just over a year, Recio, Macey, and Guerra made multiple payments to Costanzo—through various intermediaries—in exchange for his agreement to violate his official duty by providing confidential DEA information that benefitted their private investigatory and criminal defense practices.

### POINT II
### Recio and Costanzo Are Not Entitled to a New Trial Because the Government Used Evidence Obtained from a Subpoena to Recio's Company

In advance of trial, the Government issued a trial subpoena to GLC seeking various business records. (A. 802–11). Recio moved to quash the subpoena, arguing that it was insufficiently specific, sought materials the Government already had, and sought testimony information in violation of Recio's privilege against self-

32

incrimination; Judge Oetken denied that motion.
(Dkt. 134). GLC therefore produced certain docu-
ments. (A. 812–24). Neither Recio nor Costanzo fur-
ther objected to the use of these documents at trial; to
the contrary, they declined to object to their admission
when offered the opportunity to do so. (Tr. 1013).

Now, on appeal, Recio and Costanzo argue that
they are entitled to a new trial because: (1) an earlier
grand jury subpoena to GLC was improperly used to
gather evidence and therefore should have been
quashed (Recio Br. 30–32); (2) the trial subpoena to
GLC improperly sought testimonial information (Recio
Br. 33–35); (3) the Government violated Recio's Fifth
Amendment rights by using evidence obtained
through subpoenas to GLC (Recio Br. 35–38, 42–43);
and (4) the use of the trial subpoena response against
Costanzo violated Costanzo's Sixth Amendment con-
frontation rights (Costanzo Br. 22–35). These argu-
ments—some of which were forfeited or waived—are
unavailing.

## A.  Relevant Facts

On February 22, 2023, a grand jury subpoenaed
GLC for various business records and communica-
tions. (A. 795–801). Recio moved to quash the sub-
poena, arguing that the subpoena: (1) improperly
gathered evidence to help the Government prepare for
trial; (2) sought materials to which the Government al-
ready had access; (3) was based on evidence obtained
pursuant to illegal search warrants; and (4) was over-
broad. (A. 908). After the parties briefed the motion
(A. 908–24), Judge Oetken denied the motion (A. 925–

33

928). Among other things, Judge Oetken rejected Recio's argument that the subpoena had been issued for an improper purpose, noting that "[t]he Government represents that its investigation into uncharged criminal conducted and uncharged co-conspirators is ongoing," and citing various uncharged offenses to which the subpoena related. (A. 927). Judge Oetken also concluded that, as an LLC, GLC did not have a Fifth Amendment privilege to assert, even if records were held by Recio "in his representative capacity as custodian of record for" GLC. (A. 927–28). On July 20, 2023, GLC produced responsive records accompanied by a custodian of records form signed by Recio. (A. 801). Three documents from that subpoena response—a retainer agreement with, and two invoices to, Johnny Grobman—were admitted at trial pursuant to a stipulation between the parties. (A. 839; GX 522–24).

On August 23, 2023, the Government subpoenaed GLC in advance of trial, seeking records relating: (1) EBCO's November 12, 2018, $2,500 invoice to GLC for "[i]nvestigative services"; (2) JEM's April 17, 2019, $10,000 invoice for "[i]nvestment of Risk Management Company"; and (3) JEM's June 3, 2019, $10,750 invoice for "[s]ervices for Johnny Grobman case." (A. 802–09). None of those invoices had been included in GLC's July 20, 2023, grand jury subpoena response. (Dkt. 112 at 4–5). Recio moved to quash the trial subpoena, arguing that "it is not specific, the materials sought by the Government are procurable in the exercise of due diligence, and it improperly seeks testimonial information by Mr. Recio." (Dkt. 111 at 1). After the parties briefed the motion (Dkt. 111–12, 122), Judge Oetken denied the motion, explaining that:

34

(1) the "subpoena seeks documentation relating to three specific payments on three specific days," which is "sufficiently specific"; (2) the "Government has the right to subpoena *GLC* for any responsive documents, irrespective of what documents it has from Recio, to obtain such GLC documents or to establish that they do not exist"; and (3) "corporations cannot avail themselves of the Fifth Amendment's protection against the compelled production of potentially incriminating testimonial communications." (Dkt. 134 at 2).

GLC produced records responsive to the trial subpoena, accompanied by a custodian-of-records form signed by Recio stating that the returns constituted business records. (A. 812–24). The production included cover sheets specifying which materials were relevant to which request. (A. 813, 819, 823). The trial subpoena response was admitted, in full, at trial without objection. (Tr. 1013; A. 812–24).

After trial, Costanzo argued for the first time that the use of subpoenaed materials from GLC at trial violated his Sixth Amendment confrontation rights (Dkt. 210 at 33–38), and Recio argued for the first time that "testimony that Recio was responsible for the production pursuant to the" trial subpoena violated Recio's Fifth Amendment right against self-incrimination (Dkt. 213 at 2). Judge Oetken disagreed. With respect to Costanzo, the District Court found that: (1) Costanzo waived, or at least forfeited, his confrontation claim; (2) there was no error under *Bruton v. United States*, 391 U.S. 123 (1968), because, "[o]n their face, these documents simply show invoices that somehow relate to certain text messages," and "[i]t is only when

35

considered together with other evidence about the entities and their connections to the parties that they become incriminating"; and (3) any error was harmless because there was "substantial circumstantial evidence of the defendant's guilt" even without the GLC trial subpoena return. (A. 870–72). Judge Oetken also explained that, even if Recio and Costanzo had timely objected to the admission of the trial subpoena return, the subpoena return would have been admitted with Recio's name redacted from the custodian of records form, and "the jury likely would have made the same inference" regarding the import of the records "given that GLC was Recio's company, and there was clear evidence of that." (A. 872). With respect to Recio, Judge Oetken found that Recio had waived or forfeited the argument that admission of the trial subpoena return violated *Braswell v. United States*, 487 U.S. 99 (1988), when he stipulated to the admission of the grand jury subpoena returns, and then did not object to admission of the trial subpoena returns, testimony about those returns, or closing argument about Recio's position as the custodian of records. (A. 886). The District Court further concluded that a new trial was not warranted under a plain error standard of review because (1) "there was no violation of *Braswell* here, where the government did not seek to compel the defendant to be the one to respond to the subpoena, but he chose to do so"; and (2) any error was "harmless beyond a reasonable doubt" given the "substantial evidence" of Recio's guilt. (A. 887–89).

36

## B. Applicable Law

### 1. Purpose of Grand Jury Subpoenas

A "grand jury investigation is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed." *Branzburg v. Hayes*, 408 U.S. 665, 701 (1972). For that reason, "post-indictment action is permitted to identify or investigate other individuals involved in criminal schemes, or to prepare superseding indictments against persons already charged." *United States v. Jones*, 129 F.3d 718, 723 (2d Cir. 1997). "It is, of course, improper for the Government to use the grand jury for the sole or dominant purpose of preparing for trial under a pending indictment. But where the grand jury investigation is not primarily motivated by this improper purpose, evidence obtained pursuant to the investigation may be offered at the trial on the initial charges." *United States v. Leung*, 40 F.3d 577, 581 (2d Cir. 1994).

A presumption of regularity and proper purpose attaches to grand jury proceedings. *See*, *e.g.*, *United States v. Salameh*, 152 F.3d 88, 109 (2d Cir. 1998); *United States v. Sasso*, 59 F.3d 341, 352 (2d Cir. 1995); *Leung*, 40 F.3d at 581. To overcome that presumption, to quash a grand jury subpoena, a defendant must "present particularized proof" that the subpoena was issued for "an improper purpose." *See, e.g.*, *United States v. Punn*, 737 F.3d 1, 6 (2d Cir. 2013).

37

### 2. The Fifth Amendment and Corporate Records

The Fifth Amendment privilege against self-incrimination belongs only to natural persons. *Braswell*, 487 U.S. at 102; *Bellis v. United States*, 417 U.S. 85, 89–90 (1974). A collective entity like a limited liability company—"an organization which is recognized as an independent entity apart from its individual members" —has no Fifth Amendment privilege. *Bellis*, 417 U.S. at 89, 92; *Braswell*, 487 U.S. at 102.

Because collective entities act only through their agents, a person who holds a collective entity's records in a representative capacity cannot refuse to produce those records, even if the act of production might be personally incriminating. *Braswell*, 487 U.S. at 109–10, 117; *In re Grand Jury Subpoena Issued June 18, 2009*, 593 F.3d 155, 158 (2d Cir. 2010). Allowing an individual with custody over an entity's records to assert the Fifth Amendment privilege "would be tantamount to a claim of privilege by the [entity]—which of course possesses no such privilege." *Braswell*, 487 U.S. at 110.

The collective entity doctrine applies to corporations regardless of their size. *See Braswell*, 487 U.S. at 110 (closely held corporation with three shareholders); *Bellis*, 417 U.S. at 101 (small partnership; "no privilege can be claimed by the custodian of corporate records, regardless of how small the corporation may be").[9] This is true even where a company is owned by

_____

[9] An individual operating a business as an unincorporated sole proprietorship may have the right to claim an act-of-production privilege with respect to the

38

a single shareholder, or where the company is a "mere alter ego" of its owner. *See, e.g.*, *Hair Indus., Ltd. v. United States*, 340 F.2d 510, 511 (2d Cir. 1965) (alter ego); *In re June 18, 2009 Subpoena*, 593 F.3d at 158 (one-person corporation); *In the Matter of Grand Jury Subpoenas Dated Oct. 22, 1991 and Nov. 1, 1991*, 959 F.2d 1158 (2d Cir. 1992) (sole shareholder). Indeed, there "is *no* situation in which the fifth amendment would prevent a corporation from producing corporate records." *In re June 18, 2019 Subpoena*, 593 F.3d at 158.

### 3. The Confrontation Clause

The Confrontation Clause gives the accused "[i]n all criminal prosecutions, . . . . the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that the Confrontation Clause "prohibits admission at trial of out-of-court testimonial statements against a criminal defendant unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine him." *Washington v. Griffin*, 876 F.3d 395, 404 (2d Cir. 2017). The Court subsequently clarified that "the Confrontation Clause applies *only* to *testimonial* hearsay." *Davis v. Washington*, 547 U.S. 813, 823 (2006) (emphasis added). Thus, if statements are "not testimonial hearsay," then "[t]he Confrontation Clause d[oes] not bar their admission at . . . trial." *Michigan v. Bryant*, 562

—————

production of tax records. *United States v. Doe*, 465 U.S. 605, 610–12 (1984). This is not such a case.

39

U.S. 344, 378 (2011). Although the Court declined to "spell out a comprehensive definition of 'testimonial'" statements, "it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68. In contrast, "[m]ost of the hearsay exceptions cover[ ] statements that by their nature [are] not testimonial—for example, business records or statements in furtherance of a conspiracy." *Id.* at 56. The Supreme Court emphasized in *Crawford* that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.* at 59 n.9.

As a part of a defendant's confrontation right, at a joint trial, absent the opportunity to cross-examine, testimonial co-defendant statements are inadmissible if they name the nondeclarant defendant as a perpetrator because their admission violates the non-declarant defendant's Sixth Amendment right to confrontation. *Bruton*, 391 U.S. at 135–36. This is because *Bruton* is not an evidentiary rule on its own; rather, it simply recognizes the natural limitations on the efficacy of limiting instructions, recognizing that, if a defendant's confession is admitted against that defendant and names the co-defendant, a jury—which typically is presumed to follow all instructions—might be unable to disregard such a confession. *Id.* at 136–37. Such statements, however, may be admitted if they are properly edited or redacted so as not to *directly* identify the non-declarant co-defendant. *Samia v. United States*, 599 U.S. 635, 655 (2023); *United States v. Jass*, 569 F.3d 47 (2d Cir. 2009).

40

The admission of a testimonial statement in violation of the Confrontation Clause is subject to harmless-error review, and the conviction should be affirmed if the error was harmless beyond a reasonable doubt. *E.g.*, *United States v. Lombardozzi*, 491 F.3d 61, 76 (2d Cir. 2007).

### 4. Standards of Review

This Court typically reviews a district court's decision to quash a subpoena and preserved evidentiary challenges for abuse of discretion, under which this Court will find error "only where the trial judge ruled in an arbitrary or irrational fashion." *United States v. Skelos*, 988 F.3d 645, 660 (2d Cir. 2021) (quashing a subpoena); *United States v. Kelley*, 551 F.3d 171, 174–75 (2d Cir. 2009) (evidentiary challenges).

However, "[w]here . . . the defense fails to object at trial," a claim is forfeited, and this Court "review[s] for plain error." *United States v. Williams*, 642 F. App'x 12, 15 (2d Cir. 2016); *see also*, *e.g.*, *United States v. Hendricks*, 921 F.3d 320, 326 (2d Cir. 2019). Under that standard, the appellant must show that: (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected his substantial rights by changing the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Marcus*, 560 U.S. 258, 262 (2010). "An error affects the substantial rights of the appellant where there is a reasonable probability that the error affected the outcome of the trial." *Mangano*, 2025 WL 479623, at *20. Likewise,

41

regarding the final requirement, "in most circumstances, an error that does not affect the jury's verdict does not significantly impugn the fairness, integrity, or public reputation of the judicial process." *Marcus*, 560 U.S. at 266. Accordingly, to have impacted the defendant's "substantial rights and the fairness of the judicial proceedings, the overall effect of the error must have been sufficiently great such that there is a *reasonable probability* that the jury would not have convicted him absent the error." *United States v. Capers*, 20 F.4th 105, 123 (2d Cir. 2021) (emphasis in original).

"Meeting all four prongs is difficult, as it should be." *Puckett v. United States*, 556 U.S. 129, 135 (2009); *see also United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004) ("the burden of establishing entitlement to relief for plain error is on the defendant claiming it, and . . . that burden should not be too easy for defendants . . . ."). The standard must be robust enough to "encourage timely objections and reduce wasteful reversals by demanding strenuous exertion to get relief for unpreserved error." *Dominguez Benitez*, 542 U.S. at 82; *see also Puckett*, 556 U.S. at 134 ("appellate-court authority to remedy" unpreserved errors "is strictly circumscribed" in order to "induce the timely raising of claims and objections"); *United States v. Vonn*, 535 U.S. 55, 73 (2002) ("[T]he value of finality requires defense counsel to be on his toes, not just the judge, and the defendant who just sits there when a mistake can be fixed cannot just sit there when he speaks up later on").

"[P]lain error review is available only for issues not intentionally relinquished or abandoned." *United*

42

*States v. Jackson*, 346 F.3d 22, 24 (2d Cir. 2003). "Where ... a claim has been waived through explicit abandonment, rather than forfeited through failure to object, plain error review is not available." *Id.*; *United States v. Olano*, 507 U.S. 725, 733 (1993) ("Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right."). "Where a defendant has *waived, ... there [was] no error at all and plain-error analysis would add nothing.*" *United States v. O'Garro*, 700 F. App'x 52, 53 (2d Cir. 2017) (emphases in original).

An "affirmative stipulation normally might give rise to a finding of actual waiver (as opposed to mere forfeiture) of the issue, barring all review on appeal." *United States v. Eldridge*, 2 F.4th 27, 37 n. 11 (2d Cir. 2021), *cert. granted, judgment vacated on other grounds*, 142 S. Ct. 2863 (2022); *United States v. Stitsky*, 536 F. App'x 98, 107 (2d Cir. 2013) (holding that "stipulation effectively waived defendants' right of confrontation"); *United States v. Barlow*, 479 F. App'x 372, 373 (2d Cir. 2012) (holding that stipulation waived defendant's right to challenge one of the elements of the offense). Moreover, a finding of waiver is particularly appropriate "when ... defendants not only failed to object to what they now describe as error, but they actively solicited it." *O'Garro*, 700 F. App'x at 53). Thus, for instance, a defendant waived any objection on appeal where counsel "was specifically asked at trial whether he had any objection to the admission of proffered evidence ..., he answered, 'None.'" *United States v. Martinez*, 862 F.3d 223, 234 (2d Cir. 2017), *cert. granted, judgment vacated sub nom. Rodriguez v.*

43

*United States*, 139 S. Ct. 2772 (2019); *see also*, *e.g.*, *United States v. Rijo*, 502 F. App'x 103, 106 (2d Cir. 2012) (finding waiver where, among other things, counsel "plainly stated that he had no objection to admission of the proffered evidence.").

## C. Discussion

### 1. Judge Oetken Did Not Abuse His Discretion in Denying Recio's Motion to Quash the Grand Jury Subpoena to GLC[10]

As Judge Oetken explained, the grand jury subpoena to GLC served the proper purpose of investigating uncharged conduct and co-conspirators. (A. 927). Indeed, the face of the subpoena indicated that the grand jury's investigation included conduct that was not the subject of the Indictment, such as acting as an accessory after the fact, in violation of 18 U.S.C. § 3, witness tampering, in violation of 18 U.S.C. § 1512, and money laundering, in violation of 18 U.S.C. § 1956, and the grand jury sought records regarding then-uncharged co-conspirators Macey and Pagan.

---

[10] Costanzo purports to join the section of Recio's brief that argues that "The District Court erred by denying Recio's motions to quash subpoenas that were issued for improper purposes and unconstitutionally sought testimonial evidence that the government used at trial in violation of Recio's Fifth Amendment right." (Costanzo Br. 21). However, it is unclear how Costanzo would have standing to seek to quash subpoenas to Recio's company, or how Costanzo could assert Recio's right against self-incrimination.

44

(A. 796–98, 917). Moreover, the grand jury has since indicted Macey and Pagan. *See United States v. Macey*, 24 Cr. 641 (JHR), Docket Entry 28 (S.D.N.Y. Feb. 14, 2025) (superseding indictment against Pagan and Macey). Such ongoing investigations suffice to that the grand jury acted with a proper purpose. *See, e.g.*, *Sasso*, 59 F.3d at 352; *United States v. Moss*, 756 F.2d 329, 332 (4th Cir. 1985); *United States v. Ruppel*, 666 F.2d 261, 268 (5th Cir. 1982). Judge Oetken properly denied Recio's motion to quash the grand jury subpoena.

Recio argues that the grand jury subpoena was used for improper purposes. As an initial matter, Recio has waived any objection to the admission of documents that GLC produced in response to the grand jury subpoena: he stipulated to them. (A. 839–41). That is conclusive. *Eldridge*, 2 F.4th at 37 n.11 (an "affirmative stipulation normally might give rise to a finding of actual waiver (as opposed to mere forfeiture) of the issue, barring all review on appeal.").

Even had Recio not waived his argument on appeal, his three arguments about why Judge Oetken abused his discretion are supported by neither the facts nor the law. First, Recio argues that "[t]here was a plethora of 'tells' within the Grand Jury subpoena that established that its purpose was to aid the government in the prosecution at trial." (Recio Br. 31). However, those "tells" appear to be that the grand jury's continuing investigation was connected to its initial investigation. (Recio Br. 31–32). Recio cites no case law for the extraordinary proposition that, once a grand jury returns an indictment, it is foreclosed from continuing

45

its investigation, including into additional offenses or defendants. And that is for good reason: "post-indictment action is permitted to identify or investigate other individuals involved in criminal schemes, or to prepare superseding indictments against persons already charged." *Jones*, 129 F.3d at 723. Indeed, here, the fact that the superseding indictment in the *Macey* case includes the time period of the Indictment and describes several of the acts proved up at Recio's trial—including the $2,500 November 2018 bribe, the $50,000 January bribe, the purchase of Yankees tickets, and the $20,750 that GLC paid to JEM (*Macey*, 24 Cr. 641 (JHR), Docket Entry 28 (S.D.N.Y. Feb. 14, 2025))—fatally undermines Recio's argument that "[t]here was a plethora of 'tells' within the Grand Jury subpoena that established that its purpose was to aid the government in the prosecution at trial." (Recio Br. 31).

Second, Recio argues that the grand jury subpoena "not only sought materials in the possession of the custodian of records of GLC but of Recio personally." (Recio Br. 32). But that is not correct. The subpoena was issued not to Recio, but to GLC, and the attached instructions explained that the "subpoena calls for the production of certain documents and communications . . . in your [GLC's] possession and control." (A. 796–97). The fact that GLC may have been a one-person corporation does not change this analysis, as "a one-person corporation cannot avail itself of the Fifth Amendment privilege." *In re June 18, 2009, Subpoena*, 593 F.3d at 159. After all, GLC was only required to produce such records if they were in the possession or control of the company or its agents. *In re Grand Jury*

46

*Proceeding*, 971 F.3d 40, 56 (2d Cir. 2020) ("The sub-poena was directed to the custodian of records for Oberlander's corporate entity, thereby reaching only records in the corporation's possession."). As Judge Oetken explained, "[g]iven that Recio is the sole member and whole owner of [GLC], there is no reason to infer an improper purpose from the mere fact that there is an overlap between information belonging to Recio in his personal capacity and information he holds as the custodian of records for the company." (A. 927).

Third, Recio claims that the Government's use at trial of three documents that GLC provided in response to the grand jury subpoena "irrefutably establishes that improper purpose" of gathering evidence to assist the Government in the trial against Recio. But that argument is squarely foreclosed by long-established law, which recognizes that "evidence obtained pursuant to the investigation may be offered at trial on the initial charges" as long as the grand jury was not used for the sole or dominant purpose of trial preparation. *Leung*, 40 F.3d at 581.

Finally, even if Recio had not waived his argument —and he did—and Judge Oetken had abused his discretion—and he did not—any error would be harmless. The Government offered—and the Court admitted—only three exhibits derived from the grand jury subpoena to GLC: a retention agreement with regard to Johnny Grobman, and two invoices related to that agreement. (GX 522–24). Recio does not—and cannot—explain how the erroneous admission of these documents "influence[d] the jury's verdict." *United States*

47

*v. Mussaleen*, 35 F.3d 692, 695 (2d Cir. 1994). This is especially so here, where the Government's case was extremely strong. *See United States v. Dhinsa*, 243 F.3d 635, 650 (2d Cir. 2001) ("The strength of the government's case against the defendant is probably the most critical factor in determining whether an error affected the verdict.").

### 2. Judge Oetken Did Not Abuse His Discretion in Denying Recio's Motion to Quash the Trial Subpoena to GLC

The Government issued a trial subpoena to GLC, seeking records connected to certain bribes that GLC had facilitated. (A. 802–09). As Judge Oetken correctly found, this subpoena did not violate Recio's "Fifth Amendment privilege against self-incrimination" because this Court "has held that corporations cannot avail themselves of the Fifth Amendment's protection against the compelled production of potentially incriminating testimonial communications, based on the 'long-established' collective entity rule." (Dkt. 134 at 2–3). Recio argues that the trial subpoena compelled him to incriminate himself because "[p]roducing documents in response to a subpoena 'may implicitly communicate statements of fact . . . and information about the existence, custody, and authenticity of the documents [produced],' particularly where the respondent must 'make extensive use of the contents of his own mind' to identify responsive documents." (Recio Br. 33 (quoting *United States v. Hubbell*, 530 U.S. 27, 37, 43 (2000))). However, Recio's reliance on *Hubbell* (Recio Br. 33–35) is misplaced: *Hubbell* involved a subpoena

48

issued to an individual. 530 U.S. at 31.[11] The trial subpoena here, however, was not issued to Recio; rather, it was issued to GLC, a limited liability company that has no Fifth Amendment rights. (A. 802). And a person who holds a company's records in a representative capacity, including as the custodian of records, cannot refuse to produce those records, even if the act of production might be personally incriminating. *See Braswell*, 487 U.S. at 109–10, 117; *In re June 18, 2009, Subpoena*, 593 F.3d at 158.

Moreover, the two concerns Recio raises on appeal —"Recio's very act of producing documents in response to the trial subpoena" and the production of "the cover sheet Recio included" (Recio Br. 34)—were of GLC's own making. GLC could have chosen to appoint a custodian of records for the purpose of responding to the subpoena, and was under no obligation to create the cover sheets.[12] *See, e.g.*, *Braswell*, 487 U.S. at 116 ("[I]t

---

[11] Similarly, in *In re Grand Jury Subpoena Duces Tecum Dated Oct. 29, 1992*, upon which Recio relies (Recio Br. 34), an individual—as opposed to a corporate entity, was subpoenaed. 1 F.3d 87, 88 (2d Cir. 1993). Recio's reliance on *Melendez-Diaz v. Massachusetts* (Recio Br. 33–34) is even further afield: *Melendez-Diaz* simply held that "affidavits reporting the results of forensic analysis" were testimonial and thus subject to cross-examination. 557 U.S. 305, 307, 329 (2009).

[12] Presumably, had GLC not identified which documents corresponded to which invoices, it would have had to put a custodian of records on the stand to help the jury.

49

is no doubt true that if a subpoena is addressed to a corporation, the corporation must find some means by which to comply because no Fifth Amendment defense is available to it. The means most commonly used to comply is the appointment of an alternate custodian."). This is because, again, Recio was not subpoenaed; GLC was, and GLC, as a corporate entity, had an independent obligation to respond to the trial subpoena.

Finally, when the Government offered the returns from the trial subpoena to GLC—Government Exhibit 530 (A. 812–24)—Judge Oetken asked if there was "[a]ny objection." (Tr. 1013). Costanzo objected to the admission of *other* exhibits, but not to the trial subpoena returns—thus demonstrating his intention not to object to the admission of Government Exhibit 530 —and Recio did not object at all. (Tr. 1013).[13] As such,

---

[13] On appeal, Costanzo claims that "the defense *did* object to the government analyst's testimony [about the GLC trial subpoena returns] as soon as it became apparent the prosecutors were using her to establish a communicative aspect to Recio's/GLC's production, not simply to introduce the documents produced." (Costanzo Br. 31 (emphasis in original)). But that mischaracterizes what happened. Rather, the Government, in questioning a witness, added what Costanzo called "cute color commentary in between." (A. 310; *see also*, *e.g.*, A. 309 (the Government adding: "Let's see if this name Moreno has come up before.")). Costanzo objected to the Government "suggesting a purpose for which we provided and responded to the grand jury subpoena" where the "witness . . . has no idea what the purpose for the document was provided."

50

Recio waived any objection to the GLC trial subpoena returns. *See Martinez*, 862 F.3d at 234 (finding waiver where counsel "was specifically asked at trial whether he had any objection to the admission of proffered evidence [and] he answered, 'None.'"); *Rijo*, 502 F. App'x at 106 (waiver occurred where, among other things, counsel "plainly stated that he had no objection to admission of the proffered evidence").

### 3. Judge Oetken Did Not Plainly Err in Failing to Limit Argument Based on *Braswell*

Recio acted as the custodian of records for GLC responding to the trial subpoena. (A. 812). Under *Braswell*, Recio maintained "an evidentiary privilege . . . prevent[ing] the government from using the custodian's act of production in a subsequent criminal proceeding against the custodian." *Armstrong v. Guccione*, 40 F.3d 89, 98 (2d Cir. 2006). Recio argues on appeal that this privilege was violated in two different ways: (1) "from the attribution to Recio that he had no contracts supportive of the invoices or other materials related to Costanzo and other parties and that he admitted that the $2,500 invoice related to Costanzo searching names on NADDIS"; and (2) an analyst without personal knowledge testified that the $2,500 invoice

---

(A. 310). The District Court directed the Government: "No commentary. Just questions." (A. 312). That resolved the objection. In other words, the objection had nothing to do with whether there was a testimonial aspect to the trial subpoena response.

51

"related to two sentences of the multipage communication." (Recio Br. 37). Relatedly, Recio argues that the Government committed prosecutorial misconduct by arguing in closing "that Recio confessed to the charged offenses based upon the trial subpoena returns." (Recio Br. 43). Each of these arguments misstates the record, typically by improperly conflating GLC with Recio; Judge Oetken did not plainly err by failing, *sua sponte*, to correct the record.

First, the documents made clear that GLC—not Recio—"had no contracts supportive of the invoices or other materials related to Costanzo and other parties" and that it was the documents in GLC's possession—not Recio's "admission"—that established "that the $2,500 invoice related to Costanzo searching names on NADDIS." (Recio Br. 37). After all, the Government had issued a narrow subpoena, and the business records that GLC produced demonstrated that the bribes that GLC paid were for nothing other than NADDIS searches and other information. (A. 812–24). In other words, the "act [was] deemed to be one of the corporation and not the individual." *In re Oct. 22, 1991, and Nov. 1, 1991, Subpoenas*, 959 F.2d at 1164. And the "Government has the right . . . to use the corporations act of production against the custodian." *Braswell*, 487 U.S. at 118. Moreover, the jury was not required to cover its eyes:

> The jury may draw from the corporation's act of production the conclusion that the records in question are authentic corporate records, which the corporation possessed, and which it produced in response

52

> to the subpoena. And if the defendant
> held a prominent position within the cor-
> poration that produced the records, the
> jury may, just as it would had someone
> else produced the documents, reasonably
> infer that he had possession of the docu-
> ments or knowledge of their contents.

*Id.* Recio does not point to a single line of testimony or piece of evidence that Judge Oetken should have precluded *sua sponte*. This is because the Government did not use Recio's act of production against Recio; rather, it used GLC's actual production.

Second, Recio appears to argue that, by reading from the subpoena returns and other evidence, the Government's analyst somehow provided misleading testimony about the connection between the documents and the $2,500 November 2018 bribe,[14] or whether Recio personally "admitted" the bribery scheme. (Recio Br. 12–16). But the analyst did nothing more than read documents in evidence to the jury;

---

[14] Oddly, Recio argues that the analyst's recitation of the documents was misleading because text messages existed indicating there was an alternative purpose for the $2,500 payment. (Recio Br. 15–16 (citing A. 1130–31)). However, those text messages were in evidence and, in fact, were part of the GLC trial subpoena return that was in evidence. (A. 816–18). It is difficult to understand how the Government inappropriately concealed the existence of these documents from the jury by offering them as part of the GLC trial subpoena return.

53

indeed, even the portions of testimony about which Recio complains (Recio Br. 13) involve questions to the analyst about "what Global Legal Consulting says," not what Recio says. (A. 307, 309). To the extent that Recio is arguing that the analyst somehow misused the cover sheets to determine which documents corresponded with which invoice, the jury could have easily determined on its own that: the documents from November 2018 (A. 814–18) related to the November 2018 invoice (A. 805); the documents from February through April 2019 (A. 820–22) related to the April 2019 invoice (A. 807); and the June 2019 check (A. 824) related to the June 2019 invoice (A. 809).

Third, Recio argues that "the closing argument that Recio confessed to the charged offenses based upon the trial subpoena return" was improper. (Recio Br. 43). Recio points to three paragraphs in the Government's closing argument (Recio Br. 23–24 (quoting A. 572–73)), and one paragraph in the Government's rebuttal argument (Recio Br. 24 (quoting A. 662–63)). The Government repeatedly referred to the fact that GLC responded to the trial subpoena in its closing: "the first reason you know the quid and the quo are connected is the records Global Legal Consulting provided in response to a subpoena told you they were" (A. 572); "Government Exhibit 530 contain Global Legal Consulting's response to the subpoena" (A. 572); "what did Global Legal Consulting provide as records relating to that EBCO invoice?" (A. 572); "you know this $2,500 was money for the information Costanzo was providing because Global Legal Consulting said it was" (A. 573). Similarly, during rebuttal, the Government referred to the fact that GLC responded to the trial

54

subpoena: "You have direct evidence in the form of GLC subpoena returns . . ." (A. 662); "Global Legal Consulting, Manuel Recio's company, received a subpoena to provide records about the $2500 payment" (A. 662); "that is Global Legal Consulting truthfully admitting that the reason Costanzo got that payment —the reason EBCO got that payment was because Costanzo was leaking DEA information and NADDIS information" (A. 663). In other words, the Government did not argue that Recio personally admitted to the charged offenses.

Indeed, the Government only twice mentioned that Recio was the custodian of records. (A. 572 ("You can look at the entire thing if you want, records that were pulled together by Manny Recio."); A. 662 ("Manuel Recio, he was the one who collected those records and he put them together")).[15] Arguably, under *Braswell*, the Government should not have elicited that Recio was the custodian of records. 487 U.S. at 118 ("in a criminal prosecution against the custodian, the Government may not introduce into evidence before the jury the fact that the subpoena was served upon and

---

[15] During rebuttal, the Government accidentally began to say that Recio admitted the connection, but corrected itself midsentence, explaining that it was GLC's documents that established the connection: "That is Recio, that is Global Legal Consulting truthfully admitting that the reason Costanzo got that payment—the reason EBCO got that payment was because Costanzo was leaking DEA information and NADDIS information." (A. 663). Nobody objected.

55

the corporation's documents were delivered by one particular individual, the custodian."). However, as Judge Oetken explained, any such error would have been harmless: "if the parties had objected to Government Exhibit 530 and the related testimony, the outcome may have been the redaction of Recio's name from the custodian of records document, but the GLC subpoena return likely would still have been admitted pursuant to the Court's holding in *Braswell*, and the jury likely would have made the same inference given that GLC was Recio's company, and there was clear evidence of that." (A. 872). That is not plain error.

### 4. Judge Oetken Did Not Plainly Err by Admitting GLC's Trial Subpoena Returns in Violation of Costanzo's Confrontation Rights

At trial, the District Court admitted GLC's subpoena returns without objection. (Tr. 1013). Those returns included a declaration of custodian of records, pursuant to Federal Rules of Evidence 803(6) and 902(11), establishing that they were business records. (A. 812). On appeal, Costanzo argues that the admission of those business records violated his Sixth Amendment confrontation rights in two ways: (1) the subpoena response was "testimonial," and Costanzo therefore had the right to cross-examine the declarant (Costanzo Br. 24–28); and (2) the subpoena response was a codefendant's admission that implicated Costanzo in violation of *Bruton* (Costanzo Br. 29–30). Costanzo is wrong.

56

Initially, Costanzo waived his Sixth Amendment objections to the admission of the GLC trial subpoena returns. When the Government offered Government Exhibit 530, Costanzo explicitly objected to other exhibits, but not to Exhibit 530. (Tr. 1013). As such, Costanzo waived any objection to the GLC trial subpoena returns. *See Martinez*, 862 F.3d at 234 (finding waiver where counsel "was specifically asked at trial whether he had any objection to the admission of proffered evidence [and] he answered, 'None.'"); *Rijo*, 502 F. App'x at 106 (waiver occurred where, among other things, counsel "plainly stated that he had no objection to admission of the proffered evidence"). Even had Costanzo not waived his claim, he forfeited it, which means that Costanzo has to meet the heightened standards of plain-error review. *Greer v. United States*, 593 U.S. 503, 507–08 (2021). He cannot.

First, the GLC trial subpoena returns were, on their face, business records pursuant to Federal Rule of Evidence 803(6). (A. 812). "Business and public records are generally admissible absent confrontation" because "having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." *Melendez-Diaz*, 557 U.S. at 324. Business records only become testimonial where "the regularly conducted business activity is the production of evidence for use at trial." *Garlick v. Lee*, 1 F.4th 122, 131 (2d Cir. 2021). Here, GLC did not produce the text messages, invoices, or checks in 2018 and 2019 "for use at trial" against Recio years later. *See Bullcoming v. New Mexico*, 564 U.S. 647, 669 (2011) (Sotomayor, *J.*, concurring) ("When the primary purpose of a statement is

not to create a record for trial . . . the admissibility of the statement is the concern of state and federal rules of evidence, not the Confrontation Clause.").

Second, the subpoena returns were admitted pursuant to the Federal Rules of Evidence, which provide that:

> The following items of evidence are self-authenticating; they require no extrinsic evidence of authenticity in order to be admitted: . . . The original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)–(C), as shown by a certification of the custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court. Before the trial or hearing, the proponent must give an adverse party reasonable written notice of the intent to offer the record—and must make the record and certification available for inspection—so that the party has a fair opportunity to challenge them.

FED. R. EVID. 902(11). While this Court has not squarely addressed the issue*, see United States v. Qualls*, 613 F. App'x 25, 29 n.1 (2d Cir. 2015) (stating that the panel "need not reach the issue of whether the Confrontation Clause would be implicated by admitting certifications prepared by records custodians solely to authenticate or lay the foundation for otherwise admissible business records"), the other circuits that have addressed the issue have agreed that certifications used to authenticate business records are not

58

testimonial and do not implicate the Confrontation Clause. *See*, *e.g.*, *United States v. Yeley-Davis*, 632 F.3d 673, 680 (10th Cir. 2011) (explaining that a certification is "nothing more than the custodian of records . . . attesting that the submitted documents are actually records kept in the ordinary course of business and the statements in the certification merely establish the existence of the procedures necessary to create a business record."); *United States v. Denton*, 944 F.3d 170, 183–84 (4th Cir. 2019); *United States v. Anekwu*, 695 F.3d 967, 976–77 (9th Cir. 2012); *United States v. Morgan*, 505 F.3d 332, 339 (5th Cir. 2007).

Third, the returns were used properly. When the Government discussed what GLC "said," it discussed the contents of the business records:

> And what did Global Legal Consulting provide as records relating to that EBCO invoice? Text messages from Recio asking Costanzo to run names in the DEA's law enforcement sensitive NADDIS databases. Not any communications between Recio and John Costanzo, Sr., who supposedly EBCO was his company, but messages between Recio and Costanzo and messages specifically asking for DEA confidential information, names that Costanzo did run in the NADDIS database, and where he did provide information to Recio . . . . In other words, you know this $2,500 was money for the information Costanzo was providing

59

> because Global Legal Consulting said it
> was.

(Tr. 1913–14). That is, GLC spoke through its non-testimonial business records, which it produced in response to a subpoena.

Costanzo argues that "Recio's production of documents in response to the trial subpoena required judgments about which documents 'related to the November 12, 2018 invoice.' That is, by providing the documents, Recio was conveying that they related to the invoice—a testimonial act inadmissible against Costanzo absent confrontation." (Costanzo Br. 26). However, putting aside that GLC—not Recio—"provid[ed] the documents" (Costanzo Br. 26), this argument would apply to any subpoena return, rendering it impossible to submit subpoena returns at trial absent calling every custodian of records. Like Recio, Costanzo appeals to *Hubbell*. (Costanzo Br. 25–26). But *Hubbell* is equally unavailing here. As Costanzo recognizes, unlike here, *Hubbell* "called for broad, open-ended categories of documents . . . so that 'the collection and production of the materials demanded was . . . the functional equivalent of the preparation of an answer to either a detailed written interrogatory or a series of oral questions at a discovery deposition.'" (Costanzo Br. 25 (quoting *Hubbell*, 530 U.S. at 41–42)). By contrast, here, the trial subpoena to GLC focused on an extremely narrow set of documents; indeed, GLC produced only five pages of document regarding the November 2018 invoice. (A. 813–18).

More importantly, however, *Hubbell* involved a personal subpoena to a target who had a Fifth

60

Amendment privilege against self-incrimination; indeed, the "two questions presented" to the Supreme Court "concern the scope of a witness's protection against compelled self-incrimination." 530 U.S. at 29. Here, by contrast, GLC was subpoenaed and simply turned over its non-testimonial business records. *Cf. Fisher v. United States*, 425 U.S. 391, 411 (1976) ("It is doubtful that implicitly admitting the existence and possession of the papers rises to the level of testimony within the protection of the Fifth Amendment. The papers belong to the accountant, were prepared by him, and are the kind usually prepared by an accountant working on the tax returns of his client. Surely the Government is in no way relying on the 'truth-telling' of the taxpayer to prove the existence of or his access to the documents."). So, too, here: the business records belonged to GLC and were, by definition, the kind regularly kept in the course of GLC's business.

Costanzo then asks this Court to find a *Bruton* violation because the subpoena return constituted a codefendant's admission that implicated Costanzo. (Costanzo Br. 29–30). However, the argument that *Bruton* —which applies where a "nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant" where "the confession has been modified to avoid directly identifying the nonconfessing codefendant," *Samia*, 599 U.S. at 639–40—is implicated fails at every step. First, the subpoena return is not testimonial in the first place; it is not a "confession." Second, even if the subpoena return were "testimonial," it is GLC's subpoena return, not Recio's, so there

61

is no "confession" of a "codefendant." Third, the sub-poena response does not include Costanzo's name, except where it lists him as a member of text messages (A. 813–18), which text messages were already admitted in evidence (GX 1001); the "act of production" does not mention Costanzo at all. (A. 871 (Judge Oetken explaining that, even if there were a *Bruton* analysis, "[o]n their face, these documents simply show invoices that somehow relate to certain text messages")). Fourth, because of this, nobody sought a limiting instruction for the subpoena responses, and none would be appropriate. Fifth, there was nothing to redact pursuant to *Bruton*.

It is therefore not surprising that Costanzo does not cite a single case holding that the introduction of corporate business records produced pursuant to a subpoena violates *Crawford*, *Bruton*, or other aspects of a defendant's confrontation rights. Indeed, it is telling that the cases upon which Costanzo relies to establish plain error (Costanzo Br. 34–35) all involve actual confessions by individuals during their plea allocutions. *See United States v. Hardwick*, 523 F.3d 94, 99 (2d Cir. 2008) (admission of plea allocution); *United States v. Riggi*, 541 F.3d 94, 102 (2d Cir. 2008) (same); *United States v. Bruno*, 383 F.3d 65, 80–81 (2d Cir. 2004) (same). This, alone, is fatal. "For an error to be plain, it must, at a minimum, be clear under current law, which means that [this Court] typically will not find such error where the operative legal question is unsettled, including where there is no binding precedent from the Supreme Court or this Court." *United States v. Napout*, 963 F.3d 163, 183 (2d Cir. 2020). This Court "typically will not find such error where the operative

62

legal question is unsettled, including where there is no binding precedent from the Supreme Court or this Court." *Id.*

Even if there were error—and there was not—and it were plain—and it was not—Costanzo would still not be entitled to relief. The primary purpose of the subpoena returns—to establish that the $2,500 invoice and check were associated with Costanzo's agreement to run names on NADDIS and otherwise provide information to Recio—was accomplished by the timing and content of the text messages that were admitted even outside the subpoena returns (GX 1001), the timing and contents of Costanzo's contemporaneous NADDIS searches (A. 831), Costanzo's comment about having "[j]ust made 2500" (A. 737), and GLC's writing of a $2,500 check to an inactive company owned by Costanzo's father the next day (A. 790), all of which could be done without reference to the GLC trial subpoena return. While Costanzo may argue about what additional evidence or arguments he wanted to make, he has not presented a plausible case that the records were not what they purported to be, and this Court "will not reverse for plain error where there is no disagreement as to the truth of the pertinent facts, and the record as a whole casts no doubt on the accuracy of that fact." *United States v. Joyner*, 313 F.3d 40, 46 (2d Cir. 2002). Moreover, as Judge Oetken put it plainly:

> to the extent there may have been error, I find that it did not affect the defendant's substantial rights or affect the fairness or integrity or public reputation of the proceedings Taken as a whole, there was

63

substantial circumstantial evidence of the defendant's guilt, as discussed earlier, and I do not think that this subpoena return, or the government's argument about it, made the marginal difference in the jury's verdict. In fact, if the parties had objected to Government Exhibit 530 and the related testimony, the outcome may have been the redaction of Recio's name from the custodian of records document, but the GLC subpoena return likely would still have been admitted pursuant to the Court's holding in *Braswell*, and the jury likely would have made the same inference given that GLC was Recio's company, and there was clear evidence of that And even if the GLC trial subpoena return had not been admitted at all, the totality of the other evidence at trial—and, in particular, the evidence regarding the $2,500 payment—would have led the jury to reach the same verdict If there was error, it was harmless error beyond a reasonable doubt.

(A. 872).

In short, there was no error, if there were, it was not plain error, and if it were plain error, it did not affect Costanzo's (or Recio's) substantial rights or affect the fairness or integrity or public reputation of the proceedings.

64

## POINT III

### The District Court Did Not Abuse its Discretion in Admitting an Email that Recio Sent from His Official DEA Email Account to His Personal Email Account Containing Confidential Details of Operations Run by Costanzo

Recio argues that Judge Oetken "erred by failing to exclude a memorandum sent by Recio from his official government email to his personal email that the government argued compromised national security but was unrelated to the charged offenses." (Recio Br. 38). Recio is mistaken.[16]

### A. Applicable Law

Evidence of uncharged criminal conduct may be admitted without reference to Rule 404(b) if it constitutes direct proof of charged criminal conduct, provides the jury with background for the events alleged in the indictment, or arose out of the same transaction or series of transactions as the charged offenses. *See, e.g., United States v. Quinones*, 511 F.3d at 309.

Even where such evidence is not admissible as direct evidence, it may still be admissible for certain non-propensity purposes, such as proving motive,

---

[16] Given that there was no abuse of discretion, error, or plain error in any of Judge Oetken's evidentiary rulings, in spite of his argument otherwise (Recio Br. 46–47), Recio does not benefit from the cumulative error doctrine. *See, e.g., United States v. Lumpkin*, 192 F.3d 280, 290 (2d Cir. 1999) ("[T]he accumulation of non-errors does not warrant a new trial.").

opportunity, intent, and knowledge. FED. R. EVID. 404(b). This Court "follow[s] an inclusionary approach to the admission of prior-act evidence," so that "evidence of prior crimes, wrongs or acts is admissible for any purpose other than to show a defendant's criminal propensity." *United States v. LaSanta*, 978 F.2d 1300, 1307 (2d Cir. 1992).

A district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of," among other things, "unfair prejudice." FED. R. EVID. 403. The touchstone of the prejudice analysis for uncharged acts is whether the proffered evidence does "not involve conduct any more sensational or disturbing than the crimes with which" the defendant is charged. *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990). Review of a ruling under Rule 403 "is highly deferential in recognition of the district court's superior position to assess relevancy and to weigh the probative value of evidence against its potential for unfair prejudice." *United States v. Coppola*, 671 F.3d 220, 244 (2d Cir. 2012).

## B. Discussion

Two weeks before he retired, Recio illicitly sent a SARC memo detailing a high-level covert operation in Venezuela from his DEA email account to his personal email account. (A. 1110–25). Costanzo was one of the authors of the memo, and had responsibility for the operation. (A. 1124). After Recio retired, he and Costanzo discussed one of the targets named in the SARC memo (A. 719–20; Tr. 876), and Costanzo disclosed that another target of the operation discussed in the SARC

66

memo had been indicted under seal (Tr. 719–20, 840–43, 874; A. 720; GX 204A-T). Costanzo offered to help Recio approach individuals related to these indictments. (GX 204A-T). Accordingly, the email attaching the SARC memo was admissible as direct evidence because it was "[a]n act that is alleged to have been done in furtherance of the alleged conspiracy." *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999). Recio's transmission of these confidential plans was part of his preparation for the bribery scheme in which he would engage with Costanzo; indeed, it provided background for his conversations with—and solicitations of information from—Costanzo about the targets in the SARC memo. In short, the email represented "background evidence" that tended to prove the existence and nature of the bribery conspiracy. *Id.* at 103.

In the alternative, the email attaching the SARC memo was admissible pursuant to Rule 404(b), as it was highly probative of Recio's intent, plan, knowledge, and absence of mistake or accident in engaging in the charged crimes. Recio knowingly violated DEA policy just two weeks prior to his retirement by sending to his personal email address confidential plans about an international operation against Venezuelan drug traffickers, and Recio's subsequent actions with Costanzo demonstrate that he did so in order to capitalize on confidential information about ongoing DEA operations to recruit new clients.

Nor was the SARC memo unduly prejudicial. The touchstone of the prejudice analysis under Rule 403 is whether the proffered evidence of uncharged acts does "not involve conduct any more sensational or

67

disturbing than the crimes with which [the defendant is] charged." *Roldan-Zapata*, 916 F.2d at 804. Here, the jury heard extensive testimony about Recio and Costanzo entering into an illicit agreement where Recio and his co-conspirators would pay Costanzo for confidential information about violent international drug traffickers; it is difficult to see how a SARC memo about one of the operations that Recio and Costanzo discussed is somehow more sensational or disturbing than the rest of the scheme.

Recio argues otherwise, albeit briefly. (Recio Br. 40–41). First, he argues that Recio sending himself the SARC memo "was materially distinct from the charged conduct, in which Costanzo was alleged to have given confidential information in return for benefits." (Recio Br. 40). But this crabbed view of the charged crime is inaccurate. Recio sending himself the SARC memo was part and parcel of the larger scheme to obtain inside information about DEA operations and targets so that Recio could recruit new clients; Costanzo was another part of the scheme. Indeed, despite Recio's claim that there was no evidence "that Recio ever attempted to recruit any of the individuals discussed in the [SARC] memorandum, or that Recio otherwise used any of the information contained therein for any purpose" (Recio Br. 40–41), there was, in fact evidence that Recio and Costanzo discussed one of the targets named in the SARC memo, and Costanzo disclosed that another target of the DEA operation discussed in the SARC memo had been indicted under

68

seal (Tr. 840–43, 874, 876; GX 204A-T; A. 720).[17] Moreover, Costanzo offered to help Recio approach individuals related to these indictments. (GX 204A-T).

In light of the relevance of the SARC memo, and the absence of substantial unfair prejudice, Judge Oetken did not abuse his discretion when he found it to be "clearly relevant and . . . clearly part of the charged scheme. Alternatively, it's legitimate 404(b) evidence." (A. 74).

## POINT IV
## There Was Sufficient Evidence Establishing Venue in the Southern District of New York

Costanzo argues that venue was improper in the Southern District of New York. (Costanzo Br. 54–61). Recio joins this argument. (Recio Br. 50).

### A.  Relevant Facts

Venue was established by two events in the Southern District of New York. First, in April 2019, Macey paid over $1,800 for tickets for Costanzo and Nic Palmeri, a high-ranking DEA supervisor, to go to a Yankees game and then out to dinner at a high-end restaurant in New York City. (GX 385, 525; A. 770). Before going to New York, Macey told Costanzo that he "came through" in buying the tickets "like I always do so that

_____

[17] The fact that these conversations occurred months after Recio sent himself the SARC memo (A. 719–20, 1110–25) simply demonstrates that Recio was playing the long game in gathering intelligence as he prepared to leave the DEA.

69

Mr. Pal[m]eri would not be disappointed." In October 2019, after Palmeri was promoted to Regional Director of Mexico for the DEA, Costanzo wrote two celebratory texts messaging to Recio, stating that "We about to own Mexico / Nic is in," to which Recio responded, "Really!!!!!!!!!" (Tr. 978; A. 776).

Second, on July 4, 2019, Recio told Costanzo that he would "be going to New York the week of [July] 19th." (GX 202C-T). Sure enough, on July 16, 2019, Recio called Costanzo from the Southern District of New York, explaining that he "just got to New York." (A. 727–28, 835–36). Costanzo gave Recio confidential information regarding an arrest about to be conducted by Homeland Security Investigations ("HSI")—confidential information that Costanzo had only as a result of his supervisory role at the DEA. Specifically, Costanzo informed Recio, after Recio mentioned that a client's visa had been cancelled, that "they're coming . . . It's HSI they're coming."[18] (A. 726). They discussed "how he can fix it now," and Costanzo explained one route: "if there's anything that benefits the DEA I would jump on it." (A. 727).

Neither Costanzo nor Recio moved to dismiss the indictment based on improper venue; rather, in an oral application at the close of the Government's case (Tr. 1592–93), and then in a post-trial motion,

---

[18] Costanzo argues that it was Recio who disclosed information to Costanzo. (Costanzo Br. 59). But, while Recio first mentioned that his client's visa was "pulled," Costanzo disclosed HSI's involvement and that "they're coming." (A. 726).

70

Costanzo first argued that that the Government had failed introduce sufficient evidence to establish venue in the Southern District of New York (Dkt. 210 at 21–28). Judge Oetken rejected the motion, reasoning that

> the evidence was sufficient to support the jury's finding on each count by a preponderance of the evidence The jury could properly find that the July 16, 2019, call from Recio placed in the Southern District of New York to Costanzo in which Costanzo provided confidential information regarding an arrest and mentioned a potential DEA angle for getting involved was in furtherance of the bribery scheme and the conspiracy. The jury also could have reasonably inferred that the trip to the Southern District of New York and Macey's payment for Costanzo and Palmeri to attend a Yankees game was a bribe payment and/or part of an effort to develop sources to obtain further confidential DEA information.

(A. 885–86).

## 1. Applicable Law

The proper forum for a criminal prosecution is the district in which the crime was committed. *See* U.S. Const. art. III § 2; FED. R. CRIM. P. 18. Because the bribery and honest service wire fraud statutes do not specify where venue lies, *see* 18 U.S.C. §§ 201, 1343, 1346, venue for those offense is proper "where the acts constituting the offense—the crime's essential conduct

71

elements—took place," *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011). In identifying the essential conduct elements, the Second Circuit "has traditionally looked at the 'key verbs' defining the criminal offense." *United States v. Kim*, 246 F.3d 186, 191 (2d Cir. 2001). But the Supreme Court has "warned against an overly rigid application of the key verb test, in which other relevant statutory language might be ignored and prohibited conduct missed." *Id.*

Moreover, when "the acts constituting the crime and the nature of the crime charged implicate more than one location, the Constitution does not command a single exclusive venue." *United States v. Miller*, 808 F.3d 607, 616 (2d Cir. 2015). Venue may lie in more than one place if the acts constituting the crime and the nature of the crime charged implicate more than one location." *United States v. Lange*, 834 F.3d 58, 68 (2d Cir. 2016). Thus, where an offense is continuing, a defendant may be tried in any district in which some part of the offense occurred.[19] *See, e.g.,* 18 U.S.C. § 3237(a); *United States v. Rommy*, 506 F.3d 108, 119 (2d Cir. 2007); *United States v. Naranjo*, 14 F.3d 145, 147 (2d Cir. 1994). Accordingly, venue for the charged

---

[19] Bribery and honest services wire fraud are both continuing offenses where venue may properly lie in multiple districts. *See, e.g.*, *United States v. Stephenson*, 895 F.2d 867, 874-75 (2d Cir. 1990) (bribery); *Rutigliano*, 790 F.3d at 395–96 (wire fraud & conspiracy); *Silver I*, 864 F.3d at 122 (concluding that honest service wire fraud is a continuing offense for purposes of considering the statute of limitations).

72

bribery and honest wire fraud offenses lies in any district where the offense was "begun, continued, or completed." 18 U.S.C. § 3237(a); *see also Rutigliano*, 790 F.3d at 397 (explaining that, for honest services wire fraud, "venue lies where a wire in furtherance of a scheme begins its course, continues or ends").

Moreover, with respect to a conspiracy charge, "venue may lie in any district in which the conspiracy was formed or in any district in which a conspirator committed an overt act in furtherance of the criminal scheme." *Rommy*, 506 F.3d at 119–20. Venue for the conspiracy charges "is [thus] proper in [any] district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue [and it does]." *United States v. Royer*, 549 F.3d 886, 894 (2d Cir. 2008); *see also Rommy*, 506 F.3d at 119 (2d Cir. 2007).

Because "venue is not an element of any crime," it "need be proved only by a preponderance of the evidence." *United States v. Davis*, 689 F.3d 179, 185 (2d Cir. 2012); *Rommy*, 506 F.3d at 119. "[W]hen a defendant is charged in more than one count, venue must be proper with respect to each count." *United States v. Smith*, 198 F.3d 377, 382 (2d Cir. 1999). Questions of venue are questions of law, which this Court reviews *de novo. See, e.g., United States v. Svoboda*, 347 F.3d 471, 482 (2d Cir. 2003). However, as with all sufficiency challenges, where a defendant challenges the sufficiency of the evidence of venue following a jury verdict, he bears "a heavy burden." *Rutigliano*, 790

73

F.3d at 396. This Court "review[s] the record evidence in the light most favorable to the government, drawing every reasonable inference in support of the jury's verdict." *United States v. Tang Yuk*, 885 F.3d 57, 71 (2d Cir. 2018).

Finally, an objection asserting "a defect in instituting the prosecution," including "improper venue," "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." FED. R. CRIM. P. 12(b)(3). Although "waiver of objections to venue should not be readily inferred," *United States v. Price*, 447 F.2d 23, 27 (2d Cir. 1971), waiver occurs "when the indictment or statements by the prosecutor clearly reveal a venue defect but the defendant fails to object," *United States v. Novak*, 443 F.3d 150, 161 (2d Cir. 2006); *accord United States v. Khan*, 821 F.2d 90, 93 (2d Cir. 1987) (finding waiver where venue defect was apparent on face of indictment); *United States v. Levasseur*, 816 F.2d 37, 45 (2d Cir. 1987) (affirming ruling that defendant waived right to contest venue at close of government's case where "the indictment gave clear notice of venue defects"). "Therefore, even though it is afforded significant Constitutional protection, a defendant's right to proper venue is a personal defense subject to waiver." *Novak*, 443 F.3d at 161.

## 2. Discussion

First, any purported defect in venue is clear on the face of the Indictment. It sets forth that Costanzo worked in Miami, Florida and Washington, DC, Recio worked in Miami, Florida, and the relevant criminal

74

defense attorneys were based in Florida. (A. 38–39). Indeed, in a 24-page speaking indictment, the Indictment only alleges one act in the Southern District of New York: "On or about July 16, 2019, JOHN COSTANZO JR., the defendant, placed a call to MANUEL RECIO, the defendant, from the Southern District of New York to discuss nonpublic DEA information that COSTANZO could provide to RECIO." (A. 55). Given Costanzo's position that the call was not "essential conduct" and a New York nexus was not foreseeable to Costanzo (Costanzo Br. 59), therefore, under Costanzo's own theory, the Indictment "clearly reveal[ed] a venue defect but the defendant fail[ed] to object" before trial, which constitutes waiver of a post-trial challenge to venue. *Novak*, 443 F.3d at 161.

Second, even if Costanzo had not waived his venue challenge, his argument that Macey's purchase of his Yankees ticket was merely "a gift between friends" and "a social outing" (Costanzo Br. 57–58) ignores the larger context. The April 2019 Yankees outing occurred several months into a year-long scheme to pay Costanzo for confidential DEA information. Indeed, Macey's purchase of the tickets and dinner—which was itself a bribe—occurred approximately two weeks before Costanzo used NADDIS to look up two DEA targets (A. 831), and only a little more than a month after Pagan opened—and gave Costanzo access to—the JEM bank account that would be used to funnel bribe payments to Costanzo. Under these circumstances, a reasonably jury could easily infer that Macey paid more than $1,800 for the Yankees tickets and dinner because of and in exchange for the confidential DEA information that Costanzo had been—and would

75

continue to—provide to him and Recio. Or, as Judge Oetken explained it, "The jury also could have reasonably inferred that the trip to the Southern District of New York and Macey's payment for Costanzo and Palmeri to attend a Yankees game was a bribe payment . . . ." (A. 885–86). A bribe payment unquestionably constitutes essential conduct for the charged offenses.[20]

A jury could also have reasonably inferred that the Yankees game and dinner was part and parcel of Macey, Costanzo, and Recio's effort to develop internal DEA sources—namely, senior DEA official Nic Palmeri—that they could utilize to obtain further DEA confidential information. As Macey explained, he bought the tickets so Palmeri "would not be disappointed," and Recio and Costanzo understood they would able to "own Mexico" once "[Palmeri] was in" there. (A. 770, GX 386). In other words, the Yankees game was an attempt, as part of the scheme, to develop another inside source, an attempt which Costanzo and Recio believed had been successful and from which they would be able to begin reaping benefits. (A. 885–86 ("the jury also could have reasonably inferred that the trip to the

_____

[20] Costanzo argues that there was no evidence that the outing involved the transmission of wires. (Costanzo Br. 57). That is wrong. Macey paid for both the Yankees tickets and the dinner with a credit card —transactions that would have necessarily involved the use of wires—and Costanzo texted Recio several pictures from the Yankees game while he was there. (GX 385, 525).

76

Southern District of New York and Macey's payment for Costanzo and Palmeri to attend a Yankees game was ... part of an effort to develop sources to obtain further confidential DEA information.")).

Third, in spite of Costanzo's argument that the July 2019 phone call "had nothing to do with the charged scheme" (Costanzo Br. 59), the evidence allowed a jury to infer otherwise. Just as with the Yankees outing, the call occurred in the middle of a lengthy scheme in which Costanzo was paid to leak confidential DEA information. During the call, Costanzo not only passed on confidential information regarding an anticipated arrest, but also explained how he might be able to get involved to further benefit Recio, Recio's client, and the other co-conspirators: "if there's anything that benefits the DEA I would jump on it." (A. 727). In other words, if there was a DEA angle, Costanzo would have a plausible reason to get involved and gather inside information. The call is thus part and parcel of the bribery scheme and Costanzo's violation of his official duties, and made in furtherance of the charged conspiracy. *See Stephenson*, 895 F.2d at 874–75; *Kim*, 246 F.3d at 193. Or, as Judge Oetken explained: "The jury could properly find that the July 16, 2019, call from Recio placed in the Southern District of New York to Costanzo in which Costanzo provided confidential information regarding an arrest and mentioned a potential DEA angle for getting involved was in furtherance of the bribery scheme and the conspiracy." (A. 885).

Costanzo also argues that it was not foreseeable to him that Recio would call him from New York. (Costanzo Br. 60). Except that Recio had told Costanzo that

77

he would be travelling to New York (GX 202C-T), and mentioned twice during the call itself that he was in New York (A. 728–29). Recio's presence in the Southern District of New York was thus reasonably foreseeable—indeed actually known—to Costanzo. Moreover, it is black-letter law that, where, as here, a conspiracy is charged, "venue is proper in any district in which an overt act in furtherance of the conspiracy was committed by any of the coconspirators." *Svodoba*, 347 F.3d at 482. Recio's call, in fact, took place in the Southern District of New York, thus also meeting the venue requirements.

Finally, Costanzo argues that, even if the continuing offenses for which they were convicted occurred in the Southern District of New York, venue is nevertheless improper because their conduct did not have "substantial contacts" with the Southern District. (Costanzo Br. 60–61). As an initial matter, this argument was waived, as Costanzo never raised it below. *See, e.g.*, *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132 (2d Cir. 2008) (explaining that party waives argument "by failing to present it below."). Even if it were not waived, though, this Court has explained that the "substantial contacts" inquiry is made only if "the defendant argues that his prosecution in the contested district will result in a hardship to him, prejudice him, or undermine the fairness of his trial." *See, e.g.*, *United States v. Coplan,* 703 F.3d 46, 80 (2d Cir. 2012); *Rutigliano*, 790 F.3d at 399–400. Costanzo has not made, or even attempted to make, any credible showing of hardship.

78

## POINT V
### Judge Oetken Did Not Err in Imposing Forfeiture

Judge Oetken imposed forfeiture in the amounts of $98,250 on Costanzo and $23,250 on Recio. (A. 881, 900). Costanzo argues that Judge Oetken "improperly required Costanzo to forfeit funds that do not qualify as 'proceeds,'" namely, the $70,000 that Pagan channeled to Costanzo through Costanzo's father and girlfriend. (Costanzo Br. 62). Recio argues that Judge Oetken improperly ordered forfeiture of $20,750—the money he paid to JEM through GLC—because Judge Oetken had already ordered that money forfeited from Costanzo and, in any event, Recio did not "actually acquire" that money. (Recio Br. 50). Both Costanzo and Recio are wrong.

### A.    Relevant Facts

Judge Oetken ordered Costanzo to forfeit $98,250. (A. 881). This included (approximately): (1) $50,000 that Pagan paid to Costanzo's father which would go toward a down payment on Costanzo's house; (2) $20,000 that Pagan paid to Costanzo's girlfriend re imburse her for paying Costanzo's debts to his attorneys; (3) $20,750 that Recio's company, GLC, paid into Costanzo's JEM bank account; (4) $5,000 that Macey paid to Costanzo's contractor; (5) $2,500 that Recio's company, GLC, paid to EBCO in November 2018; and (6) the value of the Yankees tickets and associated dinner. (A. 875–81). Judge Oetken explained that "all of the payments that have been discussed were part of the bribery scheme" (A. 878), and "that . . . money was intended for [] Costanzo, he had access to it . . . and it

79

was intended for him, and therefore, he possessed—he received it in the relevan[t] sense." (A. 881).

The Government initially sought forfeiture of $90,300 from Recio, which was how much Macey paid Recio during the period of the charged bribery scheme. (A. 890; Dkt. 250 at 8). Recio agreed that Macey paid that amount to Recio, but argued that not all of Macey's payments to Recio had been shown to relate to the bribery payments. (A. 891). Judge Oetken found that Recio was "obviously on the payroll of Macey," but that it was "too speculative to estimate how much of that is derived from criminal conduct." (A. 897). The Government then reduced its forfeiture request to $23,250, reflecting the money that Recio paid to Costanzo by transferring it from GLC to either EBCO or JEM. (A 897). Judge Oetken rejected Recio's argument that doing so would constitute improper joint and several liability and imposed forfeiture of $23,250. (A. 898–99).

## B.  Applicable Law

A district court's legal conclusions regarding forfeiture are reviewed *de novo*, and its factual findings for clear error. *United States v. Treacy*, 639 F.3d 32, 47 (2d Cir. 2011). The calculation of forfeiture "is not an exact science"; a court may "use general points of reference as a starting point for calculating the losses or gains from [the criminal activity] and may make reasonable extrapolations" from the relevant evidence. *Id.* at 48. As "an aspect of sentencing," *Libretti v. United* States, 516 U.S. 29, 49 (1995), forfeiture amounts are

80

determined by a preponderance of the evidence, *United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007).

The applicable forfeiture statute provides for the forfeiture of "[a]ny and all property, real and personal, that constitutes or is derived from proceeds traceable to [the offense of conviction]." 18 U.S.C. § 981(a)(1)(C). In cases involving "illegal services [and] unlawful activities," proceeds is defined to include "property of any kind obtained directly or indirectly, as the result of the commission of the offense . . ., and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." 18 U.S.C. § 981(a)(2)(A).

Where, as here, the forfeiture sought is in the form of a personal money judgment, the district court "must determine the amount of money that the defendant will be ordered to pay." FED. R. CRIM. P. 32.2(b)(1)(A). The court's determination "may be based on evidence already in the record." FED. R. CRIM. P. 32.2(b)(1)(B).

Proceeds of a crime "need not be personally or directly in the possession of the defendant . . . in order to be subject to forfeiture," but rather "must have, at some point, been under the defendant's control . . . in order to be considered acquired by him." *United States v. Contorinis*, 692 F.3d 136, 147 (2d Cir. 2012). Moreover, temporary control is sufficient, and the defendant need not retain the proceeds. *United States v. Tanner*, 942 F.3d 60, 68 (2d Cir. 2019); *see also United States v. Ohle*, 441 Fed. Appx. 798, 803 (2d Cir. 2011) (rejecting challenge to forfeiture order that "appears to rest on the mistaken premise that [defendant] can only be required to forfeit fraud proceeds that he personally

kept"); *United States v. Uddin*, 551 F.3d 176, 181 (2d Cir. 2009) (affirming forfeiture order based on entire amount of proceeds initially received by defendant, "whether or not Uddin shared the cash he received");

## C. Discussion

### 1. Judge Oetken Did Not Err in Ordering $98,250 in Forfeiture Against Costanzo

Judge Oetken ordered $98,250 in forfeiture against Costanzo, which included the $50,000 that Pagan paid to Costanzo through Costanzo's father in January 2019 (GX 401B), and the $20,000 that Pagan paid Costanzo through Costanzo's girlfriend in January 2020 (GX 401A). On appeal, Costanzo argues that his forfeiture is overinflated by $70,000 because "the government failed to prove—even by a preponderance of the evidence—that" those two payments "had anything to do with the supposed bribers, and anything to do with the charged scheme." (Costanzo Br. 62).

However, there was more than sufficient evidence for Judge Oetken to conclude by a preponderance of the evidence that Pagan made these payments in his role as a conduit for bribes. Among other things: co-conspirators used Pagan and JEM (which Pagan helped establish) as a conduit for other bribe payments (GX 471A, 471B); Costanzo lied to his mortgage lender about the source of the $50,000 (GX 434A), these payments alone exceeded Pagan's net income for 2019 (GX 709); and Pagan provided incredible testimony about each payment (Tr. 1771–73, 1779–80). This was sufficient to "establish[ ] the requisite nexus between the property and the offense by a preponderance of the

evidence." *United States v. Kaufman*, No. 21-2589, 2023 WL 1871669, at \*6 (2d Cir. Feb. 10, 2023) (summary order).

## 2. Judge Oetken Did Not Err in Ordering $23,250 in Forfeiture Against Recio

Judge Oetken ordered $23,250 in forfeiture against Recio, which included the $10,000 that Recio had GLC pay Costanzo through JEM on April 17, 2019 (GX 471A), and the $10,750 that Recio had GLC pay Costanzo through JEM on June 3, 2019 (GX 471B). On appeal, Recio argues for the first time that forfeiture of these two payments—totaling $20,750—is improper because he never "received" those proceeds. (Recio Br. 50). Recio waived this argument, which was not raised below. *See, e.g., In re Nortel Networks*, 539 F.3d at 132. Regardless, at sentencing, Recio did not dispute that he did, in fact, receive this money (see, *e.g.*, GX 440, 440D), but instead characterized "all of Mr. Macey's payments to Mr. Recio" as "salary payments that Mr. Recio got while he was working for Mr. Macey" (A. 891; *see also* A. 895 (referring to Recio as receiving "regular payments of $6,500")). And Recio transferred $20,750 of those proceeds, in two checks, from GLC to JEM. (GX 471A, 471B). There was ample evidence that these were bribes. Recio's argument appears to be that he did not "'receive' such proceeds" because he passed them through to Costanzo. (Recio Br. 50). However, for the period of time that money was in the GLC bank account for Recio transferred it to Costanzo, Recio exercised control of those funds making them subject to forfeiture by him. *See Contorinis*, 692 F.3d at 147; *Mathieu*, 853 F. App'x at 742–

83

43 (concluding that defendant had sufficient control over assets in bank accounts for which defendant was signatory). Indeed, Recio's control over, and receipt of, those proceeds, is based on the same premise—that the money was paid by Macey to GLC and then transferred from GLC to Costanzo through a corporate intermediary—as the $2,500 that Recio does not dispute. (A. 867, 892 ("we acknowledge that the government has established forfeiture regarding that 2,500")). That is why this Court has repeatedly rejected the argument that, where a defendant passes money to a co-conspirator, he is not subject to forfeiture of that money. *See, e.g.*, *Tanner*, 942 F.3d at 68–69; *United States v. Pastore,* Nos. 18-2482(L), 18-2610(CON), 2022 WL 2068434, at *6 (2d Cir. 2022) (summary order); *United States v. Guerrier*, No. 20-3469, 2022 WL 610338, at *3 (2d Cir. 2022) (summary order); *United States v. Jergensen*, 797 F. App'x 4, 8 (2d Cir. 2019).

In the alternative, Recio argues, based on *United States v. Honeycutt*, 581 U.S. 443 (2017), that the forfeiture order is improper because the "proceeds were already forfeited against Costanzo." (Recio Br. 50). He is wrong. As this Court has explained:

> *Honeycutt*'s bar against joint and several forfeiture for co-conspirators applies only to co-conspirators who never possessed the tainted proceeds of their crimes. . . . [W]hen each co-conspirator acquired the [ ] proceeds 'as a result of the crime,' each can still be held liable to forfeit the value of those tainted proceeds, even if those proceeds are no longer in his possession.

84

*Tanner*, 942 F.3d at 68–69. Here, where Recio acquired the $20,750 in bribery proceeds from Macey before, and for the purpose of, transferring the money to Costanzo, *Honeycutt* is inapplicable.

## CONCLUSION

**The judgments of conviction should be affirmed.**

Dated:      New York, New York
            March 3, 2025

                        Respectfully submitted,

                        MATTHEW PODOLSKY,
                        *Acting United States Attorney for the*
                        *Southern District of New York,*
                        *Attorney for the United States*
                            *of America.*

MATHEW ANDREWS,
EMILY DEININGER,
MICHAEL D. MAIMIN,
    *Assistant United States Attorneys,*
            *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

On February 25, 2025, this Court granted the Government leave to file an oversized brief of no more than 21,000 words. Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation set by the Court in its February 25, 2025, order. As measured by the word processing system used to prepare this brief, there are 20,789 words in this brief.

MATTHEW PODOLSKY,
*Acting United States Attorney for the Southern District of New York*

By: MICHAEL D. MAIMIN,
*Assistant United States Attorney*